# EXHIBIT "H"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

MIRIAM BAUZA,

                      Plaintiff,

      - against -    Case No. 07 CIV. 6542

MEDIACOM COMMUNICATIONS CORPORATION,

                      Defendant.

------------------------------------------------x

                      March 17, 2008

                      10:04 a.m.


Deposition of REGINA BURGOS, a witness on behalf of the Defendant herein, taken pursuant to Notice, and held at the offices of Bonnist & Cutro, 800 Westchester Avenue, Suite S332, Rye Brook, New York, before April Pearl Schirm, a Court Reporter and Notary Public of the State of New York.

DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.6095
800.DAL.8779  dalcoreporting.com

1
2   don't know how it gets started. I would send them
3   to HR.
4       Q.   Okay. Great. That's fair enough. I
5   don't want you answering questions you don't have
6   an answer to.
7            Was Mediacom a self-insured entity
8   with regard to disability benefits?
9       A.   Yes.
10      Q.   What does that mean, self-insurer?
11      A.   As far as I know, we pay for
12  everything.
13      Q.   Okay. So Aetna in this case, everyone
14  understands that they are an insurance company,
15  they weren't actually making the payment of any
16  disability benefits to any employees?
17      A.   Yes, they make the payment, but we pay
18  them.
19      Q.   Okay. That's fine. I was going to
20  finish my question. That's good.
21           So they administer the disability
22  policy for Mediacom?
23      A.   I guess so.
24      Q.   Do you feel a little uncomfortable
25  answering that?



```
 1                    REGINA BURGOS
 2        A.   Yeah, because that is more benefits,
 3   you know.
 4        Q.   Okay.  Is it fair to say that your
 5   understanding of it is that the company ultimately
 6   made the -- was responsible for the payments, but
 7   Aetna had some role in actually distributing the
 8   payments to the employees?
 9        A.   All I know is Aetna makes the
10   payments.
11        Q.   Right.
12        A.   And they bill Mediacom.
13        Q.   Okay.  That's fair enough.  And as far
14   as your role in auditing this process, where do
15   you come in as far as your audit, when you
16   testified a few moments ago that you audit -- you
17   got reports from Aetna?
18        A.   Employees are supposed to receive 66
19   and two thirds of their pay.  So I have all of
20   their salary information, and I see the payments.
21   I see in the system when they went out.  So I know
22   there is a waiting period, and I know what they
23   are supposed to receive.
24        Q.   Okay.  Now, is that part of your
25   normal job responsibilities to review those
```



REGINA BURGOS

1
2  records from Aetna in regards to disability
3  payments to employees?
4       A.   Yes.
5       Q.   Now, did you ever get that directive
6  from management that that was part of your
7  responsibilities?  Was that something in writing
8  or something someone told you orally or both or
9  neither?
10      A.   Neither.
11      Q.   How did it come to be your
12 understanding that that was part of your job
13 responsibility; reviewing the disability payments
14 made by Aetna?
15      A.   From previous employment.
16      Q.   Not related to Mediacom?
17      A.   Not related to Mediacom.
18      Q.   How did it come about that you would
19 get information from Aetna in regards to
20 disability payments made to employees?
21      A.   About a month after I started, I got a
22 stack of envelopes this high.
23      Q.   Let the record reflect you are making
24 a very high stack.
25      A.   Uh-huh.



1                    REGINA BURGOS

2        Q.    Where did those come from, those

3    records?

4        A.    Benefits, Joe Michulski.

5        Q.    Internally from the company and

6    Mr. Michulski?

7        A.    He was getting them, and they became

8    my responsibility.

9        Q.    When you received that stack of

10   paperwork, was there any explanation of an

11   expectation of what you were supposed to do with

12   it?

13       A.    There was an understanding that I knew

14   what to do with it.

15       Q.    Okay. When you first received that

16   stack of documents, what time period did it cover,

17   do you know?

18       A.    No, I don't know.

19       Q.    When you started in June 2006, when is

20   the first time, do you recall, that you reviewed

21   information regarding disability benefits that

22   were paid by Aetna?

23       A.    Probably, and I'm guessing, probably

24   in July, August time frame.

25       Q.    Okay. And what would be your



REGINA BURGOS

1
2  procedure, if you had any, for reviewing those
3  materials?
4      A.  I would open envelopes and go through
5  them, put them in order, spot check a few
6  employees, make sure we are paying the right
7  amount.  Go through, look at the taxes that were
8  withheld, make sure the Social Security is
9  correct, look and see when the last time we made a
10 deposit concerning those amounts are and just go
11 through and spot check.  I wouldn't check each
12 person, but I would go through and check, you
13 know, every three or four, especially the ones in
14 the corporate office, because those I'm more
15 familiar with, their salaries, but I would check
16 the field too, make sure the payments are correct.
17     Q.  And these payments that you reviewed,
18 these were for all employees of Mediacom?
19     A.  Yes.
20     Q.  If you can answer this, when you got
21 this report from Aetna, generally, how many
22 employees would sometimes be on the list, or was
23 it a range?
24     A.  It depends.  By the end of the
25 quarter, there would be a few hundreds.



REGINA BURGOS

2  Q.  Out of that few hundred, what would be
3  a typical sample for you to review?
4  A.  Maybe 40, 50, depending on how many
5  came in at a time. Sometimes I could do the whole
6  report. Just depends.
7  Q.  Okay. Now, if you had found a
8  discrepancy in one of those reports, what would
9  you do next?
10  A.  After I checked the information?
11  Q.  Yes.
12  A.  I would go to HR and give them the
13  information and let them know there is something
14  wrong here.
15  Q.  Who in HR would you go to?
16  A.  Judy Mills.
17  Q.  Now, what determined that that was the
18  procedure for you to follow?
19  A.  She's the head of benefits. That is
20  her area.
21  Q.  Okay. So no one specifically advised
22  you to do that, but it was your understanding from
23  your past experience that that would be the person
24  you normally would go to?
25  A.  Not even from past experience. She is



27

1          REGINA BURGOS

2  employee, but thereafter at the end of the summer,

3  she came back to work?

4       A.   Yes.

5       Q.   When you use the term back to work, do

6  you have an understanding of why she wasn't at

7  work?

8       A.   She was on disability.

9       Q.   How did you know that at the time, if

10 you knew that at the time?

11      A.   Because when I started employment,

12 they said I had two direct reports, one was Miriam

13 and she was on disability.

14      Q.   Okay. I'll back up a little bit. So

15 you started the job in June 2006, you reported to

16 Mr. Walsh, right?

17      A.   Uh-huh.

18           MR. RIOLO: You have to say yes.

19      A.   Yes.

20           THE WITNESS: Sorry.

21           MR. RIOLO: It's okay.

22      Q.   You just testified you had two direct

23 reports, one was Ms. Bauza?

24      A.   Yes.

25      Q.   Who was the other employee?



REGINA BURGOS

1
2  payroll and doesn't know payroll.
3      Q.  Your testimony is that Ms. Falto
4  reported to Ms. Bauza?
5      A.  Yes.
6      Q.  What made you draw the conclusion that
7  she didn't have a knowledge of payroll?
8      A.  A couple of things.  I had given her a
9  spreadsheet that I needed salary information on.
10 When I received it back, there was incorrect
11 information.
12          I gave her -- this is probably the
13 biggest issue.  I gave her 100 to 200 checks.  We
14 needed manual checks.  They had to be grossed up,
15 which is a minor term in payroll.  If you are
16 doing payroll, you should know what gross up
17 means.  I got the checks back, and every single
18 check was incorrect.
19     Q.  As far as the spreadsheet issue, did
20 you ever ask Ms. Bauza why she did not do it up to
21 your expectations?
22     A.  I sent it back to her and asked her to
23 correct it.
24     Q.  Did she correct it?
25     A.  Yes.

1      REGINA BURGOS

2   that Ms. Falto was reporting to her, even after

3   you -- even when you started employment?

4              MR. RIOLO: Objection to form.

5              MR. CUTRO: That's a bad

6       question.

7       Q.  Ms. Bauza never learned of the fact

8   that, in your estimation, Ms. Falto was no longer

9   reporting to her; is that correct?

10      A.  No, I believe she knew.

11      Q.  How did she know?

12      A.  Because there was a new manager, and

13  while she was out, Gladys reported to me.

14      Q.  Who was the manager prior to you?

15      A.  Of payroll?

16      Q.  Yes.

17      A.  I guess Joe Michulski. I wasn't

18  there, so.

19      Q.  Okay. Sitting here today, your

20  understanding of the prior chain of command would

21  have been Mr. Michulski on top, Ms. Bauza and

22  Ms. Falto, correct?

23      A.  Yes.

24      Q.  It's your testimony that you were

25  hired when Ms. Bauza was out on disability leave,



```
1                    REGINA BURGOS
2    correct?
3        A.   Yes.
4        Q.   And you came in below Mr. Michulski,
5    correct?  In the stead of Mr. Michulski?
6        A.   Mr. Michulski's job is not payroll
7    manager.  He is in another position.
8        Q.   Okay.
9        A.   The company felt that they needed
10   somebody in an upper position in payroll that knew
11   the job, and that is the position I took.
12       Q.   You took that position?
13       A.   That was a brand new position.
14       Q.   Did you ever ask Ms. Bauza, in regards
15   to that spreadsheet issue, if she assigned that
16   work to be done by anyone else?
17       A.   No.
18       Q.   But when you raised the issue about it
19   not being correct with her, you did get back that
20   work corrected?
21       A.   Yes.
22       Q.   She met your expectations then?
23       A.   Yes.
24            MR. RIOLO:  Objection.  You can
25       answer.  It's fine.
```



58

REGINA BURGOS

1
2  Q. Okay. Did you have any involvement in
3  the decision to terminate Ms. Bauza?
4  A. No.
5  Q. To your understanding, who made that
6  decision?
7  A. Human resources.
8  Q. Do you know why Ms. Bauza was
9  terminated?
10 A. Do I know why?
11 Q. Yeah.
12 A. Why the decision was made? I wasn't
13 part of the decision making, but it did relate,
14 that I know, to the Aetna overpayments.
15 Q. And how do you know that?
16 A. Because I brought the Aetna
17 overpayments to their attention.
18 Q. Did you make any recommendation?
19 A. I was not in the position to do that.
20 Q. You brought the over -- I think you
21 testified to this earlier. You discovered the
22 error after reviewing the Aetna statements, right?
23 A. Yes.
24 Q. And you brought that to the attention
25 of Ms. Mills, right?



```
                    REGINA BURGOS
```

1  
2      A.  Yes.  
3      Q.  Did you say anything to Ms. Mills in  
4  regards to how you wanted that situation to be  
5  handled?  
6      A.  No.  
7      Q.  I'm going to show you a document.  
8          MR. CUTRO:  Let's mark these.  
9          MR. RIOLO:  Can we take a break  
10  while you mark the documents.  
11          MR. CUTRO:  Sure.  
12  
13          (Recess taken.)  
14  
15          (Plaintiff's Exhibit 2,  
16          SPREADSHEET BATES STAMPED  
17          235-236, marked for  
18          identification.)  
19  
20          (Plaintiff's Exhibit 3, ONE-PAGE  
21          HANDWRITTEN DOCUMENT BATES  
22          STAMPED 237, marked for  
23          identification.)  
24  
25  BY MR. CUTRO:

```
 1                    REGINA BURGOS
 2   asking you about, that conversation.
 3           A.    When Miriam first came back --
 4           MR. RIOLO:   This is a different
 5   conversation, just for clarity.
 6           THE WITNESS:   Yes, it is, other
 7   than the exempt, nonexempt.
 8           Q.    Okay.
 9           A.    When Miriam first came back, she had
10   to take a day off.  I'm not sure if it was the
11   same week she came back or the next week.  It was
12   very close to the time she came back.  She took
13   the day.  Again, I told her you take the time you
14   need.  She took the day.  It was time to turn in
15   time sheets.  She brought her time sheet to me and
16   she said, can I get paid for the day I took off.
17   I said, you know what, Miriam, no.  I said, you
18   took off part of the time because you had to go to
19   another doctor the day before, which we're paying
20   you for.  I said, you don't have any time left in
21   your bank.  You didn't come in.  I'm sorry.  I
22   don't feel you should be paid for the day.  That
23   conversation took place.
24           At some point, she went to my boss,
25   Brian Walsh, and said, you know what, I work extra
```



hours, you know, I think I should be paid this. Brian Walsh called me into his office and said, we're going to pay Miriam for the time off. I said okay. We will. He is my boss. He told me to pay her. So after that, every time she took off she got paid.

    Q.   It's your understanding you had the authority --

    A.   I didn't have the authority.

    Q.   Let me finish the question.

       When you first gave the response to Ms. Bauza that the company wasn't going to pay her, it was your understanding that you had the authority to make that decision?

    A.   I had the authority to approve or not approve the time card, yes.

    Q.   What made you have that understanding, that that was in your authority?

    A.   Because every manager approves their employee time cards.

    Q.   You didn't take it upon yourself to go ask Mr. Walsh whether or not Miriam can get paid for that day?

    A.   No.

