# EXHIBIT "K"

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

MIRIAM BAUZA,

                Plaintiff,

    - against -    Case No. 07 CIV. 6542

MEDIACOM COMMUNICATIONS CORPORATION,

                Defendant.

------------------------------------------------x

                March 17, 2008

                2:05 p.m.


Deposition of JUDY MILLS, a witness on behalf of the Defendant herein, taken pursuant to Notice, and held at the offices of Bonnist & Cutro, 800 Westchester Avenue, Suite S332, Rye Brook, New York, before April Pearl Schirm, a Court Reporter and Notary Public of the State of New York.

DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.609!
800.DAL.8779  dalcoreporting.com

```
 1                      JUDY MILLS
 2         A.   Yes.
 3         Q.   What did you do, if anything, after
 4   Ms. Burgos brought this information to your
 5   attention regarding Ms. Bauza?
 6         A.   I met with Steven Rubin, who is with
 7   Mercer.  Steven happened to be on site that day.
 8   We were having discussions about our benefit plans
 9   for the new year.
10         Q.   Right.
11         A.   So I reviewed the matter with him, and
12   he was going to follow up on trying to get some
13   additional information on this situation.
14         Q.   And just by way of background,
15   Mediacom utilized Aetna to administer the payment
16   of the disability payments to its employees for
17   short term disability, right?
18         A.   Yes.
19         Q.   But the payments are actually
20   self-insured by Mediacom, correct?
21         A.   Yes.
22         Q.   Mediacom actually pays out of its own
23   earnings any claims for disability put in by
24   employees?
25         A.   That's correct.
```



```
                        JUDY MILLS
 1
 2         A.    Correct.
 3         Q.    Did you type this document up
 4   yourself?
 5         A.    Yes, I did.
 6         Q.    After reviewing this document, any
 7   other inconsistencies that you noticed?
 8         A.    No.
 9         Q.    And on the second paragraph of this
10   memorandum, which is Plaintiff's Number 8, it
11   begins:  On November 13th, it was learned, while
12   on a leave of absence, Ms. Bauza may have
13   collected the disability payments.  So the 13th is
14   the date that Ms. Burgos came to you with that
15   information?
16         A.    Yes.
17         Q.    It also mentions here that copies of
18   endorsed checks you received on the 14th.  Where
19   did you receive those checks from?
20         A.    They would have probably come from
21   Aetna, I believe.
22         Q.    How would Aetna provide those checks
23   to you?
24         A.    I'm not sure I understand your
25   question.
```



1                    JUDY MILLS
2        Q.    Okay.  In the normal course, is it
3   that Aetna sends these checks back to you and
4   Mediacom has a file for those checks, or do you
5   request Aetna to send you these checks?
6        A.    We requested them.
7        Q.    Who did you request from Aetna to send
8   you those checks?
9        A.    I don't know if it was Steven Rubin or
10  somebody contacted Aetna directly, but it was
11  probably Steven Rubin.
12       Q.    So your testimony before about who you
13  spoke to at Aetna or anyone else still applies,
14  when you had that conversation with Mr. Rubin on
15  the 13th, after that you received some checks back
16  the next day from Aetna?
17       A.    Yes.
18       Q.    So you are assuming at some point
19  someone besides you made a request of Aetna for
20  this and you got that information?
21       A.    I probably asked Steven Rubin during
22  our meeting on the 13th to get me proof.  I didn't
23  want to believe this.
24       Q.    Right.
25       A.    Okay.



1        JUDY MILLS

2        A.   I think that it was appropriate for
3   her to call them, as she did.  And I also think
4   that it would have been appropriate for her to
5   follow through, to contact Joe Michulski at that
6   time.
7        Q.   Even if Aetna had told her that they
8   had calculated it correctly?
9        A.   Yes.  She should have contacted him.
10  She knew that it was incorrect.
11       Q.   During that November 15th meeting, Ms.
12  Bauza did tell you that she had spoken to someone
13  at Aetna, right?
14       A.   Yes.
15       Q.   Did you ever -- strike that.
16            Did she ever come back to you and give
17  you more information about regarding that claim?
18       A.   No.
19       Q.   That she had spoken to someone at
20  Aetna?
21       A.   She never came back with a name, no.
22       Q.   Did she ever come back with any
23  information regarding the call without a name?
24       A.   No.
25       Q.   Did she ever tell you that she called



```
 1                    JUDY MILLS
 2    but Aetna doesn't have any record of her call?
 3          A.   I don't remember if she came back and
 4    told me that.  I know she came back to say that
 5    she couldn't find anything.  Okay.
 6          Q.   She did come back and report that to
 7    you?
 8          A.   Yes.
 9          Q.   Did you ask her what steps she had
10    taken to get that information from Aetna?
11          A.   No.
12          Q.   Did you ever ask anyone at Aetna to
13    check their records to see if what Ms. Bauza had
14    said was true?
15          A.   Through Steven Rubin we did.
16          Q.   At the time you spoke to Mr. Rubin,
17    that was prior to Ms. Bauza saying she made phone
18    calls to Aetna, correct?
19          A.   Correct.
20          Q.   Even though you didn't have that
21    knowledge, you still asked Mr. Rubin to see if
22    there were any calls made by Ms. Bauza to Aetna?
23          A.   It was probably after she said that
24    she called them that we asked him to follow up on
25    that.
```



JUDY MILLS

```
 2    Q.   That is my question.
 3    A.   Yes.
 4    Q.   Did you follow up with Mr. Rubin after
this meeting on November 15th with Ms. Bauza?
 6    A.   Yes.
 7    Q.   When did you follow up with Mr. Rubin?
 8    A.   I couldn't be specific.  It would have
been shortly after that meeting.
10    Q.   Did you document that request in
writing?
12    A.   No.
13    Q.   Did Mr. Rubin respond to that request?
14    A.   In what way?
15    Q.   Did he give you an answer?
16    A.   Yes, and the email that you have on
record indicates that.
18    Q.   Okay.  Did you ever ask anyone
directly -- did you ever contact Aetna directly at
all regarding Ms. Bauza?
21    A.   I don't recall if I did or not.  If
anything, I may have left a message for either
Jean Falto or Matt Galligan, but I don't believe I
spoke with either of them.  I don't recall any
conversations with them, as a matter of fact.
```



```
1                    JUDY MILLS
2         Q.   Did you -- what did you believe of the
3    veracity of Ms. Bauza's statement, that she called
4    someone at Aetna and they told her that they
5    calculated it correctly?
6              MR. RIOLO:  Objection.  When?
7         Q.   When she first told you at the
8    November 15 meeting.
9         A.   At that time, I was believing her.  I
10   was hoping.  Nobody wanted -- everybody liked
11   Miriam.  We were hoping that we would be able to
12   get this cleared up.
13        Q.   When Ms. Bauza wasn't able to clarify
14   it, did you change your position regarding the
15   veracity of her statement that she called someone
16   at Aetna, and they told her that they calculated
17   the benefits correctly?
18        A.   I can't say that we -- I would say
19   that we questioned whether or not we had all of
20   the information from her.  I shouldn't say whether
21   we had all the information.  But we questioned
22   what she was telling us at that point.
23        Q.   After that meeting on November 15th, I
24   believe you testified that there was another
25   meeting with Ms. Commisso-Weinand and Mr. Gillert
```



1   JUDY MILLS

2   regarding Ms. Bauza's termination?

3   A.  Yes.

4   Q.  Between November 15th and that
5   meeting, the information you had received was that
6   Plaintiff's Exhibit Number 7, which is the
7   email --

8   A.  Correct.

9   Q.  -- concerning Mr. Rubin's report on
10  the situation?

11  A.  Yes.

12  Q.  And the input you got from Ms. Bauza
13  after the 15th meeting, November 15th meeting?

14  A.  Yes.

15  Q.  Anything else did you utilize at that
16  meeting to decide whether or not to terminate Ms.
17  Bauza?

18  A.  No.

19          MR. RIOLO:  Other than the
20  earlier stuff too?

21          MR. CUTRO:  Yes.

22  A.  No.

23  Q.  What happened at that meeting?  Do you
24  know the date of that meeting you had with
25  Mr. Gillert and Ms. Weinand?



```
                        JUDY MILLS
```

1  
2  what were the circumstances?  
3      A.   That she received the overpayment,  
4  that she knew that it was incorrect and that she  
5  never brought it to our attention. Those were the  
6  circumstances.  
7      Q.   At that meeting, was it ever discussed  
8  whether there were similar fact patterns that had  
9  arisen with other employees and what discipline  
10 was used in those types of situations?  
11     A.   No.  
12     Q.   Who had the ultimate authority to make  
13 the decision to terminate Ms. Bauza at that  
14 meeting?  
15     A.   The ultimate authority would have been  
16 Italia Commisso-Weinand and Mark Stefan.  
17     Q.   Did you make a recommendation at that  
18 meeting as to how to handle Ms. Bauza, or did you  
19 present the facts or both?  
20     A.   I made a recommendation, yes.  
21     Q.   What was your recommendation?  
22     A.   My recommendation was termination.  
23     Q.   Now, was the fact that Ms. Bauza was  
24 out on disability leave discussed at that meeting?  
25     A.   No.



```
 1                    JUDY MILLS
 2    responsibilities --
 3         A.    No.
 4         Q.    -- at Mediacom, right?
 5         A.    No, but she knew of it.
 6         Q.    But different companies have different
 7    benefit policies, correct?
 8         A.    Yes.
 9         Q.    Some companies may have 66 and two
10    thirds, and other ones may have better plans,
11    right?
12         A.    Well, she admitted she knew it was 66
13    and two thirds.
14         Q.    And she also admitted that that is why
15    she called Aetna, because she thought there was a
16    discrepancy?
17         A.    Yes.
18         Q.    Do you recall her telling you that the
19    discrepancy was in the calculation of the time
20    period that the benefits calculated over and that
21    is where she felt the error was?
22         A.    No.
23         Q.    Who was present at the meeting on
24    November 28th when Ms. Bauza was terminated?
25         A.    Joe Michulski and myself.
```



1        JUDY MILLS

2    Q.   Anyone else?

3    A.   No.

4    Q.   Prior to that meeting, did you discuss
5    with Mr. Michulski what was going to be discussed
6    at that meeting?

7    A.   I don't know if I specifically told
8    him about or went through what was going to be
9    discussed at the meeting. I believe that he was
10   told of the decision to terminate by Mark Stefan,
11   and then it was Joe and I meeting with Miriam to
12   deliver the news. I don't remember if he and I
13   actually spoke ahead of time. I mean, I might
14   have prepped him for the meeting before Miriam
15   came in, but I don't remember beyond that.

16   Q.   Did you remember Mr. -- prior to Ms.
17   Bauza coming into the meeting, do you remember
18   discussing anything else with him about Ms. Bauza?

19   A.   I don't.

20   Q.   What happened at that meeting?

21   A.   I did, I think, the talking. Not I
22   think, I know I did. I did all of the talking.
23   And I explained to Miriam that she was in a
24   position of trust, that she received the
25   overpayment, that she knew that it was an




```
 1                     JUDY MILLS
 2    overpayment.  And given the nature of her
 3    position, we were going to discontinue her
 4    employment.
 5           Q.    What did Miriam say, if anything?
 6           A.    That she couldn't believe it.
 7           Q.    Anything else?
 8           A.    I believe that was pretty much it.
 9           Q.    Did Mr. Michulski say anything?
10           A.    I don't think he said anything, no.
11           Q.    Was Ms. Bauza upset?
12           A.    Yes.
13           Q.    When was she told her termination was
14    effective?
15           A.    Well, that would be her last day, the
16    day that I told her that she was terminated, but
17    then we offered to continue her pay for a certain
18    period of time.  I have to look here.  Continue
19    her pay through January 1, and that we also were
20    offering her COBRA through the month of January,
21    offering to pay her COBRA.
22           Q.    And this meeting took place in human
23    resources?
24           A.    In my office.
25           Q.    How long did that meeting take place?
```

