# EXHIBIT "M"

LEXSEE 2000 US DIST LEXIS 13545

**BEN EKWEGBALU, Plaintiff, -against- CENTRAL PARKING SYSTEM, CHARLES HUNTZINGER, Individually and as Vice President of Central Parking System, ALFRED O'HARA, Individually and as Account Manager/Supervisor of Central Parking System, BILL GOTTLING, Individually and as Personnel Director of Central Parking System, Defendants.**

97 Civ. 9477 (MGC)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 13545*

September 21, 2000, Decided
September 22, 2000, Filed

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted, and action dismissed.

**COUNSEL:** Josh H. Kardisch, Esq., HELFER, HELFER & KARDISCH, LLP, Bellmore, New York, for Plaintiff.

Douglas E. Rowe, Esq., Mineola, New York, for Defendants.

**JUDGES:** MIRIAM GOLDMAN CEDARBAUM, United States District Judge.

**OPINION BY:** MIRIAM GOLDMAN CEDARBAUM

**OPINION**

**CEDARBAUM, J.**

Ben Ekwegbalu complains that his employment with Central Parking System ("Central") was terminated because of his race and national origin. Based on this alleged discrimination, plaintiff asserts claims against Central pursuant to Title VII, [1] *42 U.S.C. § 2000e, et seq.*, and against all the defendants under New York Human Rights Law, Exec. Law *§ 290, et seq.*, the Employment Retirement Income Security Act of 1974, *29 U.S.C. § 1132, et seq.*, and *42 U.S.C. §§ 1981, 1981(a)*, and *1985*. Defendants have moved for summary judgment pursuant to *Fed. R. Civ. P. 56.* For the reasons that follow, the motion is granted.

[1] Plaintiff has withdrawn his Title VII claims against the individual defendants.

[*2] UNDISPUTED FACTS

Central owns, operates, and manages parking garages throughout the United States. Plaintiff, a black Nigerian, was hired by Meyers Parking, Central's predecessor, in June of 1992 [2] as assistant manager of Central's Pier 40 garage in New York City. In November of 1994, Central assigned plaintiff to the audit department. As an auditor, plaintiff was required to audit Daily Reports of Business ("DRBs") prepared by parking garage managers at 21 locations. Plaintiff compared the DRBs with the amount of money actually delivered to the bank for deposit in order to verify that the correct amount was deposited. (Gottlin Aff. P 6; Pl. Dep. at 52.) Alfred O'Hara was the audit manager. (Pl. 56.1 Stmt. P 3.) Plaintiff was to report any discrepancies or shortages to O'Hara. (Pl. Dep. at 31.)

[2] Both plaintiff and defendant state that plaintiff began his employment with Meyers Parking in June of 1992. However, the employment records show that plaintiff began his employment on September 1, 1992. (Gottlin Aff. Ex. A.) This discrepancy is not material to this motion. Thus, for purposes of this motion, the date agreed upon by the parties, June 1992, will be treated as plaintiff's starting date.

[*3] Central terminated plaintiff's employment after an incident of theft was discovered at the Lincoln garage, one of the garages that plaintiff audited. According to Central policy, DRBs were supposed to be submitted for auditing within forty-eight hours. (Pl. Dep. at 52.) On December 1, 1996, plaintiff contacted the manager of the Lincoln garage to inquire about late delivery

of money from the garage. DRBs were also delinquent. On December 9, 1996, plaintiff contacted the manager of the Lincoln garage to request the delinquent DRBs. Plaintiff received the DRBs for December first through third on that day. On December 12, 1996, plaintiff received the DRBs for December 4 through December 6. He discovered that approximately $ 6,000.00 was missing from the Lincoln garage. On December 13, 1996, plaintiff informed O'Hara of the problem at the Lincoln garage. O'Hara asked plaintiff to investigate the situation. Plaintiff went to the Lincoln garage on December 19, 1996 and discovered that approximately $ 18,000 was missing. (Kardisch Aff. Ex. H.) Central suspected several employees at the Lincoln garage of theft. (Kardisch Aff. Ex. H.) Plaintiff was not accused of participation in the theft. [*4] (Pl. Dep. at 79.) But, on January 10, 1997, plaintiff met with O'Hara and Bill Gottlin, Central's Personnel Director, who informed him that his employment was terminated. (Pl. Dep. at 80.)

Defendants contend that plaintiff was terminated for failing to properly and completely perform his audit responsibilities. (Gottlin Aff. P7, 8; O'Hara Aff. P7, 8.) Defendants assert that plaintiff should have reported the late arrival of the DRBs from the Lincoln garage to O'Hara sooner and that he should have conducted a field audit sooner. Had such a report been made and such an audit conducted, the theft could have been minimized. (Id.) Plaintiff asserts that he adequately performed his duties as an auditor and that the defendants' explanation for his termination is merely a pretext for racial and ethnic discrimination. As evidence of this claim, plaintiff points to several comments that O'Hara allegedly made to him.

THE ALLEGED STATEMENTS

Plaintiff identifies four derogatory statements about his race and national origin that O'Hara allegedly made to him. (Pl. Dep. at 34-38, 42-43.) Plaintiff testified that sometime before September of 1994, O'Hara told him that he would not be promoted [*5] because of his race. (Pl. Dep. at 36.) Plaintiff testified that sometime in 1994, O'Hara asked him if he was related to the Rwandans portrayed on television. (Pl. Dep. at 43.) Plaintiff also testified that in either 1995 or 1996, O'Hara advised him to become a porter because he thought that "Africans should not be in management positions." (Pl. Dep. at 39.) Finally, plaintiff testified that at some time during his employment, O'Hara stated that he does not like the fact that Central employs African-Americans and other minorities in the audit department. (Pl. Dep. at 43-44.)

Following the last statement, plaintiff complained to Tarek Mousa, Central's Director of Operations. (Pl. Dep. at 41.) Plaintiff testified that after he complained to Mousa, O'Hara did not make statements to him about

race or national origin. (Id.) Plaintiff does not claim that any other person employed by Central made any racially or ethnically offensive statements at any time.

O'Hara denies that he made any of the alleged statements. (O'Hara Aff. P 13.) In his deposition, O'Hara testified that he advised Gottlin and Huntzinger not to terminate plaintiff's employment. (O'Hara Dep. at 73.) Whether O'Hara made [*6] the statements in question or advised against plaintiff's termination are questions of fact which cannot be resolved on summary judgment.

DISCUSSION

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)*. The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)*. In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir. 1993)*. Nonetheless, "*Rule* [*7] *56* mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.*

I. The Title VII Claim

A. Timeliness

Central contends that plaintiff's discrimination claim under Title VII is time-barred because plaintiff filed his complaint more than 180 days after O'Hara allegedly made a discriminatory statement. The relevant portion of the statute provides that: "[A] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." *42 U.S.C. § 2000e-5(e)(1)*. Because the adverse employment action complained of is the termination of plaintiff's employment, plaintiff's claim is not time-barred. The discriminatory statements alleged are offered as evidence of Central's discriminatory motive for firing plaintiff. Plaintiff was terminated on January 10, 1997. The EEOC received plaintiff's administrative charge on

April 25, 1997, well within the 180-day period following [*8] plaintiff's termination. (Rowe Aff. Ex. B.) Thus, plaintiff's claim is not time-barred.

B. The Merits

Title VII claims are evaluated under the burden-shifting analysis developed in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* Under this scheme, a plaintiff must first establish a prima facie case of discrimination. If a plaintiff meets this burden, then the burden of production, but not persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. Plaintiff has the burden of persuasion by a preponderance of the evidence that the legitimate reason offered by the employer is a pretext for discrimination. *Id. at 802-04; Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981).* Plaintiff must produce "sufficient evidence to support a rational finding that . . . more likely than not [discrimination] was the real reason" for his termination. *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (quoting Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994)).* [*9] Although plaintiff need not present evidence of discrimination independent of his prima facie case, the evidence he presents must be sufficient to show that the reason proffered by the employer for his termination is a pretext for discrimination. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 2109, 147 L. Ed. 2d 105 (2000).*

Assuming without deciding that plaintiff has proffered sufficient evidence of discrimination to meet his burden of establishing a prima facie case, he has not proffered sufficient evidence to meet his ultimate burden of showing that the reason Central has given for his termination is a pretext for discrimination. Plaintiff must do more than cast doubt on the correctness of Central's decision to terminate his employment. This is not a suit for wrongful discharge, but of employment discrimination. The jury cannot substitute its business judgment for that of the employer. Plaintiff must proffer evidence from which a rational jury can find that racial or ethnic discrimination played a part in the employer's decision.

Plaintiff contends that the duties of his job did not require him to conduct a field audit, that is, to visit the Lincoln [*10] garage and determine that money was being stolen. Thus, plaintiff argues, Central's explanation for his termination, that he should have discovered the theft sooner, is merely a pretext. However, plaintiff admits that he did conduct field audits from time to time. (Pl. Dep. at 57.) Moreover, Central's reason for termination is not only that plaintiff should have conducted a field audit. Central also points to the timing of plaintiff's

report to O'Hara. Plaintiff was required to report any irregularities to O'Hara immediately. Yet, he did not report the late DRBs from the Lincoln garage until December 13, 1996, more than a week after he became aware of the problem.

Plaintiff also points to O'Hara's four comments as evidence that Central's proffered reason for his termination is a pretext. The four comments attributed to O'Hara are insufficient to show that the reason for terminating plaintiff is a pretext because plaintiff is unable to show a connection between the statements and his termination. *See O'Connor v. Viacom, Inc., 1996 U.S. Dist. LEXIS 5289, 93 Civ. 2399, 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996)* (granting summary judgment because plaintiff presented no evidence that discriminatory [*11] remarks were related to adverse employment action). The most recent alleged remark was about one year prior to plaintiff's termination, and plaintiff received satisfactory performance reviews throughout the years in which O'Hara was his supervisor. (Pl. Aff. P 36.) *See Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000)* (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)* ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.")).

Any logical connection between O'Hara's comments to plaintiff and plaintiff's termination is further undermined by the racial and ethnic diversity of the audit department supervised by O'Hara. In his deposition, plaintiff testified that when he was employed by Central there were five persons in the audit department, including O'Hara and himself. (Pl. Dep. at 11.) One of the other employees was an African-American who still works with O'Hara in the audit department. (Pl. Dep. at 11, 39; Gottlin Supp. Aff. Ex. A.) Another employee [*12] was a Romanian, and has since resigned. (*Id.*) The last was an Indian who still works in the audit department. (*Id.*) Moreover, it is undisputed that Claudius Riley, a black Jamaican, was promoted to the audit department three days after plaintiff was fired. (Gottlin Supp. Aff. P 4 & Ex. A.) An African-American, Hayden Blake, also joined the audit department in January of 1997, within a month after plaintiff's termination. (*Id.*) On the undisputed facts, plaintiff will be unable to withstand a motion to dismiss at trial.

II. Remaining Claims

New York courts require the same standard of proof for claims brought under the Human Rights Law as for those brought under a Federal Title VII claim. *See Kremer v. Chem. Constr. Corp., 456 U.S. 461, 479, 102 S. Ct. 1883, 1896, 72 L. Ed. 2d 262 (1982)* (noting that the

elements of a successful employment discrimination claim under New York and federal law are "virtually identical"); *Tomka v. Seiler Corp., 66 F.3d 1295, 1304 n. 4 (2d Cir. 1995)*. Claims of violations of *42 U.S.C. §§ 1981, 1981(a)*, and *1985* also share the same elements as a claim for employment discrimination under Title [*13] VII. *Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38, 44 (2d Cir. 1984)*.

Finally, plaintiff's ERISA claim is that defendant interfered with his pension benefits by terminating him. Although plaintiff does not even address it in his papers, this unsupported claim appears to be that defendants violated § 510 of ERISA. That statute states in pertinent part: "It shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." *29 U.S.C. § 1140*. Plaintiff has provided no evidence of Central's pension plan. Moreover, plaintiff has provided no evidence that defendants terminated him for the purpose of interfering with any pension benefits. Even if

plaintiff lost pension benefits as a result of his termination, "no ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Dister v. Continental Group, Inc., 859 F.2d 1108, 1111 (2d Cir. 1988)* (quoting *Titsch v. Reliance Group, Inc., 548 F. Supp. 983, 985 (S.D.N.Y. 1982)*. [*14]

CONCLUSION

For the foregoing reasons defendants' motion for summary judgment is granted, and this action is dismissed.

SO ORDERED.

Dated: New York, New York

September 21, 2000

MIRIAM GOLDMAN CEDARBAUM

United States District Judge

LEXSEE 2003 US DIST. LEXIS 2716

**ISAIAH F. WOOLLEY and ROBERT COLES, Plaintiffs, -v- BROADVIEW NETWORKS, INC., Defendant.**

**01 Civ. 2526 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 2716*

**February 25, 2003, Decided**
**February 26, 2003, Filed**

**DISPOSITION:**     [*1] Motion for summary judgment granted in part and denied in part.

**COUNSEL:** Laurent S. Drogin and Daniel Chiu, Tarter Krinsky & Drogin LLP, New York, NY, for Isaiah F. Woolley and Robert Coles, Plaintiffs.

Kevin G. Lauri, Steven D. Hurd and Terence J. Corrigan, Jackson Lewis LLP, New York, NY, for Broadview Networks, Inc., Defendant.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

OPINION AND ORDER

GERARD E. LYNCH, District Judge:

Isaiah F. Woolley and Robert Coles brought this action against their former employer Broadview Networks, Inc., under Title VII and other federal, state, and local antidiscrimination laws, alleging that they were subjected to unequal conditions and terms of employment, and, in Woolley's case, subsequently fired, because of their race and/ or in retaliation for their complaints of discrimination. Woolley additionally alleges that Broadview violated the Americans with Disabilities Act ("ADA") by failing to provide a reasonable accommodation while he was afflicted with insomnia and sleep deprivation, and by terminating his employment because of his disability status. Defendant now moves for summary judgment [*2] on all claims. The motion will be granted in part and denied in part.

I. Background

Except where noted, the following facts are undisputed by the parties. Broadview is a relatively new telecommunications and high speed internet provider with a facility in Long Island City, New York, at which both plaintiffs were employed. The facility, also known as a "Central Office," consisted of a customer service office and a telecommunications switch--the electronic hardware and software that establishes telephone and internet connections for customers. Plaintiff Isaiah Woolley, at the time he was fired, was a probationary Central Office Technician ("CO Tech") at the switch, and plaintiff Robert Coles was, at all relevant times, a Switch Engineer.

In May, 2000, Mr. Tom Yacopino became Broadview's Director of City Operations at the Long Island City Facility. His duties included general supervision of the switch, and therefore of both plaintiffs in this case. He was, according to Broadview, "expected to bring the Long Island City Facility to professional telecommunications standards by the end of 2000," although Broadview does not state in its papers in what respects the Facility fell [*3] short of those standards prior to Mr. Yacopino's arrival. (D. Mem. at 4.)

A. Woolley

Woolley, an African-American man born in Ghana, was employed by defendant from September 1999 until he was fired in September 2000. He was initially hired as a Customer Service Representative at a pay rate of $ 14.00 per hour. Desiring a more technical job, Woolley requested and was given a position as a probationary CO Tech in October 1999. CO Techs are responsible for the day-to-day, round-the-clock operation of the switch, including installation, connection, troubleshooting, and maintenance of circuits, maintaining connections with

external fiber optic signals, and certain billing tasks. CO Techs generally are paid more than $ 14.00 per hour (Chiu Affid. Ex. Y), but Woolley continued to be paid $ 14.00 because, Broadview claims, he was "not yet qualified to be a CO Tech." Yacopino Tr. at 122-24 (Lauri Affid. Ex. 6). Woolley remained on probationary status, with no increase in pay rate, until he was fired.

On August 21, 2000, Woolley sent an electronic mail message to Eric Roden, Broadview's Chief Operating Officer, and Scott Matukas, Vice President of Human Resources, alleging that, because [*4] of his race, he was not offered certain training opportunities that had been offered to other CO Techs, thus denying him the opportunity to become a permanent CO Tech and obtain a higher rate of pay. (Lauri Affid. Ex. 17.) That same day, Woolley's attorney wrote to Broadview asserting that Woolley had "completed his 90-[day] probationary period ... on approximately December 20, 1999," and demanding that Broadview "review Mr. Woolley's wage claim" based on an allegedly appropriate pay rate of $ 20 per hour for CO Techs. (Lauri Affid. Ex. 18). Woolley sent another e-mail to the same individuals two days later. This message omitted the accusation of discrimination, but reiterated his complaints regarding training and rate of pay, and additionally complained that he had "just been told [he would] be assigned to work on the evening shift." (Lauri Affid. Ex. 19.) On September 5, 2000, Matukas wrote to Woolley reporting that an internal investigation, based on "interviews with [Woolley's] managers and a meeting with [Woolley]," found "no evidence of bias." (Lauri Affid. Ex. 21.) On September 7, 2000, Woolley's attorney wrote to Susan B. Smith, Broadview's Managing Director of Human [*5] Resources, reiterating Woolley's requests for training and a retroactive increase in pay to $ 20 per hour. The letter additionally claimed that "Broadview has been 'gunning' for Mr. Woolley ever since he raised his discrimination claim," and requested that an accommodation be made for Woolley, under the ADA, for his sleep deprivation and insomnia, in the form of reassignment to the day shift. (Lauri Affid. Ex. 24.) A letter from Susan B. Smith, dated September 18, 2000, informed Woolley that he would be dismissed from employment as of September 15, 2000. (Lauri Affid. Ex. 22.)

Broadview denies any discriminatory motive for not offering Woolley training, not promoting him to permanent status as a CO Tech, assigning him to the night shift, and ultimately for firing him. It claims that Woolley's performance as a probationary CO Tech was inadequate, and that he engaged in various forms of misconduct. In support of these assertions, Broadview has offered the testimony of Thomas Yacopino, Woolley's supervisor at the time the relevant decisions were made. See, e.g., Yacopino Tr. at 108-10, 120-21, 126-27 (Lauri

Affid. Ex. 6.) It has also produced supporting documentation, almost all [*6] of it authored by Yacopino. A letter to Smith from Yacopino dated August 11, 2000, describes in detail Broadview's criticisms of Woolley. Among these are that on August 10, 2000, Woolley was "seen on [the] Internet with pornographic pictures"; that on August 3, 2000, Woolley falsified his time sheet by entering a lunch break as paid time; that on July 26, 2000, Woolley failed to accomplish a "routine repair," thus requiring outside technicians to be summoned unnecessarily; that on July 20, 2000, Woolley was reprimanded for failing to carry out a directive to supply Yacopino with certain documentation; that on July 16, 2000, Woolley "took over 3 hours to respond to a beep while on call"; that Broadview had received a complaint from a vendor alleging that Woolley had, on June 13, 2000, "demanded" various promotional gifts; and that on June 8, 2000, Woolley had abused a company employment referral program by "recruiting people from other departments to route all resumes through him so he could collect on the referral award." (Lauri Affid. Ex. 13.) More generally, Yacopino reported, Woolley "failed to ... take personal responsibility for obtaining the skills necessary to be a [CO Tech, [*7] ] ... is very weak in his ... communication skills, has a very difficult time taking instruction and completing a given task, ... has shown little aptitude and perseverance to learn the DMS 500 technology on his own or to be a self starter[, and] is not able to perform the basic functions of a [CO Tech] without constant attention or supervision." Id.

Other documentation of Broadview's dissatisfaction with Woolley includes an August 3 e-mail from Yacopino to Smith stating that Woolley "does not have the skills required to be successful in [the CO Tech] position" and requesting that Woolley either be transferred back to Customer Service or fired (Lauri Affid. Ex. 14); an August 11, 2000, e-mail from the Administrative Assistant who discovered Woolley viewing pornography on his computer (Lauri Affid. Ex. 15); and a printout of web sites viewed from Woolley's computer listing numerous apparently sexually-oriented sites (Lauri Affid. Ex. 16).

Woolley claims that these explanations are pretexts for actions in fact motivated by bias. He also claims that the supporting documentation was manufactured only after he had notified Broadview, on August 21, 2000, that he believed he was [*8] being discriminated against because of his race. To support these claims, Woolley relies on (1) the obviously erroneous dating of Yacopino's "August 11, 2000" letter (the letter refers to events occurring as late as August 18); (2) his claim that he was never spoken to about any inadequacies; and (3) the fact that he was regularly entrusted to manage the switch overnight--including on the night of December 31, 1999, when there was widespread concern about

possible service outages that might arise due to the Y2K software problem. Woolley also disputes Broadview's allegations of misconduct. He asserts that other people could have been and in fact were responsible for accessing the numerous pornographic web sites that had been viewed on his computer, that his requesting gifts from vendors was a "common industry practice ... specifically authorized by Broadview's employment manual," and that Broadview failed to produce crucial evidence regarding Woolley's abuse of the recruitment incentive program and his alleged falsification of time sheets. To support his claim that all of Broadview's actions were motivated by bias, Woolley alleges that he "received a letter under the door at his home [*9] which warned him that he would not succeed in his claims against the Company and referred to him as Kunta Kinte." (Compl. P 25.) Woolley has not produced this letter, claiming he "ripped it," Woolley Tr. 323 (Chiu Affid. Ex. A), but Coles has produced a similar letter (Lauri Affid. Ex. 34), which he allegedly received on the same day (Compl. P 37).

B. Coles

Coles, also an African-American man, was hired by Broadview as a Switch Engineer on or about June 8, 1999. Coles alleges that his performance was consistently evaluated as "satisfactory," and that he even received praise for good work, until some time "soon after" his September 22, 2000, evaluation, when he alleges Broadview "knew or had reason to know that Coles had information supportive of Woolley's claims of workplace discrimination and retaliation." (Compl. PP 30-31.) To establish that Broadview had such knowledge, Coles relies on an e-mail he wrote to Smith on November 8, 2000, which accused Broadview of retaliating against him by placing him on the night shift, and stated that "as is known to the Company, I worked with ... Woolley, and have information supportive of his claims." (Lauri Affid. Ex. 31.)

Broadview counters [*10] with testimony and a paper trail detailing Coles's alleged deficiencies. An e-mail memo dated September 28, 2000, indicates that Yacopino was considering demoting Coles to a CO Tech position because of his deficient skills, knowledge, and performance. (Lauri Affid. Ex. 26.) An exchange of e-mail messages between Yacopino and Gene Leahy, Broadview's Vice President of City Operations, on September 28, 2000, further detailed Coles's shortcomings. (Lauri Affid. Ex. 28.) Three "Progressive Discipline" reports, all dated October 17, 2000, document individual lapses in Coles's performance. On November 7, 2000, Coles was offered the choice either to resign or to participate in a "Performance Improvement Plan" ("PIP") that would have required Coles to fill out a detailed daily

activity log and to study and discuss with a supervisor a book entitled *The 7 Habits of Highly Effective People*. (Lauri Affid. Ex. 29, 33.) Coles alleges that he was also told on November 7 that he would have to work the night shift; Broadview claims that this was unrelated to Coles's performance issues and that everyone was expected to rotate into the night shift periodically. Coles refused to agree to the PIP, and [*11] refused to work the night shift because of childcare issues. Coles's January 2001 annual performance evaluation indicated that Coles's performance, in Broadview's view, was still inadequate. (Lauri Affid. Ex. 31.) Coles refused to sign this review and submitted a letter of resignation on February 9, 2001. (Lauri Affid. Ex. 37.)

Coles alleges that Broadview's entire course of conduct was motivated by racial bias and was in retaliation for his expressed support for Woolley's claim of racial bias. To support this claim that the complaints about his qualifications and performance were mere pretexts, he relies on the timing of the documentation, all of which was created after he claims that Broadview came to know that "Coles had information supportive of Woolley's claims of workplace discrimination and retaliation" (Compl. P 31); on several instances of written praise he received for his work; and on his claim that his supervisor Thomas Yacopino was the author of an unsigned, undated letter, allegedly sent to him at home by ordinary mail and received on November 25, 2000, stating, in its entirety: "Mr. Coles[:] You and the big Dummy (Kunta Kinte) will never win. You think the two of [*12] you are so smart you will both be in for a surprise not with what we have on him."

II. Discussion

A. Standard for Summary Judgment

When adjudicating a motion for summary judgment, a court must resolve all ambiguities in favor of the non-moving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).* The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996).* Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c).*

To establish a genuine issue of material fact, the opposing party "'must produce specific facts indicating'

that a genuine factual issue [*13] exists." *Scotto, 143 F.3d at 114* (quoting *Wright v. Coughlin, 132 F.3d 133, 137 (2d Cir. 1998)*); see also *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp., 81 F.3d 275, 277 (2d Cir. 1996)* (quoting *Anderson, 477 U.S. at 252)*.

B. Title VII Discrimination Claims

In deciding a summary judgment motion in a Title VII employment discrimination complaint, we apply the framework of *Fisher v. Vassar College, 114 F.3d 1332, 1335-36 (2d Cir. 1997)* (en banc), recently reaffirmed in *James v. New York Racing Assoc., 233 F.3d 149, 155 (2d Cir. 2000)*. [*14] We begin by asking whether the plaintiff has established the "minimal" prima facie case defined by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. As the Second Circuit put it in James,

> This requires no evidence of discrimination. It is satisfied by a showing of "membership in a protected class, qualification for the position, an adverse employment action," and preference for a person not of the protected class.

*233 F.3d at 153-54* (quoting *Fisher, 114 F.3d at 1335*). Meeting this test "creates a presumption that the employer unlawfully discriminated." *Fisher, 114 F.3d at 1335* (quoting *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*). This presumption "places the burden of production on the employer to proffer a nondiscriminatory reason for its action." *James, 233 F.3d at 154*. If the employer fails to present such a reason, plaintiff prevails.

"On the other hand, once the employer 'articulates a non-discriminatory reason' for its actions ... the [*15] presumption completely 'drops out of the picture.'" Id. (quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*). At that point, "the employer will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Id. Evidence casting doubt on the employer's prof-

fered justification "may--or may not--be sufficient" to provide this support. *Fisher, 114 F.3d at 1333*. Thus, when the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court's responsibility is to "examine the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000)* (quoting *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)*).

Here, Broadview has proffered nondiscriminatory reasons for its actions respecting both plaintiffs. Thus the analysis can begin [*16] with an examination of whether plaintiffs' evidence casts enough doubt on Broadview's explanations to permit a reasonable jury to find that Broadview intentionally discriminated against one or both of the plaintiffs.

There is significant evidence in the record tending to show that the deficiencies in plaintiffs' performance that Broadview cites were the actual reasons for Broadview's decisions with respect to their employment. However, plaintiffs go beyond simply challenging that evidence. They also present evidence, in the form of racially inflammatory anonymous letters, that a reasonable fact finder could attribute to a Broadview supervisor and that could thereby support an inference that racial animus was the true motivation for taking action against Woolley and/ or Coles, or was the true motivation for making charges of deficient performance and misconduct that caused Broadview to act as it did. Specifically, a reasonable fact finder could conclude that the contents of the anonymous letters, one of which is actually in evidence, indicate that their source was someone who knew about Woolley's situation, who knew he was not only of African descent but was of African origin, and [*17] who knew that Coles and Woolley were in some way associated with each other. Thus, "viewing the evidence in the light most favorable" to the plaintiffs, *Weyant, 101 F.3d at 854*, and keeping in mind that "summary judgment is sparingly used where intent and state of mind are at issue," *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)*, it cannot be said, with respect to the discrimination claims, that plaintiffs could not satisfy their "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff," *Reeves, 530 U.S. at 143*.

C. Title VII Retaliation Claims

Section 704(a) of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants

for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... or participated in any manner in an investigation ... under this subchapter.

*42 U.S.C. § 2000e-3(a).* "The objective of this section is obviously to forbid an employer from [*18] retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).* The elements of a prima facie case of retaliation under Title VII are distinct from those for a discrimination claim, but the same structure of burden shifting based on defendant's proffer of nondiscriminatory reasons for its actions applies. *Choudhury v. Polytechnic Institute of New York, 735 F.2d 38, 44 (2d Cir. 1984).*

As to retaliation, however, plaintiffs fail to meet even the minimal burden of establishing a prima facie case. To establish a prima facie case of retaliation, a plaintiff must show that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001) (quoting Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir.2000)).* [*19] The last element of the prima facie case requires only "that the protected activity preceded the adverse action." Id. However, the record here establishes the opposite sequence of events. As to Woolley, it is undisputed that by August 3, 2000, Yacopino was attempting to find a replacement and was planning on having Woolley transferred out of the CO Tech position or even fired, complaining that Woolley did not "have the skills required to be successful in this position." (Lauri Affid. Ex. 14.) But Woolley presents no evidence that he engaged in a protected activity prior to August 21, when he complained that he was being discriminated against because of his race. (Id. Ex. 17.)

As to Coles, it is undisputed that as early as August 21, 2000, Broadview began to express concerns about Coles's qualifications and competence for the Switch Engineer position. Coles is correct in asserting that his performance review for the first seven months of 2000 rated him "satisfactory" in most areas. But the August 21 review also described numerous areas needing improvement:

Robert needs to improve on his proactivity for switch maintenance, Preventative Maintenance, Troubleshooting of [*20] peripheral equipment, follow up with vendors, customers and support organization .... I would like to see more of a focus on completing a project with high quality before moving on .... Documentation of work completed and circuit acceptance as well as maintenance logs need to be improved .... I would like to see his follow up with our customers both internal and external improve ....

(Lauri Affid. Ex. 25.) An internal memo indicates that by September 28, Yacopino was observing further deficiencies in Coles's performance. (Id. Ex. 26.) Coles supplies no evidence indicating that he registered any complaint about Broadview's treatment of Woolley any earlier than November 8, 2000 (Lauri Affid. Ex. 31), and his own deposition testimony is inconsistent as to whether Broadview had any reason earlier than this to believe he was supporting Woolley. Compare Coles Tr. 88 (Chiu Affid. Ex. B) ("I asked [Yacopino] why isn't Isaiah ... receiving the training"), and *id. 108* ("[Yacopino] saw Isaiah at [a local restaurant] .... He felt that Isaiah had came [sic] down there to meet with me, so he ... said don't give Isaiah any information concerning what's going on at Broadview, [*21] and don't help him in any way."), with *id. at 108 (Lauri Reply Affid. Ex. 2)* ("Q: You don't know if [Yacopino] knew you were helping Mr. Woolley at this point, do you? A: ... I don't know."), and *id. at 137-38* ("Q: Prior to [November 8] is there any other basis that you believe that the company was aware that you had information supportive of Mr. Woolley? A: Not to my knowledge .... Q: You didn't tell the company anything other than what is in the [November 8] e-mail concerning your information supportive of Mr. Woolley's claims? A: That's correct."). Even if the Court infers from Coles's own inconsistent testimony that Broadview knew he was supporting Woolley, there is not a shred of evidence suggesting that Broadview obtained this knowledge prior to August 21. With respect to Coles's claim that he questioned Yacopino about why Woolley had not been offered training, Coles himself testified that he could not remember when those training sessions were offered. *Id. at 87 (Lauri Affid. Ex. 4)*, and in any case, nothing about Coles's description of that conversation suggests that it was a protected activity under Title VII.

Because neither plaintiff has advanced any evidence [*22] tending to show that he engaged in a protected activity prior to Broadview's commencement of adverse employment actions against him, neither has asserted a

prima facie case of retaliation under Title VII, and defendant's motion for summary judgment on these claims must therefore be granted.

D. Plaintiffs' Other Claims

Plaintiffs allege that Broadview's actions also violated New York State's and New York City's Human Rights Laws (Compl. PP 47, 49, 55, 57, 78, 80, 86, 88) and the Civil Rights Act of 1866, *42 U.S.C. § 1981* (Compl. PP 51, 59, 82, 90). "The identical standards apply to employment discrimination claims brought under Title VII, ... Executive Law *§ 296* and the Administrative Code of the City of New York," *Keady v. Nike, Inc., 116 F. Supp. 2d 428, 437 n.8 (S.D.N.Y. 2000)* (internal citation omitted); *see also Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997)* ("Claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." (internal citations omitted)). Similarly, the Second Circuit has held that the elements of an employment discrimination action under [*23] *§ 1981* are identical to those for an action under Title VII. *Choudhury, 735 F.2d at 44.* Thus, defendant's motion to dismiss plaintiffs' claims under the state and city human rights laws and under *§ 1981* will be denied as to plaintiffs' racial discrimination claims, and granted as to plaintiffs' retaliation claims.

Finally, Woolley claims that he is a "qualified individual with a disability" under the ADA, *42 U.S.C. § 12101 et seq.*, and makes several claims based on that alleged status. (Compl. PP 62, 70.) He also makes related claims under the State and City Human Rights statutes. (Compl. PP 65, 68.) To succeed in a claim under the ADA, the plaintiff bears "the initial burden of establishing a prima facie case." *Wernick v. Federal Reserve Bank of N.Y., 91 F.3d 379, 383 (2d Cir. 1996).* To satisfy that burden, the plaintiff must show that (1) he is disabled; (2) that he is "otherwise qualified to perform [his] job"; and (3) that he was "discharged because of" his disability. Id. Woolley clearly cannot meet the third element, and it is thus unnecessary for the Court to address the first two.

To establish the causation [*24] element of his prima facie case, a plaintiff must "introduce evidence sufficient to permit a factfinder to conclude that she was [fired] solely because of her disabilities." *Borkowski v. Valley Central School Dist., 63 F.3d 131, 143 (2d Cir. 1995).* At the very least, the employer must have knowledge of the disability. *Kolivas v. Credit Agricole, 1996 U.S. Dist. LEXIS 17478,* Dkt. No. 95 Civ. 5662 (DLC), 1996 WL 684167, at *3 (S.D.N.Y. Nov. 26, 1996); *Hedberg v. Indiana Bell Telephone Co., 47 F.3d 928, 931-34 (7th Cir. 1995).* It is undisputed that Broadview was not made aware of Woolley's insomnia, and his desire for an accommodation, until September 7, 2000. As discussed above, the record clearly establishes that by August 3, 2000, Broadview had concluded that Woolley would not continue in his probationary CO Tech position and, if no other position was available, would be fired. Therefore, no jury could conclude that Woolley's termination was "solely" because of his disability.

The legal standards for discrimination claims under the ADA and under New York state and city law are essentially the same, except to the extent that the New York statutes support a broader [*25] definition of "disability," *Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 147 (2d Cir. 1998),* a distinction not relevant here. Accordingly, the above discussion of the federal ADA claims applies to the state and city claims as well. Defendant's motion for summary judgement is thus granted as to the state and city claims.

CONCLUSION

For the reasons stated, defendant's motion for summary judgment is denied as to all federal, state, and city law claims relating to discrimination based on race or national origin, and granted on all other claims.

SO ORDERED.

Dated: New York, New York

February 25, 2003

GERARD E. LYNCH

United States District Judge