**EXHIBIT "B"**

## Page 10

JUDY MILLS

1
2  in human resources?
3      A. Yes.
4      Q. Tell me about that.
5      A. I attended a number of human resources
6  seminars, workshops over the course of the years.
7  I'm a member of SHRM and attend some of their
8  workshops that they have. SHRM, Society for Human
9  Resource Management.
10     Q. Okay. When you were senior manager,
11 when you first started at Mediacom, what was the
12 reporting structure in human resources?
13     A. I reported to Paul Gillert, who was
14 vice president of human resources.
15     Q. Mr. Gillert was vice president of
16 human resources at the time of Ms. Bauza's
17 termination as well, right.
18     A. Yes.
19     Q. He is still currently an employee of
20 Mediacom?
21     A. Yes, he is.
22     Q. Now, when you were promoted up through
23 director and senior director, did the reporting
24 structure change at all?
25     A. No, it did not.

## Page 11

JUDY MILLS

1
2      Q. So in fact, there is no buffer between
3  you and Mr. Gillert?
4      A. No.
5      Q. Anyone who reported to you in human
6  resources?
7      A. Yes.
8      Q. Who was that?
9      A. At the time, the director position.
10 You want names or titles?
11     Q. Start with title.
12     A. We had an HR supervisor, an HR
13 administrator, two -- three, I'm sorry,
14 administrative assistants and one other HR person.
15 I forget if they are an administrator or a
16 coordinator.
17     Q. Okay. Generally speaking, during the
18 time you were either senior manager or HR
19 director, those people were below you?
20     A. Yes.
21     Q. Those titles were below you?
22     A. Yes.
23     Q. In general, what procedures did
24 Mediacom follow if it wanted to terminate an
25 employee? Let me caveat that. I'm not talking

## Page 12

JUDY MILLS

1
2  about a layoff. I'm talking about for something
3  the employee -- for an infraction.
4      A. For cause?
5      Q. For cause. And I don't want to --
6  that is a legal implication. Because you don't
7  actually have to have cause.
8      A. Correct.
9      Q. I don't want to say it like that. If
10 there was an incident that required the
11 termination of an employee, not a layoff, what was
12 generally the procedure, during the period 2006
13 that Ms. Bauza was employed by Mediacom?
14     A. We have a progressive discipline
15 policy. The policy allows that depending upon the
16 infraction, you can jump over certain steps or you
17 can go right to termination.
18     Q. Who is the person that would
19 ultimately make a decision to terminate an
20 employee?
21         MR. RIOLO: Objection. You can
22     answer.
23     A. Well, it depends on the location. I
24 mean, in New York, it would be Paul Gillert and
25 Italia Commisso-Weinand would be involved in the

## Page 13

JUDY MILLS

1
2  decision to terminate. Outside of New York, all
3  termination requests have to come to the corporate
4  headquarters before someone can be terminated,
5  and most times I'm the one who makes those
6  determinations.
7      Q. You mentioned another name, Italia?
8      A. Italia Commisso-Weinand.
9      Q. What position does that person hold?
10     A. Senior vice president human resources
11 and programing.
12     Q. Where does Ms. Commisso-Weinand fit in
13 the reporting structure as far as HR between
14 Gillert, yourself and her? Among you three, how
15 would that work?
16     A. Paul Gillert reports to Italia.
17     Q. Okay.
18     A. Okay.
19     Q. She's his boss. Okay. Where is she
20 located?
21     A. Middletown, New York.
22     Q. When was the first time you learned
23 about an issue concerning Ms. Bauza in regard to
24 disability payments that she received from Aetna?
25     A. Off the top of my head, I believe that

14

1     JUDY MILLS
2  it was early to mid November.
3     Q. 2006?
4     A. Yes.
5     Q. And what was the information you
6  learned regarding that issue?
7     A. I learned that she had been collecting
8  a lot more in disability than she was eligible to
9  receive.
10    Q. Where did you learn that information
11 from?
12    A. I learned it from Regina Burgos, who
13 got it off the report.
14    Q. And I see you are pointing to the
15 document that is sitting in front of me.
16    A. Yes.
17    Q. Since you mentioned that, I'll just
18 show you a document which has been marked as
19 Plaintiff's Exhibit Number 2.
20    A. Uh-huh.
21    Q. Do you see that document?
22    A. Yes, I do.
23    Q. Is that the document that Ms. Burgos
24 gave you that contained the information
25 regarding --

15

1     JUDY MILLS
2     A. Yes.
3     Q. -- the overpayment of disability?
4     A. Yes.
5     Q. Did Ms. Burgos give you any other
6  documents?
7     A. Not that I can recall.
8     Q. Okay. What did Ms. Burgos say to you
9  with regard to this issue, besides what you just
10 testified to, anything else?
11    A. No. I don't recall her saying
12 anything else.
13    Q. And had Ms. Burgos come to you before
14 that date with any issues regarding overpayment of
15 disability benefits to other employees?
16    A. No.
17    Q. Had anybody else at Mediacom come to
18 you at any time regarding an overpayment of
19 disability payments by any provider to any
20 employee of Mediacom?
21    A. No.
22    Q. So this was the one and only time you
23 had to deal with this particular issue of an
24 overpayment of disability benefits by an outside
25 administrator to one of the employees of Mediacom?

16

1     JUDY MILLS
2     A. Yes.
3     Q. What did you do, if anything, after
4  Ms. Burgos brought this information to your
5  attention regarding Ms. Bauza?
6     A. I met with Steven Rubin, who is with
7  Mercer. Steven happened to be on site that day.
8  We were having discussions about our benefit plans
9  for the new year.
10    Q. Right.
11    A. So I reviewed the matter with him, and
12 he was going to follow up on trying to get some
13 additional information on this situation.
14    Q. And just by way of background,
15 Mediacom utilized Aetna to administer the payment
16 of the disability payments to its employees for
17 short term disability, right?
18    A. Yes.
19    Q. But the payments are actually
20 self-insured by Mediacom, correct?
21    A. Yes.
22    Q. Mediacom actually pays out of its own
23 earnings any claims for disability put in by
24 employees?
25    A. That's correct.

17

1     JUDY MILLS
2     Q. Now, what role does Mercer Benefits
3  play in that process? I know you mentioned you
4  spoke to Steven Rubin. How is he involved in this
5  process?
6     A. Because we pay them a lot of money,
7  and they are there to help us when we have issues
8  with benefits, regardless of the plan.
9     Q. What company is he with?
10    A. He's with Mercer.
11    Q. What is his role with regard to
12 between Mediacom and Aetna? What is his function,
13 as far as you are concerned?
14    A. I guess he is sort of in between
15 person. When there are issues at a high level
16 that we think need to be resolved or we need to
17 have a high level approach to them, we would ask
18 Steven or Mercer to assist with them.
19    Q. Mr. Rubin is not an employee of
20 Mediacom, right?
21    A. No, he is not.
22    Q. Now, prior to Ms. Burgos bringing to
23 your attention what's been marked Plaintiff's
24 Exhibit Number 2, did you know who Ms. Bauza was?
25    A. Oh, yes.

5 (Pages 14 to 17)

## Page 22

           JUDY MILLS
2  between you two at that time?
3     A. Yes.
4     Q. Did Mr. Rubin ever get back to you
5  about what his --
6     A. Yes.
7     Q. -- investigation may have concluded?
8     A. Sorry. Yes.
9     Q. When did he get back to you?
10    A. I don't remember the exact date,
11 but -- I don't remember the exact date, but he did
12 get back to me.
13    Q. Did he get back to you in what form?
14 Did he call you, sent you an email, write you a
15 letter?
16    A. I believe that I got an email from
17 him.
18          MR. CUTRO: I'm going to show you
19       a document that we're going to mark as
20       Plaintiff's Exhibit Number 7.
21
22          (Plaintiff's Exhibit 7, EMAIL
23          CORRESPONDENCE BATES STAMPED
24          0238-239, marked for
25          identification.)

## Page 23

           JUDY MILLS

3     Q. This is an email, string of emails.
4  The last notation, which is from Steven Rubin,
5  says it's sent on Tuesday, November 21, 2006.
6  It's to J. Mills at Mediacomcc.com. Subject says
7  STD overpayment. And below that there are some
8  other emails. I'm just identifying that for the
9  record. This is marked as Plaintiff's Exhibit 7.
10    A. Yes.
11    Q. Take a look at that email.
12    A. Yes.
13    Q. Does that email represent the
14 response --
15    A. Yes.
16    Q. -- Mr. Rubin sent to you to try to
17 explain the error with the overpayment?
18    A. Yes.
19    Q. And besides that email, did you have
20 any other conversations with Mr. Rubin regarding
21 the Bauza disability payment issue?
22    A. I believe the only other conversation
23 I had with him was regarding the reimbursement to
24 Mediacom of the overpayment.
25    Q. What was the -- when was that

## Page 24

           JUDY MILLS
2  conversation?
3     A. I don't recall. I mean, obviously, it
4  would have been after this.
5     Q. Was it a phone conversation?
6     A. Yes.
7     Q. You are aware that at some point Ms.
8  Bauza did pay back the overpayment, right?
9     A. Yes.
10    Q. So it was sometime between when Ms.
11 Bauza paid the overpayment and after this email of
12 November 21, 2006, that conversation that you had
13 with him?
14    A. I'm sorry. Can you say that again.
15    Q. All right. The conversation you had
16 with Mr. Rubin regarding Ms. Bauza paying back the
17 amount occurred sometime after the last date of
18 this email, which is November 21, 2006?
19    A. Yes.
20    Q. But prior to when Ms. Bauza actually
21 paid the amount back?
22    A. Yes, that's correct.
23    Q. Did you speak to -- other than that
24 conversation and this email, you had no further
25 conversation with Mr. Rubin regarding the Bauza

## Page 25

           JUDY MILLS
2  overpayment?
3          MR. RIOLO: And the initial one
4       she testified to.
5          MR. CUTRO: Correct.
6     A. I don't recall any. If I did, it was
7  nothing of any substance.
8     Q. Okay.
9     A. Okay.
10    Q. Now, in this email, Mr. Rubin
11 basically forwards you an email from a Matt
12 Galligan at Aetna, correct?
13    A. Correct.
14    Q. Did you ever speak to Mr. Galligan at
15 Aetna?
16    A. No, I did not. No.
17    Q. Did you speak to anyone at Aetna
18 regarding the overpayment?
19    A. I did not, no.
20    Q. Is it fair to say that the -- strike
21 that.
22          What is your understanding as to why
23 the overpayment was made?
24    A. My understand is that the claim may
25 have been submitted or it was submitted late, that

26

JUDY MILLS

1  JUDY MILLS
2  somebody on Aetna's side had to do a calculation
3  to make up for some benefits that Miriam would be
4  due. They did that. They put that in their
5  computer but possibly never went back to change
6  the number to what it actually should have been.
7  That is why she was receiving the benefits to the
8  extent that she was.
9     Q. This was a mistake totally the fault
10 of Aetna, correct?
11    A. Yes.
12    Q. Ms. Bauza had no cause in that fault?
13    A. No.
14    Q. If Ms. Bauza did not pay back the
15 overpayment, Mediacom would have been responsible
16 for that deficiency, right?
17    A. Yes.
18    Q. Aetna wasn't going to pay it, right?
19    A. I can't say for sure that they
20 wouldn't pay it. Would we have persisted?
21 Probably.
22    Q. Hypothetically, if Ms. Bauza did not
23 reimburse the deficiency, Mediacom would have
24 taken responsibility for this mistake?
25    A. Yes.

27

1  JUDY MILLS
2     Q. Despite the fact that Mr. Galligan is
3  saying in this email that Aetna was not going to
4  be responsible, correct?
5     A. Correct.
6     Q. Do you know any other documents
7  besides Plaintiff's Exhibit Number 2 and
8  Plaintiff's Exhibit Number 3 and Plaintiff's
9  Exhibit Number 7 that exist that concern subject
10 matter of this error by Aetna paying Ms. Bauza
11 disability?
12    A. I don't recall any other document.
13    Q. Okay. Was Ms. Bauza ever given a
14 termination letter?
15    A. I don't believe so.
16    Q. Were there ever any emails between you
17 and anyone at all regarding the subject matter of
18 Ms. Bauza's overpayment by Aetna?
19    A. No.
20    Q. Did you have any conversations with
21 anyone regarding the overpayment by Aetna to Ms.
22 Bauza?
23       MR. RIOLO: Other than --
24    A. When?
25    Q. Just in general, I know you are going

28

1  JUDY MILLS
2  to say, beside Mr. Rubin you testified to. We
3  know there are others, obviously. Who would those
4  people be in this universe that you spoke to about
5  the Ms. Bauza issue?
6     A. Paul Gillert, Italia Commisso-Weinand,
7  Joe Michulski, obviously, and Mark Stefan.
8     Q. Anyone else?
9        MR. RIOLO: Not including Steve
10 Mercer and Regina.
11       MR. CUTRO: Correct.
12    Q. You also spoke to Ms. Bauza too,
13 right, at some point?
14    A. At some point, sure. Absolutely.
15    Q. Besides the people we talked about
16 prior, Paul Gillert, Commisso, Michulski and --
17    A. Mark Stefan.
18    Q. Who is Mark Stefan?
19    A. He is CFO. Joe Michulski reports to
20 Mark Stefan.
21    Q. Okay. He may have said that earlier
22 today.
23       What did you say to Mr. Gillert about
24 this situation and when?
25    A. I would venture to say I spoke with

29

1  JUDY MILLS
2  him the same exact day that this came in.
3     Q. I apologize. There are three
4  documents in front of you. I'm going to take
5  Plaintiff's Number 7 away because that was after
6  the fact.
7        When did Ms. Burgos come to you, do
8  you remember when that was, what day in November
9  it was?
10    A. I don't remember the exact day.
11    Q. I believe there are representations by
12 the company in some documents that it was sometime
13 in November. I don't want to put a date --
14    A. It was definitely in November.
15       MR. RIOLO: There is a
16 termination memo which was drafted which
17 was served as part of our discovery.
18       MR. CUTRO: Right.
19       MR. RIOLO: Which kind of
20 solidifies the date as to what was learned
21 throughout the process.
22    Q. Did you draft that termination memo?
23    A. Yes, I did.
24    Q. That memo was not given to Ms. Bauza?
25    A. That was just a memo to my file.

8 (Pages 26 to 29)

30

JUDY MILLS

1  JUDY MILLS
2  Q. Would it be helpful for you to take a
3  look at that? I'll show it to you later. That
4  memo can have the wrong dates on it too. The
5  dates are not the key point here. It's not really
6  the issue.
7      All right. So you get this
8  information from Ms. Burgos sometime in November.
9  Who was the next person you spoke to besides
10 Rubin?
11     A. Paul Gillert.
12     Q. How did that come? Did you call him?
13 Did you email him?
14     A. I went to his office. He is right
15 across from me, so I went to his office.
16     Q. All right. What did you say to him?
17     A. I said to him that -- I don't remember
18 my exact words, but I said it appears as though
19 Miriam was collecting more on her disability than
20 what she was eligible for, and it appeared as
21 though it was substantially more.
22     Q. What did he say in response to you, if
23 anything?
24     A. I don't remember his exact words, but
25 I -- I can't say his exact words.

31

JUDY MILLS

1  JUDY MILLS
2  Q. Sum and substance, what did he say?
3      A. To check into it. We obviously were
4  going to check into it. And eventually, we were
5  going to meet with her to get her take on what had
6  happened.
7      Q. So he told you, take a look into it?
8      A. Yeah. To explore it, yes. Yeah.
9      Q. Did Mr. Gillert know who Ms. Bauza
10 was?
11     A. Yes.
12     Q. Did he know that she had been out on
13 disability leave prior to you coming into his
14 office that day?
15     A. Yes.
16     Q. How do you know he knew?
17     A. Because he was part of HR. We were
18 very close. It was a very close group, and Miriam
19 was, for a long time, part of this group of people
20 that worked in the same area together.
21     Q. Ms. Commisso-Weinand, what
22 conversations did you have with her or contact?
23     A. They would have been similar to the
24 ones with Paul Gillert.
25     Q. When was the first time you approached

32

JUDY MILLS

1  JUDY MILLS
2  her?
3      A. I couldn't say. It was around the
4  same exact time frame, I'm sure.
5          MR. RIOLO: Same exact time frame
6      as?
7          THE WITNESS: As when I first
8      spoke with Paul.
9      Q. Where is her office located.
10     A. Right next to mine in the same
11 building.
12     Q. What do you recall telling Ms.
13 Commisso-Weinand?
14     A. It would have been the same exact
15 thing I said to Paul Gillert.
16     Q. Did she say anything back to you in
17 response?
18     A. I'm sure. I mean, again, the goal was
19 to explore this. We weren't going to take it just
20 on a piece of paper. So we needed to explore it.
21     Q. Okay. Mr. Michulski, when did you
22 contact him regarding Ms. Bauza?
23     A. Probably was that same exact day as
24 well.
25     Q. Why did you contact him?

33

JUDY MILLS

1  JUDY MILLS
2      A. Because he had been in charge of these
3  things in the past, and he was very much involved
4  with the benefits.
5      Q. What did you ask of Mr. Michulski
6  regarding Ms. Bauza?
7      A. I don't know that I specifically asked
8  him anything or told him.
9      Q. What did you tell him?
10     A. The same thing. That it appears as
11 those Miriam had gotten an overpayment.
12     Q. Did he have any response to you on
13 that?
14     A. He -- with the amount we were talking
15 about, most of the response was surprise, and
16 let's explore it and try to get to the bottom of
17 it.
18     Q. Mr. Stefan, when did you bring this
19 issue to his attention?
20     A. I don't believe that I spoke with him
21 until we had the meeting to discuss possible
22 termination.
23     Q. When was that meeting to discuss
24 possible termination?
25     A. That probably was within the few days

42

JUDY MILLS

Q. So you three in person discussed how to deal with this issue?
A. Yes.
Q. That was as a result of Ms. Burgos providing you what is now Plaintiff's Exhibit Number 2, Mr. Rubin doing a calculation, which is Plaintiff's Exhibit Number 3, and then you getting copies of checks back from Aetna that indicated that Ms. Bauza actually received the checks and endorsed them?
A. Yes.
Q. Anything else did you have at that point as far as information that was factored into --
A. I don't believe there was anything else.
Q. Who contacted Ms. Bauza to let her know she was going to be called in to this meeting on the 15th?
A. I don't recall who specifically. It could have been Regina may have brought her over, but I don't know specifically.
Q. Do you know who you contacted to let them know that this meeting was going to take

43

JUDY MILLS

place?
A. I'm sure I spoke to Regina and Joe.
Q. Did you tell them what the subject of that meeting was going to be?
A. Yes.
Q. What did you tell them the subject of that meeting was going to be?
A. Miriam's situation, the overpayment and to ask her about it.
Q. Did you tell them to advise Ms. Bauza about the subject matter of that meeting?
A. No.
Q. Did you tell them not to tell her what the subject matter of the meeting was?
A. No.
Q. Where was that meeting held, ultimately, with Ms. Bauza?
A. In my office. That I'm sure of. It was in my office.
Q. In human resources?
A. Yes.
Q. It was you, Ms. Burgos, Mr. Michulski and Ms. Bauza?
A. Correct.

44

JUDY MILLS

Q. What happened at that meeting?
A. I explained to Miriam what we had learned, asked her for an explanation. She indicated to us that she knew that there was something wrong when she had gotten the disability check -- checks I should say. She said that she had contacted Aetna. And whoever it is that she spoke with there told her that there was no problem with it.
   She said that she knew that she was to receive 66 and two thirds of her pay. And she said that she had also planned on -- she was going to call Joe Michulski when she got the overpayment or when she thought she had an overpayment, but then she decided that she would wait until she returned to work. I believe the meeting ended with Miriam saying that she was going to check her notes or to find out who it was at Aetna that she had talked with, and that she would be coming back to us with that information.
Q. Anything else discussed at that meeting?
A. I don't recall anything else off the top of my head. I mean, she was surprised. She

45

JUDY MILLS

said that she was embarrassed, that type of thing.
Q. Did you tell Ms. Bauza at that meeting that she may be discharged?
A. No.
Q. Did you tell her she may be subject to any disciplinary action?
A. No.
Q. Were you aware that when Ms. Bauza returned back from disability leave that she was still undergoing chemotherapy?
A. Yes.
Q. Did you have any knowledge about whether or not she was on any other type of medication as a result of her treatment?
A. No.
Q. Did you ask her what type of medication she was on?
A. No.
Q. Is there any policy in writing at Mediacom that provides that the procedure to be followed if you receive an overpayment is to immediately contact Mediacom?
A. No.
Q. Is there any unwritten procedure about

12 (Pages 42 to 45)

## 54

**JUDY MILLS**

1  
2  what were the circumstances?  
3  A. That she received the overpayment,  
4  that she knew that it was incorrect and that she  
5  never brought it to our attention. Those were the  
6  circumstances.  
7  Q. At that meeting, was it ever discussed  
8  whether there were similar fact patterns that had  
9  arisen with other employees and what discipline  
10 was used in those types of situations?  
11 A. No.  
12 Q. Who had the ultimate authority to make  
13 the decision to terminate Ms. Bauza at that  
14 meeting?  
15 A. The ultimate authority would have been  
16 Italia Commisso-Weinand and Mark Stefan.  
17 Q. Did you make a recommendation at that  
18 meeting as to how to handle Ms. Bauza, or did you  
19 present the facts or both?  
20 A. I made a recommendation, yes.  
21 Q. What was your recommendation?  
22 A. My recommendation was termination.  
23 Q. Now, was the fact that Ms. Bauza was  
24 out on disability leave discussed at that meeting?  
25 A. No.

## 55

**JUDY MILLS**

1  
2  Q. Other than the fact that there were  
3  disability benefits that were the subject of the  
4  issue?  
5  A. No.  
6  Q. In Plaintiff's Number 8, in the third  
7  paragraph, you wrote, it was communicated to  
8  Miriam, given the nature of her position in  
9  payroll, there was no doubt that she knew of the  
10 overpayment. And she failed to call us  
11 immediately upon realizing that she was being  
12 informed of wrong information by Aetna and that  
13 more than three months had gone by since her  
14 return and she still did not tell anyone.  
15     Now, in that sentence, you use the  
16 word, did not call us immediately, correct?  
17 A. Uh-huh.  
18 Q. Now, is that the company's position,  
19 that in instances when an employee receives an  
20 overpayment, they have an obligation to notify  
21 Mediacom immediately of that overpayment?  
22     MR. RIOLO: Objection. You may  
23     answer.  
24 A. I would say in Miriam's case, because  
25 her case is the only one I handled with something

## 56

**JUDY MILLS**

1  
2  like this, that with her being in payroll and her  
3  knowing the overpayment, knowing that she received  
4  the overpayment, that the position was that you  
5  are in a position of trust and you need to contact  
6  us when things like this happen.  
7  Q. So did it make a difference, even if  
8  she had called Aetna, like she claimed and they  
9  told her it was correct, would that have made a  
10 difference in the decision to terminate her?  
11     MR. RIOLO: Objection.  
12 A. I don't know.  
13 Q. Would it have made a difference in  
14 your decision -- I take that back.  
15     In you making your recommendation to  
16 terminate Ms. Bauza, would it have made a  
17 difference if she had called Mr. Michulski,  
18 attempted to call Mr. Michulski while she was out  
19 on leave?  
20     MR. RIOLO: Objection.  
21 A. Yes, it would have made a difference.  
22 Q. Did you ever ask Mr. Michulski if she  
23 had called him and raised this issue to him?  
24 A. Yes.  
25 Q. When did you ask him that?

## 57

**JUDY MILLS**

1  
2  A. It would have probably been right  
3  after the meeting with her when she said that she  
4  tried to call.  
5  Q. Do you recall specifically having that  
6  conversation with him?  
7  A. No. I mean, I would ask general  
8  questions, have you spoken with Miriam, those  
9  types of things. No, I can't say.  
10 Q. After the meeting on November 15th,  
11 your testimony is that Mr. Michulski attended,  
12 that when Ms. Bauza raised the issue about  
13 contacting Mr. Michulski, you addressed that issue  
14 with him at sometime after that meeting?  
15     MR. RIOLO: Objection. That's a  
16     mischaracterization, but you can answer.  
17 A. I would say that if I had a  
18 conversation with him, it would have been, did  
19 Miriam try to reach you.  
20 Q. But you are not sure whether you had  
21 that conversation with him?  
22 A. No.  
23 Q. Do you know if anyone had that  
24 conversation Mr. Michulski?  
25 A. No, I don't know.

58

1　　　　　JUDY MILLS
2　　Q. In making the recommendation to
3　terminate Ms. Bauza, did you consider that
4　treatment that Ms. Bauza was undergoing while she
5　was out on leave in regards to impacting her
6　mental capacity and her ability to -- general, you
7　know, physical well being?
8　　　　　MR. RIOLO: Objection.
9　　　　　THE WITNESS: Can I answer?
10　　Q. Yes.
11　　A. It was clear because she had already
12　said that she knew it was an overpayment, okay,
13　that she already knew that. It wasn't something
14　that she claimed she did not know. Okay. I would
15　have to say that her -- I didn't have to consider
16　that because she had already said that she knew
17　that there was an overpayment.
18　　Q. Understood.
19　　A. Okay.
20　　Q. You know, the memo -- your
21　recollection is that she did acknowledge these
22　payments?
23　　A. Yes.
24　　Q. Because she did call Aetna to question
25　it, but in Ms. Bauza's ability to call Mediacom

59

1　　　　　JUDY MILLS
2　immediately and try to resolve this issue, did you
3　take into consideration the fact that she had just
4　undergone surgery and was under several
5　medications that may have impacted her ability to
6　respond properly to this situation to Mediacom?
7　　　　　MR. RIOLO: Objection.
8　　A. I didn't because she had said that she
9　was going to call Joe. So she had already came to
10　that conclusion that she was going to call him.
11　But she decided to wait until she returned. So I
12　never had to take that into consideration.
13　　Q. Okay.
14　　A. Okay.
15　　Q. Did you ever ask Mr. Rubin to have
16　Aetna get any phone logs from conversations that
17　it had with Ms. Bauza?
18　　A. I don't know if I specifically asked
19　him to do that.
20　　Q. Did you have any knowledge about
21　whether Aetna recorded phone calls that were made
22　to it?
23　　A. I have -- sorry. Finish your
24　question.
25　　Q. Did you ever have any knowledge about

60

1　　　　　JUDY MILLS
2　whether Aetna recorded phone calls by its customer
3　to it regarding questions?
4　　A. No. Specifically, no.
5　　Q. Okay. In general?
6　　A. In general, I had a hunch that they
7　probably did, but I cannot speak for them.
8　　Q. Did you ever ask Mr. Rubin to inquire
9　of Aetna whether they made a recording?
10　　A. No, I did not. I didn't ask
11　specifically for something like that.
12　　Q. Okay. That meeting that you had with
13　Ms. Weinand and it was Mr. Gillert, right?
14　　A. Uh-huh.
15　　Q. And yourself, did you discuss the
16　Bauza matter at all prior to the final termination
17　meeting with her with anyone else?
18　　A. I would guess that we probably did
19　have some discussion.
20　　Q. Who would we be?
21　　A. Paul Gillert and Italia and I.
22　　Q. But the final decision was made at
23　that meeting?
24　　A. Yes.
25　　Q. Was there any discussion of any other

61

1　　　　　JUDY MILLS
2　type of discipline short of termination to invoke
3　in this situation?
4　　A. I don't recall any other, any other
5　discussion of any other disciplinary action.
6　　Q. Did the company review anything else
7　in Ms. Bauza's personnel file in regards to making
8　the decision to terminate her?
9　　A. No.
10　　Q. Performance had nothing to do with it?
11　　A. No.
12　　Q. At that meeting you had on the 15th
13　with Ms. Burgos, Mr. Michulski and Ms. Bauza, did
14　Ms. Bauza ever tell you during that meeting that
15　she never collected disability benefits before?
16　　A. She may have. She may have.
17　　Q. And you did know at that meeting that
18　Ms. Bauza's responsibilities in her everyday job
19　were not in the area of disability benefits,
20　correct?
21　　A. Ms. Bauza has a background in
22　benefits. She administered similar benefits in
23　the past. And she knew about the 66 and two
24　thirds.
25　　Q. But that was not part of her job

16 (Pages 58 to 61)

66

1  JUDY MILLS
2  Q. From that day to sitting here today,
3  have you had any discussions with Mr. Michulski
4  about Ms. Bauza's termination?
5  A. With him, no.
6  Q. With anyone else, besides your
7  attorneys, besides Mr. Riolo?
8  A. Probably with Paul Gillert and Italia,
9  because, you know, we had this situation with the
10 severance that we were offering her. So there
11 were continuing discussions.
12 Q. What discussions did you have with
13 Mr. Gillert after Ms. Bauza's termination
14 regarding Ms. Bauza?
15 A. I don't remember anything real
16 specific. I mean, they were just general
17 discussions, nothing of any substance.
18 Q. What about with Ms. Weinand?
19 A. Same thing. I mean, it really
20 wouldn't -- there really was nothing of any
21 substance.
22 Q. Did Ms. Bauza ever tell you that Ms.
23 Burgos had said to her that she was abusing the
24 company's time by going to chemotherapy?
25 A. Miriam did come to me one day not

67

1  JUDY MILLS
2  happy with how Regina had dealt with a doctor's
3  appointment. Maybe it was the chemo. And I told
4  Miriam to go talk with Brian Walsh if she had a
5  concern.
6  Q. Did Ms. Bauza talk to Mr. Walsh?
7  A. As far as I know she did, yes.
8  Q. When was that that she raised that
9  issue to you?
10 A. I honestly don't remember.
11 Q. Prior to this issue being raised with
12 the Aetna overpayment, right?
13 A. Oh, absolutely, it was prior to that.
14 Q. After she returned from disability
15 leave?
16 A. Yeah.
17 Q. Did you ever investigate further
18 regarding the allegations that Ms. Burgos had made
19 that statement about Ms. Bauza abusing company
20 time by going to chemotherapy?
21    MR. RIOLO: Objection.
22 A. I don't believe that that's how it was
23 presented to me. I believe that it was more, I
24 came into work for an hour and a half and I had to
25 leave for an appointment. And Regina questioned

68

1  JUDY MILLS
2  the reason why she came into work. I don't think
3  that it had -- there was a discussion that it was
4  because she was going to chemotherapy. And that
5  is when I told Miriam to go talk with Brian Walsh,
6  who would have been Regina's supervisor.
7  Q. Could Ms. Bauza have phrased it as I
8  asked it?
9  A. I can't say how she would phrase it.
10 I mean, I'm not there. I wasn't there, so I can't
11 say.
12 Q. I mean, Ms. Bauza's -- one of the
13 allegations in this lawsuit is that Ms. Bauza
14 claims that she had told you that Ms. Burgos said
15 that Ms. Bauza was abusing company time by her
16 going to chemotherapy. Could she have used those
17 words, that phrasing with you and you don't
18 recall?
19 A. I don't believe that that is how it
20 was presented to me.
21 Q. When you were at that meeting with Ms.
22 Bauza and others on November 15th, did Ms. Bauza
23 ask you whether this issue of an overpayment had
24 been raised before with other employees, in
25 regards to Aetna's payment of disability benefits?

69

1  JUDY MILLS
2  A. I don't recall her asking me that.
3  But I mean, it's not uncommon for employees to ask
4  how others were treated in the past. So I mean,
5  if she did, my normal response is that we're
6  dealing with this particular issue, and we have to
7  focus on this particular issue.
8  Q. Did you tell her it was none of her
9  business?
10 A. No, I would never say that.
11 Q. Were you aware that Ms. Bauza had
12 filed a discrimination charge with the EEOC
13 regarding her termination?
14 A. Sure. I mean, I believe I was, yeah,
15 I mean.
16 Q. Do you understand the difference
17 between a charge filed with the Equal Employment
18 Opportunity Commission and a complaint filed in
19 federal court, like in this action?
20 A. Yes, I do.
21 Q. At some point, were you made aware
22 that there was an EEOC charge filed by Ms. Bauza?
23 A. Yes.
24 Q. Did you ever see that charge?
25 A. Yes, I've seen it.

70

JUDY MILLS

Q. Did anyone at Mediacom contact you to help prepare in responding to that charge?
A. Yes.
Q. Who was that?
A. That would have been Bruce Gluckman.
Q. Mr. Gluckman is?
A. Sorry. He is vice president, legal.
Q. He is a lawyer?
A. Yes.
Q. Aetna no longer administers the disability benefits, correct?
A. That's correct.
Q. Were you involved in the process that resulted in Aetna losing the account and another insurance provider being awarded the account?
A. Yes.
Q. Was the fact that Aetna made an error in regards to Ms. Bauza's payment one of the factors that made Mediacom consider not continuing the account with Aetna?
A. We already made the decision to move from Aetna before the situation.
Q. Before the situation?
A. Uh-huh.

71

JUDY MILLS

Q. Mr. Michulski testified earlier today, and he believed that when he was responsible for reviewing the payouts made by Aetna for disability payments to Mediacom employees that he had came across two other employees that were paid an overpayment in error by Aetna.
A. Okay.
Q. Are you aware of that?
A. I'm aware of a couple of other overpayments since Miriam, yes.
Q. Were these after Miriam?
A. After Miriam.
Q. And these were by Aetna?
A. Yes.
Q. What were the facts surrounding those cases?
A. They were of minimal amounts. They were -- I don't have all of the facts. I mean, they were not people in positions that would cause me to have to look into it or to react, I should say, the way that we did or the way that we looked at it with Miriam. The amounts were certainly not up to $4,000.
Q. Correct me if I'm wrong, in Ms.

72

JUDY MILLS

Bauza's case, whether the amount was $4,000 or $.40, according to your testimony, it was wasn't the amount, it was her position and responsibility?
A. $.40 --
    MR. RIOLO: Objection. Go ahead.
A. $.40 would not have been noticeable at all. This was something that stood out, and it was impossible for somebody not to notice it.
Q. Okay. Now, these two other incidents, how much were the amounts?
A. I don't know.
Q. You don't know whether they were minimal or not?
A. I know that they were minimal. I know that they were nowhere near $4,000.
Q. What were they near?
A. I honestly don't know the number.
Q. How did those incidents come to your attention, the other two overpayments by Aetna?
A. Probably because we were doing -- we were reviewing things more closely at this point. We wanted to know if we had a problem.
Q. Mr. Michulski testified he noticed

73

JUDY MILLS

these errors and brought them to someone's attention.
A. Okay.
Q. No disciplinary action was taken against those two employees that Aetna made overpayments to; is that correct?
A. I don't know of any disciplinary action, no.
Q. What time period did these other two overpayments occur?
A. I don't know.
Q. After --
A. I have no idea.
Q. After Ms. Bauza was terminated, after November '06?
A. That is when I learned of them, yes.
Q. Do you know if they were from incidents prior to November '06?
A. I don't recall.
Q. When do you recall learning about them; around November '06?
A. Probably later than November '06.
Q. After Ms. Bauza was terminated?
A. Yeah.

19 (Pages 70 to 73)

74

JUDY MILLS

Q. Did you bring those incidents to anyone's attention at Mediacom?

A. I spoke with Paul Gillert about them, yes.

Q. What did Mr. Gillert say about it, if anything?

A. These were people that were out in the field. My instructions were to deal with it with the HR people out in the field, which is what I did.

Q. How did you deal with it?

A. I only remember one specifically. In that particular case, they spoke with the person, and the person began making payments. It was, again, one of these kinds of situations where the amounts were not so great on the face of it, but over a period of time, it can add up. In that particular case, it might have been $50 a week that was really unnoticeable unless you sat down and really added everything up.

Q. Do you know the name of that employee?

A. I don't, not off the top of my head, no.

MR. CUTRO: I'm going to put in a

75

JUDY MILLS

request, Mr. Riolo. I believe that my document request covers this scenario.

DOCUMENT/INFORMATION REQUESTED

MR. RIOLO: I'm not sure if they do, but that's fine.

MR. CUTRO: I believe they do, but I mean, we can talk about it after, any pending requests. I'm pretty sure that I asked for that information. I'm not making a negative inference about the fact that it wasn't -- it's not in production. That is why we're in discovery. We can discuss that issue.

BY MR. CUTRO:

Q. Do you know who Gladys Falto is?

A. Yes.

Q. Who is she?

A. Gladys was a payroll person who reported to Miriam.

Q. She is no longer with the company,

76

JUDY MILLS

correct?

A. Correct.

Q. She resigned?

A. Yes.

Q. She wasn't terminated, right?

A. No.

Q. Do you recall Ms. Burgos bringing to your attention the fact that she had an issue with Ms. Falto claiming overtime for work that Ms. Burgos believed that she may not have actually worked the overtime and/or she may have been spending too much time on an allotted task that she was assigned?

A. Yes.

Q. What did you do, if anything, in response to Ms. Burgos bringing this to your attention?

A. I would have advised her to sit down and talk with her about it, to talk with Gladys about it.

Q. Did you do that?

A. Did I sit down with Gladys?

Q. Yes.

A. No.

77

JUDY MILLS

Q. Did you advise Ms. Burgos to sit down?

A. Sure.

Q. Did you take any other action at HR regarding that issue that Ms. Burgos brought to your attention?

A. There was no need at that point to take any action.

Q. Isn't it true that part of Ms. Burgos' concern was Ms. Falto was putting in to get paid for overtime for hours she may not have actually worked?

A. I don't know that to be a fact. I don't know.

Q. If that was a fact -- let me step back for a minute.

If an employee puts in to get paid for time that they didn't work, whether it be overtime or something else, as an HR person --

A. I would be very concerned about that.

Q. That is called theft of time, right?

A. Yes. I would be very concerned about that.

Q. If you were advised by an employee of Mediacom that another employee may have been

20 (Pages 74 to 77)

78

JUDY MILLS

1 JUDY MILLS
2 involved with a situation where they put in
3 overtime that they didn't work, that is something
4 that is a serious matter, correct?
5    A.  I don't believe that it was for
6 overtime that they didn't work. I believe that it
7 was more how the work was getting done that was
8 taking longer, but I don't recall it being for
9 work not being done.
10    Q.  But if it was for work being not done,
11 you are saying that your response would have been
12 different?
13    A.  Absolutely.
14    Q.  Ms. Falto was in a similar position of
15 trust as Ms. Bauza, right?
16    A.  Yes.
17    Q.  So if there were accusations of theft
18 of the time, that would be a serious matter,
19 correct?
20    A.  Yes.
21    Q.  Similar to the serious matter with Ms.
22 Bauza, correct?
23    A.  I would need more information before I
24 said it should be handled similar to that.
25    Q.  Did you ever follow up with Ms. Bauza

79

1 JUDY MILLS
2 regarding your advice to her to go see Mr. Walsh
3 when she complained to you about how Ms. Burgos
4 was responding to her request for time?
5    A.  I don't believe that I did, but I'm
6 almost positive that at the end of that meeting, I
7 kept the door open for Miriam to stop back in to
8 see me if there were any other issues.
9    Q.  But you don't know one way or the
10 other how that issue was resolved with Ms. Bauza,
11 do you?
12    A.  I know how it was resolved.
13    Q.  How do you know that?
14    A.  I would guess that Miriam probably
15 told me. I don't know how I know, but I know how
16 it was resolved.
17    Q.  Okay.
18    A.  Okay.
19    Q.  Give me a second. I'm just going to
20 look through this stuff.
21    A.  Sure.
22    Q.  Since you have retained a new provider
23 to administer disability benefits, has there been
24 an issue of overpayment of disability benefits to
25 any Mediacom employee?

80

1 JUDY MILLS
2    A.  No, not that I'm aware.
3    Q.  Not limited to disability benefits,
4 have you been involved in any issues with any
5 overpayments made to employees, besides what we've
6 testified here to today?
7    A.  No.
8    Q.  Have you ever been involved in an
9 issue with Mediacom itself making an error in
10 overpaying its employees in its own payroll cycle,
11 where they have given them a check that was too
12 much?
13    A.  I have not, no.
14    Q.  Okay. When you were making the
15 decision on Ms. Bauza's termination, did you ever
16 inquire of anyone else in HR about whether they
17 had seen a scenario where an employee was
18 overpaid, whether it be by an outside provider or
19 internally?
20    A.  No. The others have been there longer
21 than me. So they certainly would know more than I
22 would.
23    Q.  You didn't ask those others?
24    A.  No.
25    Q.  Did Mr. Gillert ever ask you about

81

1 JUDY MILLS
2 whether this scenario --
3    A.  I don't believe he did.
4    Q.  -- had arisen before?
5    A.  No.
6    Q.  Did Ms. Weinand ever ask you about
7 whether this type of scenario had arisen before?
8    A.  I don't believe so. I don't believe
9 that we ever had a person who was in a position of
10 trust where this has happened.
11    Q.  Okay. Just give me one minute.
12    A.  Sure.
13        MR. CUTRO:  I have no more
14 questions.  Thank you.

17        (Time noted: 3:44 p.m.)