**EXHIBIT "C"**

26

```
 1              REGINA BURGOS
 2   Ms. Bauza, whatever you are more comfortable with.
 3   I don't have a problem with that.
 4       A. Okay.
 5       Q. Now, when you started in June 2006,
 6   was Ms. Bauza at site, at your work location?
 7       A. No.
 8       Q. When was the first time, if ever, did
 9   you meet Ms. Bauza?
10       A. When she came back, which was maybe
11   August.
12       Q. Of 2006?
13       A. Yeah. I didn't -- yeah.
14       Q. And I'll tell you, Ms. Burgos, I'm not
15   here to give you a memory test. I understand
16   there are records here that reflect certain dates,
17   and you can certainly approximate. Later on I may
18   have some documents that may help you with that.
19   We're just talking about general time lines here,
20   but if there are specific dates that are
21   important, you know, I'll let you know that I'm
22   looking for a specific date, and we'll try to show
23   you things that will help you out. I'm not trying
24   to trick you here or anything like that. So at
25   some point, Ms. Bauza was not on site as an
```

27

```
 1              REGINA BURGOS
 2   employee, but thereafter at the end of the summer,
 3   she came back to work?
 4       A. Yes.
 5       Q. When you use the term back to work, do
 6   you have an understanding of why she wasn't at
 7   work?
 8       A. She was on disability.
 9       Q. How did you know that at the time, if
10   you knew that at the time?
11       A. Because when I started employment,
12   they said I had two direct reports, one was Miriam
13   and she was on disability.
14       Q. Okay. I'll back up a little bit. So
15   you started the job in June 2006, you reported to
16   Mr. Walsh, right?
17       A. Uh-huh.
18           MR. RIOLO: You have to say yes.
19       A. Yes.
20           THE WITNESS: Sorry.
21           MR. RIOLO: It's okay.
22       Q. You just testified you had two direct
23   reports, one was Ms. Bauza?
24       A. Yes.
25       Q. Who was the other employee?
```

28

```
 1              REGINA BURGOS
 2       A. Gladys Falto.
 3       Q. And what was Ms. Bauza's title?
 4       A. Payroll supervisor.
 5       Q. What was your understanding of her
 6   responsibilities, her job responsibilities?
 7       A. I really didn't have a thorough
 8   understanding.
 9       Q. Okay. No one at the company explained
10   to you what she would or would not be doing for
11   you?
12       A. No.
13       Q. How about Ms. Falto, what was her
14   title?
15       A. It was either payroll administrator or
16   payroll analyst. I'm not sure.
17       Q. What was your understanding during the
18   summer of 2006 as far as her job responsibilities?
19       A. She was doing the field payroll.
20       Q. Okay.
21       A. And everything to do with that.
22       Q. Okay. Now, prior to summer of 2006
23   when Ms. Bauza returned to work, had you ever met
24   her before?
25       A. No.
```

29

```
 1              REGINA BURGOS
 2       Q. Now, when you started in June 2006,
 3   when was the first time you audited the
 4   information that you received from Aetna in
 5   regards to disability payments?
 6       A. It was a few months.
 7       Q. And Ms. Bauza was one of the employees
 8   that was receiving disability benefits during the
 9   summer of 2006, correct?
10       A. Yes.
11       Q. Do you recall ever spot checking Ms.
12   Bauza from the materials you received from Aetna
13   prior to, I think you said, October or November?
14       A. Around there, something like that. I
15   think it was October. No, because things were
16   backed up. Joe Michulski brought me over a whole
17   stack, so.
18       Q. So you don't specifically recall
19   whether or not you had checked Ms. Bauza as one of
20   the employees you spot checked prior to --
21       A. Prior to spot checking it?
22       Q. Prior to October 2006?
23       A. No. I would say no.
24       Q. But you had reviewed some of those
25   materials Mr. Michulski provided to you, you just
```

30

REGINA BURGOS

2 don't recall whether you checked Ms. Bauza's in
3 particular?
4     A.  I had started to go through the stack.
5 So yes, I had reviewed some people.
6     Q.  Okay. Now, I know you just testified
7 in general what your thought process was, as far
8 as who you chose to spot check. What made you
9 decide in October '06 to take a look at Ms. Bauza
10 in regard to Aetna disability payments?
11         MR. RIOLO: Objection to form.
12     You can answer.
13         THE WITNESS: I can answer?
14         MR. RIOLO: Yes.
15     A.  That was the stack that I got to, had
16 her name in it. As I was spot checking, she was
17 there and --
18     Q.  And what -- I'm sorry. Go ahead.
19     A.  She was an easy one, because she was
20 one of my employees. So I knew her salary right
21 offhand.
22     Q.  Okay.
23     A.  You tend to know what the employees
24 that work for you get paid.
25     Q.  Did you have any understanding as to

31

REGINA BURGOS

2 why Ms. Bauza was out on disability leave?
3     A.  Yes.
4     Q.  What was your understanding?
5     A.  That she had breast cancer.
6     Q.  Okay. Did you know the extent of the
7 treatment she was receiving?
8     A.  No.
9     Q.  And how did you come to understand
10 that she had breast cancer?
11     A.  When I started, they said you have two
12 employees that are reporting to you. One is here
13 and one is out. She is on disability. She has
14 breast cancer.
15     Q.  And who told you that information?
16     A.  Probably Judy Mills.
17     Q.  Okay. Do you recall when that
18 conversation took place? And I'm not looking for
19 exact dates or times. Generally?
20     A.  Probably the first week I started.
21     Q.  So sometime in June 2006?
22     A.  Yeah. Yes.
23     Q.  Did Ms. Mills tell you anything else
24 about Ms. Bauza besides that information?
25     A.  Anything else?

32

REGINA BURGOS

2     Q.  At all. She was nice. She wasn't
3 nice. She drove a red car. I mean anything at
4 all whatsoever.
5     A.  She is your payroll supervisor. She
6 knows that you are coming in above her, and she is
7 fine with that. That was it.
8     Q.  That's it?
9     A.  Uh-huh.
10    Q.  Okay.
11        MR. RIOLO: That's yes?
12    A.  Yes.
13    Q.  Yes, okay. Did you ask any questions
14 about Ms. Bauza?
15    A.  No. One question I asked.
16    Q.  Okay.
17    A.  When was she coming back.
18    Q.  Okay. And did you get a response from
19 Ms. Mills?
20    A.  I did, and I don't remember the exact
21 date and time, but she knew when she was scheduled
22 to come back.
23    Q.  Okay. What were Ms. Bauza's job
24 responsibilities when she came back from
25 disability leave?

33

REGINA BURGOS

2     A.  I did not set up job responsibilities
3 right away. The corporate payroll was given back
4 to us. So Gladys Falto was now going to be doing
5 the corporate payroll, which we had somebody else
6 doing while Miriam was out. And I assume whatever
7 job she did before she was going to do again. And
8 that was help with the field payroll.
9     Q.  Did Ms. Bauza -- when she returned to
10 work, did you tell Ms. Bauza that is what you
11 expected her to do in particular?
12    A.  No.
13    Q.  Ms. Bauza comes back to work, you meet
14 for the first time I assume, right?
15    A.  Uh-huh. Yes.
16    Q.  Did you give her any directives as far
17 as what you expected from her?
18    A.  No, other than to continue what she
19 had done before.
20    Q.  Okay.
21    A.  And we just were going through another
22 conversion with time and attendance, so I wanted
23 her to get up to par with that.
24    Q.  Okay. Now, after she returned from
25 disability leave, was Ms. Bauza fulfilling her job

9 (Pages 30 to 33)

34

REGINA BURGOS

2 responsibilities, as far as you were concerned?
3     A. When she first came back? Am I
4 allowed to ask you a question?
5         MR. RIOLO: Why don't you qualify
6     it. If you want to break it down into
7     different times, you can do that to answer
8     his question.
9     Q. We're not talking about a long period
10 of time from when she returned and when she left.
11 She returned from disability leave in the summer
12 '06. My question to you is, was she meeting your
13 expectations? If there came a point when she
14 wasn't in any regard, let me know and we'll talk
15 about it.
16     A. When she first came back, I gave an
17 opportunity to see what her knowledge was, which I
18 tend to do with all of my employees to see what
19 level they are at. So I gave her an opportunity
20 to show me what she knew. I gave her different
21 assignments. And no, she did not meet my
22 expectations.
23     Q. In particular what didn't she meet
24 your expectations in?
25     A. I felt she did not have a thorough

35

REGINA BURGOS

2 understanding of payroll to be in the position she
3 was in.
4     Q. When did you draw that conclusion?
5     A. Probably within the first month she
6 was back.
7     Q. Did you ever discuss that with her?
8     A. No, I did not.
9     Q. Did you ever discuss that issue with
10 anyone at Mediacom?
11     A. Yes, I did.
12     Q. With who?
13     A. HR.
14     Q. Who at HR?
15     A. Judy Mills.
16     Q. When did you have that conversation
17 with Ms. Mills?
18     A. Probably within a month.
19     Q. We're talking September-ish of '06?
20     A. I -- when you get to a certain age,
21 you forget things. I would guess maybe September.
22 That's a guess.
23     Q. Let me make it simpler. Prior to Ms.
24 Bauza being terminated, you had this conversation
25 with Ms. Mills?

36

REGINA BURGOS

2     A. Yes.
3     Q. But Ms. Bauza never learned of any of
4 these issues of her job performance that you had
5 with her from you; is that correct?
6     A. That's correct.
7     Q. You never gave her a written reprimand
8 or write up regarding these issues?
9     A. No.
10     Q. Do you know if Ms. Mills ever
11 addressed these issues that you had with Ms.
12 Bauza's performance with Ms. Bauza?
13     A. No, I don't know. I don't think so,
14 but I'm not 100 percent on that.
15     Q. What was your purpose in explaining to
16 Ms. Mills that you had an issue with Ms. Bauza's
17 performance?
18     A. Because I was a new person. I didn't
19 hire Miriam. I didn't hire Gladys. My thing was,
20 I felt that for one, there was a role reversal
21 between Gladys and Miriam. Gladys had a lot more
22 knowledge than Miriam, and Miriam was her
23 supervisor. So that was one of the reasons I
24 brought it up, and I was concerned. I had an
25 employee that was supposed to be a supervisor of

37

REGINA BURGOS

2 payroll and doesn't know payroll.
3     Q. Your testimony is that Ms. Falto
4 reported to Ms. Bauza?
5     A. Yes.
6     Q. What made you draw the conclusion that
7 she didn't have a knowledge of payroll?
8     A. A couple of things. I had given her a
9 spreadsheet that I needed salary information on.
10 When I received it back, there was incorrect
11 information.
12         I gave her -- this is probably the
13 biggest issue. I gave her 100 to 200 checks. We
14 needed manual checks. They had to be grossed up,
15 which is a minor term in payroll. If you are
16 doing payroll, you should know what gross up
17 means. I got the checks back, and every single
18 check was incorrect.
19     Q. As far as the spreadsheet issue, did
20 you ever ask Ms. Bauza why she did not do it up to
21 your expectations?
22     A. I sent it back to her and asked her to
23 correct it.
24     Q. Did she correct it?
25     A. Yes.

10 (Pages 34 to 37)

46

REGINA BURGOS

2 did.
3   Q. Okay. And after you explained to her and Ms. Falto how you wanted this done, did she correct the mistake that was made?
6   A. Yes.
7   Q. Did it get done right?
8   A. Yes, because I sat there and showed them specifically how to do it.
10  Q. Did she ever make that mistake again?
11  A. I never gave her them again.
12  Q. And those are the only two issues you had as far as Ms. Bauza not meeting your expectations?
15  A. They are the only two that come to mind.
17  Q. Now, the second issue with the grossing of the checks, did you issue any written reprimand to Ms. Bauza that she knew that you had a problem with her performance?
21  A. No.
22  Q. Did you ever discuss that issue with any other employee at Mediacom?
24  A. HR.
25  Q. Who at HR?

47

REGINA BURGOS

2   A. Judy Mills.
3   Q. Why did you discuss it with Ms. Mills?
4   A. Because this was a payroll supervisor that did not know payroll.
6   Q. Now, did you discuss other performance issues of other employees with Ms. Mills besides these two incidents with Ms. Bauza?
9   A. I only had two employees.
10  Q. So still the question is, did you ever discuss any other performance issues with Ms. Falto with Ms. Mills?
13  A. Yes.
14  Q. You did?
15  A. Yes.
16  Q. What issues did you have with Ms. Falto's performance?
18  A. Putting down overtime when I felt there was no need for it.
20  Q. Explain what your problem was with that issue with Ms. Falto?
22  A. I didn't feel there was a need for overtime to get the job done.
24  Q. Let me ask you, did you believe Ms. Falto was not working the overtime, or do you

48

REGINA BURGOS

2 believe that she was taking too long to do the job and then requesting overtime?
4   A. Both.
5   Q. You told this to Ms. Mills?
6   A. Yeah, and I told it to Gladys too.
7   Q. When did you raise this issue with Ms. Mills about the overtime?
9   A. I don't recall.
10  Q. Prior to Ms. Bauza being terminated?
11  A. Yes.
12  Q. What did Ms. Mills say in response to the complaints you made about Ms. Falto?
14  A. It wasn't really -- I don't know. I don't remember.
16  Q. Is Ms. Falto still employed at Mediacom?
18  A. No, she is not.
19  Q. When did her employment end?
20  A. Maybe June 2007.
21  Q. What was the reason her employment ended?
23  A. She voluntarily quit.
24  Q. Was Ms. Falto ever disciplined, to your knowledge, as a result of the overtime issues

49

REGINA BURGOS

2 you raised with Ms. Mills?
3   A. I spoke to her on more than one occasion.
5   Q. Was she ever disciplined as a result of that issue you raised with her on the overtime? Was she suspended, demoted?
8   A. No. We don't -- no.
9   Q. She wasn't terminated?
10  A. No.
11  Q. Was there ever a write-up put in Ms. Falto's file regarding that overtime issue?
13  A. I don't know if I put it on her review or not.
15  Q. Okay. So one of the issues you complained about to Ms. Mills regarding Ms. Falto was that you believed that Ms. Falto was putting down for overtime to get paid from the company for hours she may not have actually worked?
20  A. Yes.
21  Q. Is there another name for that in the company, as far as HR? Do you know what they call that?
24  A. Another name?
25  Q. Yeah, for that type of infraction by

50

REGINA BURGOS

1  an employee.
2      A. Not that I know of.
3      Q. Theft of time, have you ever heard
4  that?
5      A. No. I never put it like that. She
6  was saying she worked from home, and I didn't feel
7  that the job needed those hours. I didn't know
8  whether she worked them or not, but I didn't feel
9  the job needed those hours.
10     Q. So you had a -- like I just asked you
11 a few moments ago.
12     A. Conversation.
13     Q. You questioned whether or not there
14 was -- one of the issues you had was whether or
15 not that time was actually worked by Ms. Falto?
16     A. Yes.
17     Q. Did your review of the Aetna records
18 in regard to disability payments ever turn up
19 anyone besides Ms. Bauza? I'm talking about from
20 the time you started working to the present day.
21     A. No.
22     Q. As far as you are concerned, as far as
23 disability payments were concerned, that was the
24 only mistake that was made?

51

REGINA BURGOS

1      A. That was the only mistake that I saw.
2      Q. What is your understanding, if any, as
3  to why that mistake was made?
4          Who made that mistake, let me ask you
5  that?
6      A. I don't know. Aetna, I guess.
7      Q. Okay.
8      A. They are the one that makes the
9  payments.
10     Q. So it wasn't Ms. Bauza's mistake?
11     A. I wouldn't think so.
12     Q. Besides reviewing Aetna in regard to
13 disability payments, you do review other payments
14 made by -- regarding payroll as well, right, by
15 other providers, correct?
16     A. Other providers?
17     Q. Yeah, other outside --
18     A. No. Those are the only payments
19 related to payroll.
20     Q. Besides disability payments, there are
21 no other payments made regarding payroll? I'm
22 asking the question, you tell me. There are no
23 other payments made?
24     A. Other than paychecks.

52

REGINA BURGOS

1      Q. Okay. You review paychecks?
2      A. Yes, I do.
3      Q. When you say Paychecks, you mean the
4  actual company that cuts the checks to the
5  employees for their wages, right?
6      A. Well, we cut the checks.
7          MR. RIOLO: It's not Paychecks,
8      the company. She reviews the actual
9      paychecks.
10         MR. CUTRO: I take that back.
11     Excuse me.
12     Q. There is a company called paychecks
13 that a lot of small companies use that actually do
14 that for us, like law firms.
15     A. No, I worked for them. I know them.
16     Q. I apologize.
17         So what you are saying is you reviewed
18 internally the company's own checks?
19     A. Payroll.
20     Q. Own payroll checks?
21     A. Yes.
22     Q. Did you ever discover errors made by
23 Mediacom in cutting checks to employees?
24     A. Yes.

53

REGINA BURGOS

1      Q. What would be the procedure to follow
2  when you discovered a payroll check error?
3      A. Well, we process -- the way we process
4  payroll is they go to a, what we call IPM. IPM
5  gives us a picture of what the payroll is going to
6  look like prior to it being processed. So we go
7  to IPM, and there's checks drawn. We correct them
8  and we process. If the checks get out wrong, when
9  we process, when the payroll comes back, we review
10 them. If the checks are wrong, we recall the
11 checks and correct them.
12     Q. Okay. Did you ever come across a
13 scenario where the company cut the wrong check out
14 of payroll and the employee actually received the
15 check and cashed the check?
16     A. Yes.
17     Q. Did you ever come across that scenario
18 where the employee did not return the money that
19 was paid in error until after the company went to
20 the employee and raised that mistake with the
21 employee?
22     A. Yes.
23     Q. How many times did that scenario occur
24 that you know?

14 (Pages 50 to 53)

54

```
                    REGINA BURGOS
 2    A.  At Mediacom?
 3    Q.  Yes.
 4    A.  Probably three.
 5    Q.  What happened in those three
 6  particular incidents?
 7    A.  It was --
 8    Q.  Let me ask the question because it may
 9  help you, although some of my questions here may
10  confuse the matter more.
11        In those three instances, do you have
12  an understanding of the procedure that was
13  utilized by the company to correct that mistake?
14    A.  Yes.
15    Q.  And you testified that the company
16  would notify these employees that they received an
17  overpayment, correct?
18    A.  Yes.
19    Q.  Okay.  Can you walk me through those
20  three incidents, to the best of your knowledge
21  about, you know, how the company handled it after
22  contact was made with these employees?
23    A.  Okay.  I'll go through one.  It was the
24  payroll processor's error.  We have a system with
25  time and attendance that hours come over, and if a
```

55

```
                    REGINA BURGOS
 2  negative 80 hours come over and the employee
 3  shouldn't get paid, there is a box that gets
 4  checked on the other payroll system that stops it
 5  from automatically paying them.  In that case, it
 6  was not checked, so the employee received a check
 7  and should not have.  The employee was contacted.
 8  And the check was -- I don't know if the check was
 9  still in hand.
10    Q.  What was the name of this employee, do
11  you recall?
12    A.  No.
13    Q.  Do you recall how much money we are
14  talking about that was paid in error?
15    A.  No.
16    Q.  Do you recall if the employee was
17  still in the employ of the company when you
18  discovered the error?
19    A.  Yes.
20    Q.  Did the employee pay back the
21  overpayment?
22    A.  Yes.
23    Q.  Was the employee --
24    A.  Well, we retrieved the money through
25  his bank account.  It was a direct deposit and we
```

56

```
                    REGINA BURGOS
 2  pulled it back.
 3    Q.  How long after the payment was made
 4  was the error discovered?
 5    A.  Pay day was on Friday, and it was
 6  discovered on Friday.  So we would have pulled it
 7  back on Monday.
 8    Q.  That was for one scenario, correct?
 9    A.  Uh-huh.
10    Q.  For the other two scenarios, what was
11  the time frame between the error being discovered
12  and the employee being notified?
13    A.  It's usually on the same day, on pay
14  day, because we are still reviewing when checks go
15  out.  So one of them would have been on the same
16  day.  I'm trying to think the longest that went
17  by.  Maybe three days after payroll, after pay
18  day.
19    Q.  The one that took three days, the
20  employee never contacted Mediacom to say, look, I
21  got too much money, right?
22    A.  On the last one, no.
23    Q.  Do you know if the company took any
24  disciplinary action against the employee?
25    A.  No, it wasn't the employee's fault.
```

57

```
                    REGINA BURGOS
 2    Q.  For being overpaid?
 3    A.  On paychecks, they don't get a
 4  statement unless they go online and look at it.
 5  So they get a direct deposit.
 6    Q.  But when you get a direct deposit,
 7  there is a place can you can go check and see what
 8  you received?
 9    A.  Yes, there is.
10    Q.  Don't you also get a stub that tells
11  you what you received?
12    A.  No, we don't print stubs.  A lot of
13  our employees are commission folks, so their
14  checks vary.
15    Q.  Was any action taken by the company in
16  regards to the person in the company who made the
17  mistake that caused this overpayment?
18    A.  The payroll processor?  The payroll
19  processor was taught how to do it right so it
20  didn't happen again.
21    Q.  Who was the payroll processor?
22    A.  I have --.
23    Q.  Was it Ms. Falto?
24    A.  I have 13 of them out there, so I
25  couldn't tell you which one it was.
```

70

REGINA BURGOS

Q. What was the subject matter -- strike that.
   What did you guys discuss, you and Ms. Mills, regarding Ms. Bauza?
A. How the error happened.
Q. What did you say, and what did Ms. Mills say back to you?
A. I said, did we report this information incorrectly, and she said no, we reported it correctly. And she was talking to Aetna to get background information.
Q. So the information was reported correctly to Aetna, that means it had to be Aetna's error in making the payment, correct?
A. That's correct.
Q. Not Ms. Bauza's error, correct?
A. That's correct.
Q. Anything else in that conversation with Ms. Mills?
A. I did clarify something, that I felt that it was not a 33 and a third percent overpayment. It was she received 200 percent of salary.
Q. Okay. Was Ms. Mills confused about

71

REGINA BURGOS

that?
A. Well, at first it appeared that it was, to her, that it was 100 percent of salary, but when I went over the information with her, I said, it's not 100 percent of salary. It's 100 percent of salary, biweekly salary every week.
Q. Okay. Anything else discussed at that meeting with Ms. Mills?
A. No.
Q. What did Ms. Mills say back to you in response to your explanation of that to her?
A. She's contacting Aetna and getting the information.
Q. Did she tell you we're going to have a meeting tomorrow with Ms. Bauza, please attend?
A. She told me she would talk to Aetna and then we would talk to Miriam.
Q. Prior to that meeting that you just discussed you had with Mr. Michulski and yourself and Ms. Mills, did you mention to Ms. Bauza that you had discovered this mistake?
A. No, I did not.
Q. Did Ms. Bauza understand what the subject of the meeting was going to be when she

72

REGINA BURGOS

was called in to meet with you, Mr. Michulski and Ms. Mills?
   MR. RIOLO: Objection. You can answer.
A. Not that I know of.
Q. According to -- you never told her what the subject of that meeting was to be about?
A. No, I did not.
Q. She could have learned from someone else, but not from you?
A. I don't know that. I guess anything is possible.
Q. Fair enough. How did Ms. Bauza learn to attend that meeting?
A. I'm not sure if I told her come on, we're going to see Judy or Judy called her. I don't remember.
Q. Did you get the sense that at that meeting Ms. Bauza knew what the subject matter of that meeting was going to be about?
A. No.
Q. What happened at that meeting?
A. We showed Miriam the payments that she received and asked her if she thought that she was

73

REGINA BURGOS

over paid.
Q. Now, did you show her Plaintiff's Exhibit Number 2?
A. Maybe.
Q. But some document was shown to Ms. Bauza at that meeting?
A. I would think it was this, but I don't recall.
Q. Okay. So if you can, best as you recollect, who spoke first, who said what? You know, I know it's a long time ago, but certainly I'm not asking for quotations but what --
A. Judy spoke first.
Q. Okay. And what did she say?
A. It's hard to remember. I don't remember exact words.
Q. I'm not asking for exact words.
A. She asked Miriam about the Aetna payments, did Miriam feel that it looked like she got overpaid. And did she know that she was overpaid. And Miriam said that she felt that the payments were wrong. She called Aetna and questioned them. Aetna said they were correct, but she felt they were wrong. And when she got

19 (Pages 70 to 73)

74

1  REGINA BURGOS
2  back, she had planned to bring it to Joe
3  Michulski's attention and she forgot.
4      Q. Anything else said at that meeting?
5      A. Yes. It was pointed out that the
6  payments were not 33 and a third overpayments,
7  that she received the 200 percent. And Miriam
8  felt that she had called Aetna. She was going to
9  go back and find out the name of the person, if
10 she had record of who she spoke to at Aetna. But
11 it was pointed out that you received 200 percent
12 of salary.
13     And I'm sure my statement was, you are
14 a payroll supervisor. I find it hard to
15 understand how you can get 200 percent of your
16 salary, and you are a payroll supervisor and not
17 realize it.
18     Q. What was Ms. Bauza's response?
19     A. I thought I was overpaid, but I called
20 Aetna and Aetna said it was okay. And I was going
21 to bring it to Joe's attention and I forgot to.
22     Q. Anything else transpire at that
23 meeting?
24     A. She was going to go back and check and
25 see if she knew or had written down the name of

75

1  REGINA BURGOS
2  the person she spoke to.
3      Q. Anything else?
4      A. That was it, that I remember.
5      Q. Did Ms. Mills tell her anything at the
6  end of that meeting?
7      A. It was left that she was going to go
8  find out, and they didn't know what position, you
9  know, what was going to happen with this. It was
10 a serious issue.
11     Q. Was Ms. Bauza advised that her
12 employment was in jeopardy at that meeting?
13     A. I don't know. I don't remember.
14     Q. Did Ms. Bauza leave that meeting by
15 herself, or did you leave the meeting with her?
16     A. I don't remember if she walked out
17 before me or not.
18     Q. Did you have any discussions with
19 Mr. Michulski or Ms. Mills without Ms. Bauza
20 present after that meeting was over regarding Ms.
21 Bauza?
22     A. The only discussion that I know that I
23 had was, she is a payroll manager. She got 200
24 percent of salary, and the position that she is
25 in, she should have known she was overpaid.

76

1  REGINA BURGOS
2      Q. Anyone have any response to you at
3  that point when you said that statement?
4      A. It was an HR issue, and they were
5  going to make the decision. It was out of my
6  hands.
7      Q. You made that statement without Ms.
8  Bauza being present?
9      A. I made it with her and without her.
10     Q. Okay. Did you -- after that meeting
11 and the testimony you just gave, did you discuss
12 anything else regarding Ms. Bauza and this
13 incident with anyone else?
14     A. No.
15     Q. Did anyone ask you for your input
16 after that date regarding Ms. Bauza?
17     A. No. It was in HR's hands.
18     Q. Did Ms. Bauza still report to you
19 after that meeting?
20     A. Yes, but she reported to me and she
21 reported to Joe, because her position was
22 changing.
23     Q. Might as well discuss that now since
24 you brought that up. When Ms. Bauza returned from
25 disability leave, you testified that Mr. Michulski

77

1  REGINA BURGOS
2  was, prior to that, her boss and moved over to a
3  different role, correct?
4      A. Mr. Michulski.
5      Q. Yes.
6      A. No, he didn't move over to a different
7  role. Payroll was just not reporting to him
8  anymore.
9      Q. All right. So payroll was not
10 reporting to him anymore, and you were involved in
11 the process, right?
12     A. Yes.
13     Q. Do you know what was going to be Ms.
14 Bauza's role in regard to reporting to him?
15     A. For benefit information.
16     Q. What was the nature of that assignment
17 for Ms. Bauza, in addition to her responsibilities
18 prior to going on disability leave and she came
19 back, there was a little change in the structure.
20 What was going to be her role?
21     A. She was going to report to Joe.
22     Q. Okay. And not to you any longer?
23     A. That's correct.
24     Q. What I'm trying to get at, while she
25 was reporting to you, during this period of time,

20 (Pages 74 to 77)

78

REGINA BURGOS

that was a transition period for her?

A. Not at first. When she first came back, she was still in payroll.

Q. Okay. Who made the decision that she was going to work for Mr. Michulski?

A. Well, pretty much when I brought incidents to Judy Mills' attention that Miriam didn't really know payroll, the decision was made, you know what, because she doesn't know payroll, but Joe needs a person, maybe she can report to Joe. And I was told later on that Miriam is going to work for Joe.

Q. Who told you that?

A. Judy Mills.

Q. And you had no problem with that?

A. Might have been Paul Gillert, one of the two.

Q. Who is Paul Gillert?

A. I didn't have any -- Paul Gillert is the VP of human resources.

Q. Okay.

A. Judy is a VP, but Paul is a higher VP?

Q. Right. Did you have any problem with Ms. Bauza reporting to Mr. Michulski?

79

REGINA BURGOS

A. Not at all.

Q. Was she still going to have reporting responsibilities to you as well?

A. When it was all said and done, no.

Q. So you would be left with Ms. Falto?

A. That's correct.

Q. But that transition never took place because Ms. Bauza was ultimately terminated, correct?

A. It started to take place. She started to take on work from Joe. So at a point she was still in payroll a little bit but was also starting to do the 401-K stuff for Joe.

Q. Okay. Did you ever contact anyone at Aetna to inquire about the issue that happened in regard to Ms. Bauza?

A. No.

Q. Were you -- besides what you just testified to today, did you ever give any further information to Mediacom regarding Ms. Bauza after you said you told Ms. Mills the statement, after that meeting, the meeting with all three of you, that you thought that a payroll supervisor should have known about the error, did you have any

80

REGINA BURGOS

further contact with Ms. Mills or anyone else regarding Ms. Bauza?

A. I think after a couple of days went by, I asked Miriam, did you have the name of the person that you spoke to at Aetna and she said no. That was the end of that conversation. And I think I walked over to Judy's office and said, Miriam doesn't have the name of the person. She said, please do not discuss it. And human resources is going to handle it.

Q. Did anyone ask you to ask Ms. Bauza if she knew the name of the person at Aetna she spoke to?

A. No.

Q. You did that on your own?

A. Yes.

Q. When did you learn that Ms. Bauza was going to be terminated?

A. Five minutes before she was terminated.

Q. No one at Mediacom asked you whether or not you agreed with the decision or not?

A. Not at all.

Q. Okay. Who advised you that she was

81

REGINA BURGOS

going to be terminated?

A. Judy Mills.

Q. What did she tell you?

A. The company had decided we are going to terminate her employment.

Q. Did she tell you anything else?

A. No.

Q. Did you ask why?

A. No.

MR. CUTRO: Mark this as Plaintiff's 4, please.

(Plaintiff's Exhibit 4, EMAIL DATED 8/29/06, BATES STAMPED 520, marked for identification.)

Q. Now, when Ms. Bauza was working for you, did she sometimes request to have time off to accommodate her medical appointments or her treatment for breast cancer?

A. Yes.

Q. What were your general responses to those requests?

A. Take as much time as you need.

21 (Pages 78 to 81)

82

REGINA BURGOS

1
2  Q. Okay. Let me show you a document that
3  has been marked Plaintiff's Exhibit Number 4. It
4  also bears the designation Mediacom 520. This is
5  a document that was produced by Mediacom in this
6  litigation. It's an email from Miriam Bauza to
7  several people at Mediacom, and it is dated August
8  29, 2006. And I believe you are one of the
9  parties, Ms. Burgos, that received this document.
10     Just take a look at this document, and
11 tell me whether or not you recall this email?
12  A. Yes. Yes, I do.
13  Q. Okay. And typically, Ms. Bauza would
14 either email you like this to let you know she was
15 out or call you?
16  A. She would let me know usually ahead of
17 time when she was going to be out.
18  Q. Was she pretty good about letting you
19 know when she was going to need to be out?
20  A. Yes.
21  Q. Sometimes she would send you an email
22 like this, or would she send you an email letting
23 you know?
24  A. I would think so.
25  Q. Okay.

83

REGINA BURGOS

1
2  A. She would let me know one way or
3  another.
4  Q. In particular, this particular email,
5  it says, Gladys is out of the office today and I
6  will be out of the office after 9:15 a.m. also and
7  will return tomorrow. If there are any issues
8  that need immediate attention, please feel free to
9  contact Regina Burgos, and it lists your number.
10     Do you recall responding to this email
11 in any way?
12  A. I probably did, and my response would
13 be, why did you come in at all.
14  Q. Why would that be your response?
15  A. Because the office only opens at 8:00.
16 Why would you come in the office for an hour.
17  Q. Okay. You didn't think she was being
18 a diligent employee, trying to get as much work in
19 as possible instead of taking the whole day off?
20  A. In an hour? No. She is driving from
21 Newburgh to Middletown to wherever she has to go.
22 I would be -- if I'm going for chemotherapy,
23 coming into work an hour before, you'd be
24 stressed, in my opinion, but.
25  Q. You didn't think -- this didn't

84

REGINA BURGOS

1
2  reflect -- to you this didn't reflect that Ms.
3  Bauza was trying to be a conscientious employee
4  coming in to work that day, even just for a little
5  bit of time?
6     MR. RIOLO: Objection. You can
7     answer.
8  A. Not after a conversation I had had the
9  day before with her, no.
10  Q. What conversation did you have with
11 her the day before?
12  A. We talked about exempt and nonexempt
13 employees. And it wasn't related directly to her.
14 It was related to exempt and nonexempt, and it
15 was, pretty sure, the day before or if it was the
16 weekend, a Friday, I mean very recent to that.
17 And I explained to her, if you are exempt and you
18 don't have any time, if you come in part of the
19 time, the company has to pay you for the full day,
20 that is the law.
21     So when she came in, and I think it
22 was the next day, and came in and was leaving at
23 9:15, my response to her was, why did you come in
24 at all. And my answer was, so I get paid for the
25 whole day.

85

REGINA BURGOS

1
2  Q. She sent you an email back saying
3  that?
4  A. I don't think it was an email. I
5  think it was in person.
6  Q. In response to your explanation to
7  her, if she didn't come in, she wasn't going to be
8  paid?
9     MR. RIOLO: Objection.
10  A. No. That wasn't the conversation.
11  Q. Okay. But you did, prior to this
12 email coming out, you had a conversation with her
13 in which you indicated that if a person had
14 exhausted their time, if they took a day off
15 completely, they wouldn't be paid for it, in
16 general, not to her specifically?
17     MR. RIOLO: Objection.
18  A. There was an earlier conversation
19 about Miriam's time off.
20  Q. With who?
21  A. With me and Miriam.
22  Q. Okay.
23  A. Okay. When Miriam -- I guess I'm not
24 supposed to elaborate.
25  Q. That's the question. That is what I'm

22 (Pages 82 to 85)

## Page 86

```
 1              REGINA BURGOS
 2   asking you about, that conversation.
 3       A.  When Miriam first came back --
 4           MR. RIOLO:  This is a different
 5   conversation, just for clarity.
 6           THE WITNESS:  Yes, it is, other
 7   than the exempt, nonexempt.
 8       Q.  Okay.
 9       A.  When Miriam first came back, she had
10   to take a day off.  I'm not sure if it was the
11   same week she came back or the next week.  It was
12   very close to the time she came back.  She took
13   the day.  Again, I told her you take the time you
14   need.  She took the day.  It was time to turn in
15   time sheets.  She brought her time sheet to me and
16   she said, can I get paid for the day I took off.
17   I said, you know what, Miriam, no.  I said, you
18   took off part of the time because you had to go to
19   another doctor the day before, which we're paying
20   you for.  I said, you don't have any time left in
21   your bank.  You didn't come in.  I'm sorry.  I
22   don't feel you should be paid for the day.  That
23   conversation took place.
24           At some point, she went to my boss,
25   Brian Walsh, and said, you know what, I work extra
```

## Page 87

```
 1              REGINA BURGOS
 2   hours, you know, I think I should be paid this.
 3   Brian Walsh called me into his office and said,
 4   we're going to pay Miriam for the time off.  I
 5   said okay.  We will.  He is my boss.  He told me
 6   to pay her.  So after that, every time she took
 7   off she got paid.
 8       Q.  It's your understanding you had the
 9   authority --
10       A.  I didn't have the authority.
11       Q.  Let me finish the question.
12           When you first gave the response to
13   Ms. Bauza that the company wasn't going to pay
14   her, it was your understanding that you had the
15   authority to make that decision?
16       A.  I had the authority to approve or not
17   approve the time card, yes.
18       Q.  What made you have that understanding,
19   that that was in your authority?
20       A.  Because every manager approves their
21   employee time cards.
22       Q.  You didn't take it upon yourself to go
23   ask Mr. Walsh whether or not Miriam can get paid
24   for that day?
25       A.  No.
```

## Page 88

```
 1              REGINA BURGOS
 2       Q.  She had to go over your head?
 3       A.  She went over my head.
 4       Q.  Then there was another conversation
 5   you testified to that was of a more general
 6   nature, where you were discussing exempt versus
 7   nonexempt employees?
 8       A.  Yes.
 9       Q.  During that conversation, you
10   mentioned the fact that if you don't come in at
11   all during that day, then the company doesn't have
12   to pay you if you exhausted all of your time?
13       A.  Right.
14       Q.  What precipitated that conversation?
15       A.  She came in my office asking about
16   exempt and nonexempt.
17       Q.  In relation to what?
18       A.  Employees.
19       Q.  In general?
20       A.  Yes.
21       Q.  Regarding something she had to do at
22   work?
23       A.  Questions like that come to me all the
24   time in my position.
25       Q.  Right.
```

## Page 89

```
 1              REGINA BURGOS
 2       A.  So I don't really remember what it was
 3   in regards to, other than the difference between
 4   exempt and nonexempt.
 5       Q.  At this point in time, the subject of
 6   this email, Plaintiff's Exhibit 4, if Ms. Bauza
 7   didn't report in for an hour that next day,
 8   according to Mr. Walsh, she was going to get paid
 9   anyway?
10       A.  Yes, but I don't remember the time
11   line as when Brian called me in his office and
12   said, the company has decided we're going to pay
13   her for these days, if that was after this day or
14   before this day.
15       Q.  Okay.
16       A.  I'm going to -- I don't know.  I'm
17   going to assume that it was after this day.
18       Q.  But you don't know?
19       A.  I don't know.  I don't remember.
20       Q.  So if this email of August 29
21   transpired before Mr. Walsh had given approval to
22   pay Ms. Bauza for working -- for not working at
23   all that day -- strike that question.  Forget that
24   question.
25           So in your mind, it's possible that
```

**Page 90**

1    REGINA BURGOS
2    the reason why Ms. Bauza came in for an hour that
3    day was because she felt she needed to in order to
4    get paid for that day?
5         MR. RIOLO: Objection. You can
6         answer.
7    A.   It's not in my mind. It's a fact
8    because she told me that.
9    Q.   Okay. When did she tell you that?
10   A.   When I asked her why she came in.
11   Q.   So this incident -- I don't want to
12   call it an incident. This email string is from
13   August 29 -- or this email from August 29 predates
14   Mr. Walsh's decision to pay her?
15   A.   That is what I'm not sure of. I'm
16   assuming it does, because I'm assuming at this
17   point for her to tell me that she came in for that
18   hour to get paid, Brian hadn't told me his
19   decision that we were going to pay her.
20   Q.   So she was reporting to work for that
21   hour because you had told her if she didn't do so
22   she would not be paid for that day?
23   A.   No, I did not tell her that she had to
24   come in for an hour.
25   Q.   No, you told her if she did not come

**Page 91**

1    REGINA BURGOS
2    in at all one day she wouldn't be paid?
3         MR. RIOLO: Objection.
4    A.   I told her that if exempt people don't
5    come in for any time during the day, they don't
6    get paid, if they don't have any time.
7    Q.   You also testified to another
8    conversation in specifics to Ms. Bauza, where you
9    said, Miriam, since you exhausted all of your
10   time, we're not paying you for any time off you
11   take, if you miss a day, right? If you miss a
12   complete day, you are not going to get paid for
13   it?
14   A.   I told her a specific time when she
15   came in my office, took the day off and asked to
16   get paid for the day that I did not feel she was
17   going to get paid for that day.
18   Q.   You didn't tell her going forward that
19   that was going to be how you were going to handle
20   that situation?
21   A.   We didn't talk about going forward.
22   Q.   Did you ever tell Ms. Bauza that she
23   was abusing the company's time by going to
24   chemotherapy?
25   A.   No, not at all.

**Page 92**

1    REGINA BURGOS
2         MR. CUTRO: Can you mark this as
3    Plaintiff's 5.
4
5         (Plaintiff's Exhibit 5, EMAIL
6         DATED 8/29/06, BATES STAMPED 228,
7         marked for identification.)
8
9    Q.   I show you what's been marked as
10   Plaintiff's Exhibit 5. This is a document that
11   was produced by Ms. Bauza in this litigation, not
12   by the company.
13        It's an email from you to Ms. Bauza
14   dated August 29, 2006. Subject matter of the
15   email is the same subject matter as Exhibit P
16   Number 4, Plaintiff's Number 4. And it appears to
17   be your response to P Number 4. Just take a look
18   at that document and read it and tell me if that
19   is an accurate characterization of that document?
20        MR. RIOLO: The one objection
21        I'll just note for the record.
22        MR. CUTRO: Sure.
23        MR. RIOLO: The dates just
24        don't -- the timing doesn't match. And I
25        don't know why that is the case, because we

**Page 93**

1    REGINA BURGOS
2    obviously didn't have it on ours.
3         If you look at it, Miriam's email
4    was sent Tuesday, August 29th at 8:08 a.m.,
5    and the date on this, it's printed out from
6    Miriam's computer from Regina, it's sent
7    August 29, 2006, at 7:25 a.m.
8         MR. CUTRO: I understand that.
9    Q.   That is what I'm going to ask you,
10   Ms. Burgos. You testified earlier that you may
11   have had a response, something to the effect of,
12   why did you come in at all. And this email's
13   response says, why did you come in at all.
14        My question to you is, do you remember
15   sending that email?
16   A.   Yes.
17   Q.   So even through there is a discrepancy
18   with the dates, you did send this email?
19   A.   Yes.
20   Q.   And the reason why is the reason you
21   just testified to earlier, right?
22   A.   Yes.
23   Q.   Do you have any explanation as to why
24   Mediacom did not produce this email as opposed to
25   only producing the prior email?