**EXHIBIT "H"**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.), 85 Fair Empl.Prac.Cas. (BNA) 17
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.))**

**C** Yang v. RadixApparel, Inc.
S.D.N.Y.,2000.

United States District Court, S.D. New York.
Carol YANG, Plaintiff,
v.
**RADIXAPPAREL, INC.,** Defendant.
No. 97 CV 7276(RCC).

Dec. 29, 2000.

OPINION AND ORDER

CASEY, D.J.
\* Plaintiff Carol **Yang** ("Plaintiff" or "**Yang**")
commenced this suit against her former employer,
Defendant **RadixApparel,** Inc. ("Defendant" or
"**Radix**"), after she was fired on February 7, 1996.
**Yang** claims **Radix** discriminated against her based
on her pregnancy, in violation of the Pregnancy
Discrimination Act of 1978 ("PDA"), 42 U.S.C. §
2000e(k); the New York State Human Rights Law,
N.Y. Exec. Law § 290 et seq. (McKinney's 1997);
New York City Administrative Code and Charter, as
amended; and N.Y. Civ. Rights Law § 40-c
(McKinney's 1997). Defendant now moves for
summary judgment. For the reasons set forth below,
the motion is denied.

I. Background

While Plaintiff disputes the majority of Defendant's
Rule 56.1 declarations on the grounds that they are
"uncorroborated" or "interested party statements,"
the following facts are undisputed unless otherwise
noted. **Radix** hired **Yang** as a technical designer in
August 1994. As a technical designer, **Radix**
expected **Yang** to examine samples of clothing, fit
the samples on live models and mannequins, and
provide comments regarding any needed alterations
to overseas manufacturers.

**Radix** requires fast turn around times, and thus her
supervisors expected that **Yang's** work would be
completed quickly. During her deposition, **Yang**
admitted that she had been told that her comments on
the clothing samples were sometimes late. *See* **Yang**

Dep. Trans. at 135. Additionally, the President of
**Radix,** Judy Rosenthal ("Rosenthal"), testified during
her deposition that **Yang's** work style was too
deliberate for a company that made inexpensive
clothing and that **Radix** could not afford to spend the
time **Yang** expended on each garment. Further,
Rosenthal alleges that in 1995 she received a
complaint from a **Radix** agent about **Yang's**
performance and, as a result, began discussions with
**Radix's** Vice President, Jeffrey Setton ("Setton"),
about the possibility of terminating **Yang's**
employment.[FN1]

FN1. The Court notes that the Defendant
does not offer any documentation of **Yang's**
alleged poor performance. Additionally,
Rosenthal did not remember if she spoke to
**Yang** about the agent's complaint. *See*
Rosenthal Dep. Trans. at 69-70. Further,
Rosenthal testified that she was not aware of
anyone every giving **Yang** a written
evaluation of her job performance. *See id.* at
23.

According to Rosenthal, in May 1995, she decided to
replace **Yang** and had meetings with Setton and
Robin Nelson, **Radix's** Head Designer ("Nelson"),
over the next several months with that goal in mind.
In December 1995, **Radix** placed an advertisement in
*Women's Wear Daily* for a technical designer, and
hired Linda Young in January 1996. Rosenthal
testified that **Yang** was uncooperative to Young, and
decided Young could only be fairly evaluated while
**Yang** was away on vacation. Thus, on February 6,
1996, Rosenthal approved **Yang's** request for a three
week vacation with the condition that she complete
her backlogged tasks before her departure.

On February 7, 1996, **Yang's** husband called **Radix**
to inform the office that **Yang** was ill and would
most likely be home sick for the remainder of the
week. The message upset Rosenthal because **Yang**
was scheduled to depart for her vacation the
following week and would be unable to complete her
work before she left. Rosenthal testified that she met
with other **Radix** executives that day and decided to
fire **Yang.** Later in the day, Rosenthal, with Setton
and Nelson on a speaker phone, called **Yang** at home.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.), 85 Fair Empl.Prac.Cas. (BNA) 17
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.))

According to the **Radix** executives' version of the conversation, Rosenthal told **Yang** she was upset that she had called in sick the day after she had promised to complete her work before her vacation, informed her she was not a good fit for **Radix**, and fired her. *See* Rosenthal Dep. Trans. at 390-91; Setton Dep. Trans. at 328. It was only then, according to the **Radix** executives, that **Yang** informed them that she was pregnant.[FN2]

> FN2. The Court notes that the portions of the Plaintiff's deposition on which Defendant relies to support its statement that "[o]nly after her employment was terminated did Plaintiff respond that she was out sick because she was pregnant," do not, in fact, support that proposition. *See***Yang** Dep. Trans at 158, 166. While **Yang's** statements demonstrate that she did not tell **Radix** executives that she was pregnant until the February 7, 1996 phone call, they do not clarify whether the executives learned she was pregnant before or after Rosenthal fired her.

*2**Yang's** version of events is somewhat different, however. First, **Yang** disputes Rosenthal's contentions that her allegedly inadequate work performance led to discussions among **Radix** executives that she should be replaced and argues that it was her understanding that Young was hired to serve as her colleague, not her replacement. *See* Rosenthal Dep. Trans. at 62, 66 (reflecting Rosenthal's testimony that in 1995 she told Yang to hire a second full-time technical designer to help her with her heavy workload). Further, the parties do not dispute that Yang received a $10,000 salary increase in August 1995, after Nelson, her immediate supervisor, suggested that she be reviewed for a raise. Moreover, contrary to Rosenthal's allegation, Yang claims that she did not promise to complete her work before leaving for her vacation.[FN3]

> FN3. In fact, the portions of Plaintiff's deposition on which Defendant relies to demonstrate that Yang agreed to the condition to her vacation, do not, upon examination, support Defendant's allegation. *See* Yang Dep. Trans at 194, 199, 203, 213-14.

Yang argues that Rosenthal only decided to fire her after she learned she was pregnant. In support of this allegation, Yang points to a portion of Rosenthal's testimony in which she relays a conversation she had with Robin Nelson on February 6, 1996 after approving Yang's vacation. Rosenthal told Nelson, "I just spoke to Carol about her vacation and she does have reservations to go on February 16, which means she will be at work all next week."Rosenthal Dep. Trans. at 254. With respect to the February 7, 1996 phone call, Yang agrees that she did not tell Rosenthal, Setton, or Nelson that she was pregnant prior to the call. Yet, she alleges that when Rosenthal said she was angry with her for calling in sick, Yang told Rosenthal that she was ill with a "pregnancy symptom, and [she] was afraid [she] was going to lose the child."Yang Dep. Trans. at 166. Rosenthal's response, according to the Plaintiff, was that Yang did not "fit into the company" and she had decided to "let [Yang] go." *Id.* at 166.

II. Discussion

A. Summary Judgment Standard

Summary judgment is appropriate where the parties' submissions demonstrate "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986) (explaining when summary judgment is appropriate)."Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson,* 477 U.S. at 255. Summary judgment is improper if the record provides a basis for a reasonable inference in favor of the nonmoving party. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994). Where the employer's intent is at issue in an employment discrimination claim, the court must be especially cautious about granting summary judgment. *See Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994).

B. The Pregnancy Discrimination Act

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.), 85 Fair Empl.Prac.Cas. (BNA) 17
(Cite as: Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.))

*3 The PDA amended the definition portion of Title VII to include pregnancy-based discrimination in the statute's prohibition of gender-based employment discrimination. In relevant part, the PDA provides that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions ...."42 U.S.C. § 2000e(k).

The burden-shifting analysis outlined in _McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 802-04 (1973) governs the plaintiff's pregnancy discrimination claim. See _Flores v. Buy Buy Baby, Inc.,_ 118 F.Supp.2d 425, 430 (S.D.N.Y.2000) (applying _McDonnell Douglas_ to a PDA claim).[FN4] Under the three-step _McDonnell Douglas_ outline, the plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. If the plaintiff successfully presents a prima facie case, a presumption arises that the employer unlawfully discriminated against the employee and the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. _McDonnell Douglas,_ 411 U.S. at 802. Finally, assuming the employer meets its burden, the plaintiff must demonstrate that the reasons offered by the employer were simply a pretext for discrimination. While the burden of production shifts throughout the analysis, the burden of proving the employer's discriminatory intent remains with the plaintiff. See _Texas Dep't of Community Affairs v. Burdine,_ 450 U.S. 248, 253 (1981).

> FN4. Pregnancy discrimination claims under New York's Human Rights Law and the New York City Administrative Code are subject to the same analysis. See _Klausner v. Industrial Risk Insurers, Inc.,_ 1999 WL 476285, at *3 (S.D.N.Y. July 8, 1999).

There are four elements to a prima facie case of pregnancy discrimination. First, the plaintiff must show that she is a member of the protected class, that is, that she is pregnant. "The employer's knowledge, in this class of cases, is a critical element of the plaintiff's prima facie case."_Geraci v. Moody-Tottrup, Int'l, Inc.,_ 82 F.3d 578, 581 (3rd Cir.1996) (noting a court cannot find an employer unlawfully discriminated against an employee if it did not know the plaintiff belonged to a protected class); see also _Brennan v. Metropolitan Opera Ass'n, Inc.,_ 1998 WL 193204, at *9 (S.D.N.Y. Apr. 22, 1998) (same). Second, the plaintiff must demonstrate that she performed the duties of her position satisfactorily. The third element of a prima facie case is that the plaintiff was discharged. Finally, she must show that her position was ultimately filled by a non-pregnant employee. See _Quaratino v. Tiffany & Co.,_ 71 F.3d 58, 64 (2d Cir.1995) (outlining the four elements). Alternatively, a plaintiff can satisfy the fourth element "by showing that the discharge occurred in circumstances giving rise to an inference of unlawful discrimination."_Id. at 64._

The court holds that there is a genuine issue of material fact as to whether the plaintiff satisfies the first prong of the prima facie case, that is, whether she was a member of a protected class and whether her employer had knowledge of her status before terminating her. The deposition testimony of **Radix's** President and Vice President support Defendant's contention that they fired **Yang** before learning she was pregnant. See Rosenthal Dep. Trans. at 390-91; Setton Dep. Trans. at 328-30. **Yang's** deposition testimony, however, supports her position that she informed them she was pregnant and then she was fired. See Yang Dep. Trans. at 166. This is a factual dispute that would most certainly affect the outcome of the case under the law governing pregnancy discrimination. See _Anderson v. Liberty Lobby, Inc.,_ 477 U.S. 242, 248 (1986). As the Second Circuit has explained:

*4 The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment.

_Vital v. Interfaith Medical Center,_ 168 F.3d 615, 622 (2d.1999) (quoting _Rule v. Brine, Inc.,_ 85 F.3d 1002, 1011 (2d Cir.1996)). Thus, since the parties' versions of the events are markedly different, summary judgment is not appropriate in this instance. It is for a jury to determine whether **Yang** can establish that **Radix** discriminated against her on the basis of her pregnancy.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.), 85 Fair Empl.Prac.Cas. (BNA) 17
**(Cite as: Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.))**

III. Conclusion

For the foregoing reasons, the Court holds that summary judgment is denied.

So ordered.

S.D.N.Y.,2000.
Yang v. Radix Apparel, Inc.
Not Reported in F.Supp.2d, 2000 WL 1886584 (S.D.N.Y.), 85 Fair Empl.Prac.Cas. (BNA) 17

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))

Page 1

**H**Boyd v. City of Albany
N.D.N.Y.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Gail Seise BOYD, Plaintiff,
v.
CITY OF ALBANY, William Bowen, Individually
and in his official capacity as Commander, Albany
Police Department and James P. Thalmann,
Defendants.
No. 99-CV-1487.

March 13, 2001.

Walter, Thayer & Mishler, P.C., Albany, New York,
for Plaintiff, Mark S. Mishler, of counsel.
Brennan, Rehfuss & Liguori, P.C., Albany, New
York, for Defendants, City of Albany and William
Bowen, John W. Liguori, of counsel.
Bouck, Holloway, Kiernan and Casey, Albany, New
York, for Defendant James P. Thalmann, Mark W.
Blanchfield, of counsel.

MEMORANDUM-DECISION AND ORDER

MORDUE, J.

INTRODUCTION

*1 Defendant James P. Thalmann, Ph.D., moves for
summary judgment under Fed.R.Civ.P. 56 in this
action claiming discrimination on the basis of gender
and national origin under 42 U.S.C. § 2000e, et seq.
("Title VII") and 42 U.S.C. § 1983 ("section 1983").
Defendants City of Albany and William Bowen,
Commander of the City of Albany Police
Department, also move for summary judgment.

BACKGROUND

Plaintiff, a woman of Puerto Rican descent, claims
that defendants discriminated against her when they
rejected her application for City of Albany ("City")
police officer based on her pregnancy, gender and/or
her national origin, despite her qualification for the
position. Plaintiff filed charges with the Equal
Employment Opportunity Commission ("EEOC")

and the New York State Division of Human Rights
("DHR") on November 6, 1997. The DHR found "no
probable cause" on April 27, 1999; the EEOC issued
a "right to sue" letter on June 22, 1999.

In her complaint, filed September 16, 1999, plaintiff
claims as follows. She began the application and
interview process for the position in November 1996.
The complaint alleges that, as part of the candidate
evaluation procedure, Thalmann, an independent
contractor hired by the City of Albany, administered
written psychological tests to plaintiff on December
31, 1996, and interviewed her on January 9, 1997.
According to the complaint, on January 10, 1997, a
police officer telephoned plaintiff and scheduled a
physical examination as her last step in the
application process. During the telephone
conversation, plaintiff stated that she was pregnant.
Later that day, the same officer telephoned plaintiff
again and told her that her candidacy was terminated
and her physical examination canceled because she
had failed the psychological evaluation.

The complaint further asserts the following. On
January 13, 1997, plaintiff and her husband went to
Thalmann's office. Thalmann told them he had not
yet prepared a report pertaining to his evaluation of
plaintiff, and that he had not yet reported the results
of the evaluation to the City. The written report of
Thalmann's psychological evaluation of plaintiff is
dated February 28, 1997. It states that plaintiff
admitted "ongoing occasional use of marijuana," that
"specific issues emerge ... with regard to [plaintiff's]
pattern of alcohol use," and that plaintiff had a
"pattern of substance abuse" which was
"conceptually incongruent with the specific nature of
the position" for which plaintiff had applied. On
March 11, 1997, the City sent plaintiff a written
notice that her candidacy was rejected based on the
results of the psychological evaluation.

According to the complaint, the City, at the direction
of defendant William Bowen, Commander of the
Albany Police Department, terminated her candidacy
on January 10, 1997, based not on the results of her
psychological examination, but rather on her gender,
pregnancy and/or national origin. Plaintiff further
claims that the contents of Thalmann's February 28,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))

Page 2

1997, report were false and did not reflect the true results of her psychological examination. Plaintiff alleges upon information and belief:

**\*2** [A]t a time subsequent to defendant Bowen's January 10, 1997, decision to terminate plaintiffs' candidacy, defendant Thalmann was asked by an employee or agent of defendant City to prepare a written report of plaintiff's psychological evaluation which would provide a purported basis for rejecting plaintiff's candidacy.... Thalmann agreed to prepare a report as requested by or on behalf of defendant City.... Thalmann's February 28th report was prepared, on information and belief, in response to the above-referenced request made by or on behalf of defendant City and with the intention of assisting defendant City in fabricating a purported legitimate basis for the termination of plaintiff's candidacy.

In the alternative, plaintiff asserts that even if Thalmann's report were true, she was subjected to disparate treatment because she was held to a higher standard than white male applicants.

The first cause of action in the complaint asserts gender discrimination (pregnancy) under Title VII. The second asserts gender and national origin discrimination under Title VII. The third, under 42 U.S.C. § 1983, claims denial of equal protection under color of state law. Plaintiff seeks attorney's fees under 42 U .S.C. § 1988.

By stipulation filed April 4, 2000, the parties agreed to dismissal of plaintiff's **TitleVII** claims against Bowen and dismissal of her section 1983 claim against the **City**. On May 9, 2000, this Court granted Thalmann's motion under Fed.R.Civ.P. 12(c) insofar as it sought dismissal of the **TitleVII** claims against him and denied the motion insofar as it sought dismissal of the section 1983 claim against him. Thus, the case now comprises the first and second causes of action under **TitleVII** against the **City** and the third cause of action under section 1983 against Bowen and Thalmann.

### EVIDENCE ON THE MOTION

At his deposition, Commander William T. Bowen testified to the application procedure in effect at the time. Each applicant progressed through a number of steps, including a background check, an interview with Sergeant Burris Beattie and Detective Phillip Kalisz, an agility test, a psychological evaluation and a physical examination. If a candidate did not pass any step, the candidacy was terminated and he or she did not progress to the next step. According to Bowen, plaintiff's candidacy was terminated after the psychological evaluation, based on Thalmann's statement, given to Beattie by telephone on January 10, 1997, that plaintiff was "not recommended" for the position as a result of her psychological evaluation. Thalmann's report concerning plaintiff was first given by telephone due to time constraints; he provided his written report later. Bowen stated that the City did not hire any candidate whom the psychologist characterized as "not recommended." Bowen further stated that he did not discuss plaintiff's candidacy with Thalmann prior to receiving Thalmann's report.

Kalisz testified that plaintiff told him and Beattie during her interview that she had smoked marijuana about 50 times, and had last used it two or three years ago. Beattie's testimony was similar to Kalisz's. Both stated that they did not discuss plaintiff's candidacy with Thalmann prior to receiving Thalmann's report.

**\*3** Thalmann testified that as an independent contractor he performed psychological evaluations of police officer candidates for the City of Albany Police Department during the winter of 1996-97. The police department forwarded to him information concerning each candidate, including brief notes concerning his or her interview by Kalisz and Beattie. Thalmann administered a series of written tests and then interviewed each candidate before making his recommendation. He explained in some detail his evaluation of plaintiff and his conclusions. He testified that he interviewed plaintiff on January 9, 1997, and on January 10, 1997, he reported by telephone his recommendations regarding plaintiff and the two other candidates he had interviewed on January 9. No one from the police department had contacted him to request a certain outcome with respect to plaintiff or any other candidate.

Thalmann's written report concerning plaintiff's evaluation includes the following:

While Ms. Seise-Boyd relates that she is not using alcohol at present due to pregnancy, she does admit to prior recreational use of alcohol, two to four drinks

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))**

per occasion with intoxication six times a year. She also admits to ongoing occasional use of marijuana. She has indicated use of marijuana up to 50 times which represents other than experimentation.

The Inwald Personality Inventory suggests that she may be a habitual user of alcohol. She describes herself as a recreational drinker with good alcohol tolerance. Results also suggest history of motor vehicle infractions and driving difficulties.... Specific items suggest that she has acknowledged that she enjoys a six-pack of beer or four or five drinks and could easily drink a six-pack or four or five drinks.

This individual does not present with psychopathology. She is reasonably bright and has rather stable work history. Specific issues emerge, however, with regard to pattern of alcohol use, and particularly, substance abuse. Beyond risk factors for general employee personnel issues, this pattern of substance abuse is conceptually incongruent with the specific nature of the position for which she is applying. Insight and judgment regarding this issue appears limited. In this regard she is not recommended for further consideration for the position of Police Officer.

Thalmann explained that the statement in the report that plaintiff admitted "ongoing occasional use of marijuana," meant that plaintiff's use of marijuana had been "other than experimental," not that it had been continuous up until the time of the interview. Thalmann further testified that on January 13, 1997, plaintiff and her husband appeared at his office, and asked why she had "failed" the psychological evaluation. Because he was uncomfortable and uncertain what he should tell her, he simply said he hadn't yet written his report.

On this motion, Thalmann submits an affidavit which is consistent with the above assertions and which emphasizes that in evaluating plaintiff he "consistently followed the same criteria [he] had observed during his entire career evaluating police officer candidates."Thalmann discusses the evaluations of the other eight candidates whom he did not recommend. Similarly, in support of their motion, Bowen and the City rely on proof that there were eight other candidates whom Thalmann did not recommend, all of whom were white males, and none of whom were hired. Redacted versions of

Thalmann's reports and test results concerning these eight candidates were included in the record.

*4 In opposition, plaintiff relies on the affidavit of her expert, Robert J. McCaffrey, Ph.D. He states:

One way to assess the validity of Dr. Thalmann's stated opinions is to examine the information relating to Ms. Boyd and to evaluate whether Dr. Thalmann's conclusions regarding Ms. Boyd match the documentary and other information available to Dr. Thalmann.

My professional opinion is that there is nothing in the documentary material related to Ms. Boyd's psychological evaluation to suggest that she was not suited to be hired as a police officer. Based on my review of Dr. Thalmann's report and raw test data as well as my own interviews with Ms. Boyd, it is my opinion that there was no valid reason to conclude that she had an active, ongoing substance abuse problem that should have precluded her from service in the role of a police officer or that there was any other indication that she should not be considered for employment as a police officer. In fact, she is considered a "low risk" for employment as a police officer based on the Inwald composite score, an assessment with which I am in agreement.

McCaffrey notes that Thalmann miscalculated plaintiff's scores on one test, resulting in a less favorable score than she was entitled to receive. McCaffrey also asserts that Thalmann applied inconsistent criteria in assessing the psychological evaluations he conducted for the City of Albany in the winter of 1996-97. McCaffrey reviews in some detail Thalmann's evaluations of four other candidates whom Thalmann categorized as "recommended" but who, according to McCaffrey, exhibit psychological risk factors at least as serious as plaintiff's.[FN1]

> FN1. Defendants assert that this portion of McCaffrey's affidavit should not be considered by the Court, because the expert disclosure pertaining to McCaffrey does not disclose that he would perform such comparisons. Plaintiff's initial expert disclosure was made in May 2000, before plaintiff received Thalmann's psychological evaluation materials on the 30 other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))

candidates. Obviously, at that time plaintiff could not have provided expert disclosure regarding a comparison of plaintiff's psychological evaluation materials with those of other recommended candidates. In June 2000, Bowen and the City notified plaintiff that they intended to rely on Thalmann as an expert at trial to provide facts and opinions consistent with his February 28, 1997, report concerning plaintiff. In a letter dated August 21, 2000, plaintiff's counsel stated: "Any analysis of the facts of this case would be incomplete without a comparison of defendant Thalmann's evaluation of Ms. Boyd (along with the relevant test results) with the evaluations (and test results) of other candidates. For example, if there was a white male candidate evaluated at the same time as Ms. Boyd who had essentially the same written test results and who also admitted having used marijuana in the past, but who nonetheless was recommended by defendant Thalmann for hiring by the City, that discrepancy would clearly be relevant to an assessment as to whether defendant Thalmann had intentionally framed his evaluation of Ms. Boyd so as to provide a pretext for the City's discrimination."Thalmann, however, did not provide these materials until October 16, 2000 (shortly before the discovery deadline of November 1, 2000), after he was ordered to do so by Magistrate Judge Smith on September 28, 2000. There is nothing in the record to suggest that defendants were surprised or prejudiced due to this sequence of events. Under all of the circumstances, the disputed portion of McCaffrey's affidavit is properly before the Court.

At her deposition, plaintiff testified that during her initial interview she told Beattie and Kalisz that she was Puerto Rican and that she was pregnant. She also told them that she had used marijuana about 50 times, mostly in college, and that she had last used it several years previously. She again mentioned her pregnancy to Beattie on January 10, 1997, when he telephoned her to set up the appointment for her physical examination.

Plaintiff testified that during her interview with Thalmann on January 9, 1997, she told him that she was pregnant but never mentioned that she had used marijuana. She states that his report is untrue to the extent that it suggests that he and she discussed the matter, and to the extent that the phrase "ongoing occasional use of marijuana" implies that she is still using marijuana. She also disputes a number of his conclusions.

With respect to the statements Thalmann made to her and her husband on January 13, 1997, when they went to his office and questioned him about the outcome of her psychological evaluation, plaintiff testified:

A I said to him that I had gotten word that I had failed the psychological and that that was a discrepancy from, you know, us meeting last week, you know, I just wanted to find out ... if there was a miscommunication. And he said that he hadn't done his reports yet, that they wouldn't be available until Wednesday, for me-gave me his business card and told me to call him on Wednesday.

*5 Q Yes, but the previous week you testified that he didn't tell you that you had passed the psychological examination, correct?

A Right, just from the previous week about me doing well. He did not say at that conversation that I had passed it, I was asking him the discrepancy and he said that his report had not been done yet, like-he was surprised that they had gotten word that I had failed because his report-

Q Did he say that?

A He acted surprised, like I don't know how they got that, my reports aren't done yet, here's my card, call me Wednesday.

Q Do you have a specific recollection of your husband asking Dr. Thalmann whether Dr. Thalmann had spoken to the Albany Police Department?

A Yes.

Q What were your husband's words?

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))

A I just told you, I think he asked him, so you haven't spoke to them? And he said, I have not completed my reports, they will not be ready until Wednesday.

Q Did Dr. Thalmann ever say to you, I have not spoken to the Albany Police Department?

A I believe he did.

Q Did he use those words?

A I don't know if he used those exact words.

A He said that he had not finished his reports. My husband asked him if he had talked to them and he implied that he had not talked to them. I don't know his exact words to say, no, I didn't call them. He was trying to brush us off like he was in a rush, caught off guard, surprised. So he was being careful as to what he said.

Q But your testimony is that he implied it, but you never heard him actually state that?

A He said that-I don't know if he actually said, no, I did not call them, but he definitely said he didn't talk to them, like he not had contact with them. That's what it was, he said he did not have contact with them, whether he said he had not contacted them, but he said he did not have contact with them.

Q He actually stated that to you?

A Yes, because my husband specifically asked that.

When she called Thalmann two days later, Wednesday, January 15, 1997, he said he could not discuss the matter with her.

According to plaintiff, on January 13, 1997, she and her husband also went to the police station and spoke with Bowen and Kalisz. Both said they had not taken a telephone call from Thalmann about the results of her psychological evaluation, and suggested that Beattie probably had done so. Later, when she questioned Beattie, he, too, denied having taken the telephone call.

DISCUSSION

Summary judgment, generally

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. See id. If the nonmovant fails to carry this burden, summary judgment is appropriate. See id.

Exhaustion of administrative remedies

*6 The City and Bowen claim that plaintiff has failed to exhaust her administrative remedies before commencing proceedings before the DHR and EEOC. They assert that she was required to challenge her disqualification by an administrative proceeding under section 50(4) of the N.Y. Civ. Serv. Law and to appeal any adverse result to the Civil Service Commission. While it is true that plaintiff has certain rights under section 50(4), defendants cite no authority for their position that a plaintiff is required to pursue this remedy before seeking relief from the DHR and EEOC. The Court finds no language in section 50(4) or in regulations or statutes pertaining to DHR or EEOC proceedings supporting defendants' position. One New York court has held that an applicant for a civil service position who is denied employment may pursue a claim under New York's Human Rights Law and is not relegated to a proceeding under N.Y. Civ. Serv. Law § 50(4)(b). See Ramos v. New York City Police Dep't, 487 N.Y.S.2d 667, 671-72 (Sup.Ct., N.Y.Co.1985). New York courts have also held that the initiation of an administrative proceeding under section 50(4) does not constitute an election of remedies under N.Y. Exec. Law § 297(9), see Ramos, 487 N.Y.S.2d at 671-72, and that it bars the commencement of a DHR proceeding or a judicial action only for as long as the section 50(4) proceeding is pending.[FN2] See Jainchill v. New York State Human Rights Appeal Bd., 442 N.Y .S.2d 595, 596 (3d Dep't 1981). Defendants have made no showing that a section 50(4) proceeding concerning plaintiff is currently pending.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))

Accordingly, the Court rejects this argument.

> FN2.N.Y. Exec. Law § 297(9) provides in part: "No person who has initiated any action in a court of competent jurisdiction or who has an action pending before any administrative agency under any other law of the state based upon an act which would be an unlawful discriminatory practice under this article, may file a complaint with respect to the same grievance under this section or under section two hundred ninety-six-a of this article."(Emphasis added.)

McDonnell Douglas analysis

To evaluate plaintiff's **TitleVII** claims against the **City** and her section 1983 claims against Bowen and Thalmann, the Court applies the three-step, burden-shifting process articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[FN3]

> FN3. The burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to section 1983 claims as well as **TitleVII** claims. *See Sorlucco v. New York City Police Dep't*, 888 F.2d 4, 7 (2d Cir.1989).

*Prima facie* case

The first step in the *McDonnell Douglas* formulation requires plaintiff to prove, by a preponderance of the evidence, a *prima facie* case of discrimination by the employer. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446-47 (2d Cir.1999), *cert. denied* 120 S.Ct. 2688 (2000). To establish a *prima facie* case, plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir.1999). The burden of establishing a *prima facie* case is not onerous, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); indeed, it has been described as "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

In discrimination cases, the only direct evidence available often centers on what the defendant allegedly said or did. "Since the defendant will rarely admit to having said or done what is alleged, and since third-party witnesses are by no means always available, the issue frequently becomes one of assessing the credibility of the parties. At summary judgment, however, that issue is necessarily resolved in favor of the nonmovant." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 57 (2d Cir.1998).

*7 Defendants argue that plaintiff is unable to establish either the second or fourth elements of a *prima facie* case of discrimination. According to defendant, plaintiff cannot establish that she was qualified for the position, nor can she establish that the termination of her candidacy occurred under circumstances giving rise to an inference of discrimination.

To satisfy the second element of the test, plaintiff need only demonstrate that she possessed the basic skills necessary for performance of the job. *See de la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir.1996). Defendants claim that due to the problems highlighted in Thalmann's report, plaintiff was not qualified for the job. Plaintiff disputes that these problems exist, and claims that they were fabricated in order to conceal the true discriminatory motive for termination of her candidacy. Plaintiff's testimony, portions of Thalmann's report, and McCaffrey's affidavit are sufficient to make out a *prima facie* showing that she was qualified for the job.

With respect to the fourth element, plaintiff has met her minimal burden of making a *prima facie* showing that the termination of her candidacy occurred under circumstances giving rise to an inference of discrimination. Plaintiff has made a preliminary showing that her candidacy was terminated despite her qualifications for the job shortly after she reminded Beattie of her pregnancy and that Thalmann fabricated a basis for the termination in order to conceal the true discriminatory motive. In the view of the Court, plaintiff has met her minimal burden of establishing a *prima facie* case, thus shifting the burden to defendants to articulate a non-discriminatory reason for the disqualification.

Non-discriminatory reason for employer's actions

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))

In the second step of the *McDonnell Douglas* test, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Bickerstaff, 196 F .3d at 446.* The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision. *See St. Mary's, 509 U.S. at 507.* Defendants here have met their burden by showing that they rejected plaintiff's application based on her statements in her interview with Beattie and Kalisz and her psychological evaluation by Thalmann.

Pretext

The burden then shifts back to plaintiff in the third step of the *McDonnell Douglas* process. Plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, and that gender or gender and national origin was. *See Bickerstaff, 196 F.3d at 446.* Plaintiff's sworn denial that she made the statements relied on by Thalmann, her evidence that her candidacy was terminated before Thalmann made his report and the affidavit of McCaffrey disputing the validity of Thalmann's conclusions, support a finding that defendant's proffered reason was false and that plaintiff has been subjected to intentional discrimination.

Equal protection

*8 Plaintiff also claims in her third cause of action under 42 U.S.C. § 1983 that she was held to a higher standard than male candidates and thus was denied equal protection. The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).* In order to establish a claim of selective enforcement under the Equal Protection clause, plaintiff must prove that compared with others similarly situated she was selectively treated, and that such selective treatment was based on an impermissible consideration. *See Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir.2000)* (citing *LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir.1980)*).

Plaintiff alleges that defendant Bowen violated her right to equal protection of the law by deciding to terminate consideration of her candidacy on the basis of gender, pregnancy, and/or national origin. She relies primarily on the affidavit of McCaffrey, discussed above, in which he states his opinion that four of the white male candidates who were recommended for further consideration had "problems" comparable to or more serious than those which were relied upon to disqualify plaintiff. The evidence submitted to the Court by plaintiff on this issue is sufficient to create a question of fact precluding summary judgment.

Qualified immunity

Qualified immunity shields government officials performing discretionary functions from civil liability if it was objectively reasonable for the official to believe that his acts did not violate clearly established rights. *See Anderson v. Creighton, 483 U.S. 635, 639 (1987).* The Second Circuit states that "upon a motion for summary judgment asserting a qualified immunity defense in an action in which an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts ... supporting the claim of an improper motive in order to avoid summary judgment.... [T]he particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir.1995).*

Bowen

Bowen argues that he is entitled to qualified immunity on the ground that as a matter of law it was objectively reasonable for him to exercise his discretionary function and terminate plaintiff's candidacy based on Thalmann's report that the plaintiff had failed her psychological examination. Defendants further point to evidence that no candidate whom Thalmann classified as "not recommended" was offered employment.

As discussed above, however, there is also some evidence tending to support plaintiff's claim of an improper motive, such as evidence that her candidacy was terminated shortly after plaintiff reminded

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 8
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.))**

Beattie that she was pregnant; that at the time plaintiff's candidacy was terminated, Thalmann had not yet made his report to the City; that Thalmann's report misrepresented what plaintiff had told him when he interviewed her; and that other candidates with similar risk factors were not eliminated. These elements constitute particularized evidence of improper motive sufficient to support plaintiff's theory that her candidacy was terminated for an impermissible reason. If the jury finds that her candidacy was terminated for such a reason, it may also find that Bowen knew of and participated in the improper conduct. In such a case, a reasonable jury could conclude that it was not objectively reasonable for Bowen to believe that such conduct did not violate clearly established rights; therefore it cannot be said as a matter of law that he is entitled to qualified immunity.

Thalmann

*9 In its previous decision denying Thalmann's motion to dismiss under Fed.R.Civ.P. 12(c), this Court treated Thalmann as a state actor subject to suit under section 1983, noting that he acted under contract with the police department to assist in the evaluation of officers, a necessary departmental function. See Camilo-Robles v. Hoyos, 151 F.3d 1, 10 (1st Cir.1998), cert. denied, 525 U.S. 1105 (1999). Thalmann argues that if he is treated as a state actor, then the section 1983 claim against him should be dismissed on the ground of qualified immunity. As with Bowen, however, there is some evidence tending to support plaintiff's claim of an improper motive and that Thalmann participated in the improper conduct.

If, on the other hand, Thalmann is treated as a private actor, the same showing is sufficient to support liability under section 1983 on the ground that he "jointly engaged with state officials in the challenged action.... [P]rivate parties conspiring with [a state official are] acting under color of state law...." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998). The evidence adduced by plaintiff on this motion, including McCaffrey's affidavit and plaintiff's testimony concerning her conversation with Thalmann on January 13, 1997, is adequate to distinguish this case from San Filippo v. U.S. Trust Co., 737 F.2d 246, 256 (2d Cir.1984), and Scotto, 143 F.3d at 115, relied on by Thalmann, in which the

Second Circuit found no evidence to support an inference of impropriety. Thalmann is not entitled to summary judgment on this ground.

CONCLUSION

Defendants have not demonstrated that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law under Fed.R.Civ.P. 56(c).

Accordingly, it is

ORDERED that the motion for summary judgment by James P. Thalmann, Ph.D., is denied; and it is further

ORDERED that the motion for summary judgment by the City of Albany and William Bowen, Commander of the City of Albany Police Department, is denied.

IT IS SO ORDERED.

N.D.N.Y.,2001.
Boyd v. City of Albany
Not Reported in F.Supp.2d, 2001 WL 263054 (N.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.