BONNIST & CUTRO, LLP
800 Westchester Avenue, Ste. S-332
Rye Brook, New York  10573
(914) 921-4820
*Attorneys for Plaintiff*
Craig M. Bonnist (CB3245)
James J. Cutro (JC7174)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- :

MIRIAM BAUZA,                              Case No.: 07 CIV 6542 (CLB)

        **Plaintiff,**

      - against -                      **Plaintiff's Local
Civil Rule 56.1 Statement of
Additional Material Facts**

MEDIACOM COMMUNICATIONS CORPORATION,

        **Defendant.**

----------------------------------------------------------------

1. Prior to her employment with Mediacom, Ms. Bauza was employed by the National League of Nursing for 31 years, the final 17 years of which as the Payroll Manager (Riolo Aff.[1] Ex. A, Complaint ¶ 9).

2. In 1995, prior to her employment with Mediacom, Ms. Bauza was diagnosed with breast cancer. (Cutro Aff.[2] Ex. A, Bauza Dep. 21).

3. Ms. Bauza underwent treatment for breast cancer which resulted in a mastectomy of her left breast. (Cutro Aff. Ex. A, Bauza Dep. 21).

---

[1] Riolo Aff. refers to Affirmation of Gregory Riolo, Esq. submitted by defendant in support of its motion for summary judgment, which exhibits are cited herein to avoid duplication of submission of exhibits.
[2] Cutro Aff. Refers to the Affirmation of James J. Cutro, Esq. submitted in opposition to defendant's motion.

4. On October 31, 2005, Ms. Bauza commenced her employment with Mediacom as a payroll supervisor. (Riolo Aff. Ex. C).

5. Ms. Bauza reported to her supervisor, Joseph Michulski (Riolo Aff. Ex. L, Michulski Dep. 12).

6. Michulski reported to Mark Stephan, the Chief Financial Officer of defendant, Mediacom. (Riolo Aff. Ex. K, Mills Dep. 28).

7. Four or five weeks into her employment with Mediacom, Ms. Bauza overheard Mark Stephan, the Chief Financial Officer, say to another employee that the "big boss" is not comfortable to pay medical bills for someone just coming aboard than for someone that has been there with five years of service. (Cutro Aff. Ex. A, Bauza Dep. 189).

8. The "big boss" is Rocco B. Commisso, founder, Chairman, Chief Executive Officer of Mediacom. (Riolo Aff. Ex. F).

9. Mr. Commisso is married to the Director of Human Resources, Ms. Italia Commisso-Weinand.

10. Ms. Commisso-Weinand and Mark Stephan made the ultimate decision to terminate Ms. Bauza's employment. (Cutro Aff. Ex. B, Mills Dep. 54).

11. Mr. Michulski made the same type of comment on two occasions to Ms. Bauza; that when a new person comes on board, the "big boss" is not comfortable paying for somebody that had just came aboard as opposed to somebody that has been there for five years of service. (Cutro Aff. Ex. A, Bauza Dep. 190).

12. In January 2006, several months after beginning her employment with Mediacom, Ms. Bauza had a routine mammogram. (Cutro Aff. Ex. A, Bauza Dep. 21).

13. Subsequently on February 13, 2006, Ms. Bauza had a biopsy of a suspicious lump, which confirmed the diagnosis of breast cancer. (Cutro Aff. Ex. A, Bauza Dep. 21).

14. Plaintiff advised Judy Mills, defendant's Director of Human Resources, Ms. Italia Commisso-Weinand, defendant's Senior Vice President of Human Resources, and Mr. Paul Gillert, defendant's Vice President of Human Resources, of the diagnosis. (Cutro Aff. Ex. A, Bauza Dep. 102-105).

15. On June 7, 2006, Ms. Bauza filed for disability leave to undergo a mastectomy and recover from the necessary cancer treatment. (Riolo Aff. Ex. D, Pl. Dep. 99, 106).

16. On June 7, 2006, Ms. Bauza filed a claim for short term disability benefits (hereinafter "STD") pursuant to the STD policy as outlined in Mediacom's Employee Handbook. (Riolo Aff., Ex. D, Pl. Dep. 107; Ex. F, at pp. 85-87).

17. Mediacom is a self-insured entity for medical insurance and disability insurance and utilizes the services of an outside corporation, Aetna, to administer and process defendant's STD plan. (Riolo Aff. Ex. H, Burgos Dep. 19).

18. Mediacom is a self-insured entity that is responsible for paying its employees medical costs and disability benefits. (Riolo Aff., Ex. B, ¶ 17)

19. Aetna was responsible for issuing benefit checks to employees receiving STD payments. (Riolo Aff., Ex. H, Burgos Dep. 19).

20. Mediacom reimburses Aetna for all benefit payments made on its behalf. (Riolo Aff. Ex. H, Burgos Dep. 19).

21. On June 7, 2006, Ms. Bauza underwent a mastectomy. (Riolo Aff. Ex. D, Pl. Dep. 21-22; 99-101).

22. After the foregoing procedures, Ms. Bauza underwent chemotherapy, which treatment she is currently still undergoing. (Riolo Aff. Ex. A, Complaint ¶ 13).

23. In early July 2007, during Ms. Bauza's leave, shortly after receiving her initial disability check, it appeared to her that there was something wrong with the check because the amount of money was not reflecting the correct days of pay. (Cutro Aff. Ex. A, Bauza Dep. 54, 166-67).

24. Ms. Bauza immediately contacted an agent at Aetna regarding the mistake. (Cutro Aff. Ex. A, Bauza Dep. 54, 166-67).

25. Ms. Bauza explained that she believed the check was incorrect and that it appeared that the mistake concerned the bi-weekly payment of her annual salary which Aetna calculated incorrectly as a weekly payment. (Cutro Aff. Ex. A, Bauza Dep. 54, 166-67).

26. Aetna assured Ms Bauza there was no error, that the payment was correct. (Cutro Aff. Ex. A, Bauza Dep. 54, 166-67).

27. Ms. Bauza asked the Aetna representative again to make sure the check was correct, she was told to hold on, and the Aetna representative confirmed for a second time the check was correct. (Cutro Aff. Ex. A, Bauza Dep. 54, 166-67).

28. Ms. Bauza then left two voice mail messages for Mr. Michulski, her supervisor, to call her, but he never called her back. (Cutro Aff. Ex. A, Bauza Dep. 167-68).

29. Ms. Bauza returned to work without accommodation on August 7, 2006 and was able to fulfill all the essential functions of her job as payroll supervisor. (Riolo Aff. Ex. A, Complaint ¶ 15).

30. In connection with the chemotherapy, Ms. Bauza was required to receive chemotherapy treatment once every three weeks and on those days she was unable to work

4

she would work longer hours the other work days to make up for the time. (Cutro Aff. Ex. A, Bauza Dep. 132, 199; Riolo Aff. Ex. A, Complaint ¶ 14).

31. On some occasions Ms. Bauza would work in the morning, and then undergo chemotherapy treatment. In either case she returned to work the following day after treatment, notwithstanding the fact that she was often ill at work, including episodes of vomiting, diarrhea, constipation. (Cutro Aff. Ex. A, Bauza Dep. 193; Riolo Aff. Ex. A, Complaint ¶ 14).

32. After returning from disability leave, Ms. Bauza noticed that management started to treat her differently; in particular, Judy Mills, Paul Gillert, and Italia Commisso-Weinand (Cutro Aff. Ex. A, Bauza Dep. 192-93).

33. Ms. Mills became short with her in conversation and did not treat her the same way as she did before Ms. Bauza took disability leave. (Cutro Aff. Ex. A, Bauza Dep. 199).

34. Ms. Commisso-Weinand stopped approaching her during the work day and would ignore her, which was different treatment than before Ms. Bauza took disability leave. (Cutro Aff. Ex. A, Bauza Dep. 200).

35. Mr. Gillert started acting indifferently towards Ms. Bauza, he stopped addressing her with normal greetings of hello and good night and no longer engaged her in any conversation. (Cutro Aff. Ex. A, Bauza Dep. 201).

36. Upon her return from leave, Ms. Bauza no longer reported to Mr. Michulski but to Regina Burgos. (Cutro Aff. Ex. C, Burgos Dep. 27, 36-38; Ex. A., Bauza Dep. 201).

37. Upon her return from leave, Gladys Falto no longer reported to Ms. Bauza. (Cutro Aff. Ex. C, Burgos Dep. 27, 36-38; Ex. A, Bauza Dep. 201).

38. Ms. Burgos immediately started to harass Ms. Bauza because of her disability, making it more stressful for her to attend chemotherapy treatment appointments as well as get paid for those days she sought treatment. (Cutro Aff. Ex. A, Bauza Dep. 131-134; Ex. C, Burgos Dep. 82-91).

39. For instance, when Ms. Bauza took a day off for chemotherapy, approved in advance by Ms. Burgos, Ms. Bauza discovered a week later that she was not paid for the day. (Cutro Aff. Ex. A, Bauza Dep. 132).

40. Ms. Bauza asked Ms. Burgos why she was not paid, especially since she was working more than eight hours a day, sometimes twelve hours, Ms. Burgos told her the only way she could get paid for the day was to come into work, even for an hour. (Cutro Aff. Ex. A, Bauza Dep. 132).

41. As a result of that explanation from her supervisor, the next time Ms. Bauza had a medical appointment concerning her disability, she sent an e-mail to Ms. Burgos explaining she would be in the office in the morning but out of the office after 9:15 AM. (Cutro Aff. Ex. A, Bauza Dep. 132; E-mails are attached as Ex. F).

42. Ms. Burgos' responded by e-mail, "Why did you come in at all?" and similarly told her in person, with a bad tone, 'why did you bother to come.' (Cutro Aff. Ex. A, Bauza Dep. 133, 140-41; Ex. F),

43. Ms. Burgos admits to making the statement and sending the e-mail. (Cutro Aff. Ex. C, Burgos Dep. 82-84).

44. Ms. Burgos also admitted that having Ms. Bauza come into work under those circumstances would have caused stress to Ms. Bauza. (Cutro Aff. Ex. C, Burgos Dep. 83).

45. When Ms. Bauza questioned Ms. Burgos about not being paid for the day she took off for a medical appointment, Ms. Burgos said Ms. Bauza was taking advantage of the company. (Cutro Aff. Ex. A, Bauza Dep. 133-34).

46. In general, Ms. Burgos was sarcastic to Ms. Bauza, and on occasion would scream at Ms. Bauza, in dealing with her on routine work matters. (Cutro Aff. Ex. A, Bauza Dep. 142-43, 145).

47. Ms. Bauza then went to Ms. Mills in Human Resources to discuss the problems with Ms. Burgos, including her accusing Ms. Bauza of abusing company time by going for chemotherapy treatments. Ms. Mills sent her to see Brian Walsh, Ms. Burgo's supervisor, but Ms. Mills did not look further into the matter. (Cutro Aff. Ex. A, Bauza Dep. 153; Ex. B, Mills Dep. 66-67).

48. Mr. Walsh advised her she would be paid for the day, but Ms. Burgos' harassing treatment of her did not change thereafter. (Cutro Aff. Ex. A, Bauza Dep. 153-54).

49. After complaining about Ms. Burgos, Mediacom changed the status of Ms. Bauza's employment to Benefits Supervisor 401(k) Loans, which Ms. Bauza considered an unfavorable transfer and a demotion, as it limited her responsibilities. (Cutro Aff. Ex. A, Bauza Dep. 126-130).

50. In or about October 2006, during her review of the Aetna statements, Ms. Burgos discovered that Ms. Bauza received excess STD payments during her leave. (Riolo Aff., Ex. Burgos Dep. 58).

51. Ms. Mills brought the issue to the attention of Mr. Gillert who advised her to look into the issue. (Cutro Aff. Ex. B, Mills Dep 30)

52. Ms. Mills brought the issue to the attention of Mr. Commisso-Weinand who also advised her to look into the issue. (Cutro Aff. Ex. B, Mills Dep 31-32)

53. On November 14, 2006, Regina Burgos (Mediacom's Senior Payroll Manager), Joe Mickulski (Mediacom's Senior Director of Corporate Finance) and Judy Mills (Mediacom's Director of Human Resources) called plaintiff into a meeting, wherein Ms. Mills explained that it was her understanding that plaintiff had received an overpayment of disability benefits. (Riolo Aff., Ex. D, Pl. Dep. 164).

54. Ms. Bauza informed Ms. Mills that she had contacted Aetna about the apparent discrepancy because she felt the payment was incorrect and was told twice that it was correct. (Cutro Aff. Ex. A, Bauza Dep. 167).

55. Ms Bauza explained she believed that the check was incorrect and that it appeared that the mistake concerned the bi-weekly payment of her annual salary which Aetna calculated incorrectly as a weekly payment. (Cutro Aff. Ex. A; Bauza Dep. 54, 166-67).

56. Ms Bauza explained that she was assured by Aetna that there was no error, that the payment was correct. (Cutro Aff. Ex. A, Bauza Dep. 54, 166-67).

57. Ms. Bauza explained that she asked the Aetna representative to make sure it was correct, and the Aetna representative confirmed for a second time the check was correct. (Cutro Aff. Ex. A; Bauza Dep. 54, 166-67).

58. Ms. Bauza explained that she left two voice mail messages for Mr. Michulski, her supervisor, to call her, but he never called her back. (Cutro Aff. Ex. A; Bauza Dep. 167-68, 170-72).

59. Ms. Bauza learned from "Angela" at Aetna that the overpayment was a computer error made by Aetna. (Cutro Aff. Ex. A, Bauza Dep. 51-54; Riolo Aff. Ex. A, Complaint ¶ 23).

60. Mediacom admits that the payment error to Ms. Bauza was solely caused by Aetna. (Riolo Aff. Ex. I).

61. On November 20, 2006, Ms. Bauza received a letter from Aetna confirming the overpayment in the amount of $3978.15 and was offered by Aetna the option to remit the overpayment in installments; however, she returned the entire overpayment by lump sum. (Riolo Aff. Ex. A; Complaint ¶ 23).

62. Mediacom does not have any policy for an employee to follow in the event the employee receives an overpayment of STD benefits. (Cutro Aff. Ex. B, Mills Dep 45)

63. After the meeting, Ms. Mills does not specifically recall if she, or anyone else at Mediacom, asked Mr. Michulski if Ms. Bauza tried to contact him when she was out on leave. (Cutro Aff. Ex. B, Mills Dep 56-57).

64. After the meeting, neither Ms. Mills nor anyone on her behalf, requested phone records to establish if Ms. Bauza called Aetna in early June to question the payment she received. (Cutro Aff. Ex. B, Mills Dep 58-59).

65. In making the recommendation to terminate Ms. Bauza, Ms. Mills did not consider that Ms. Bauza's claimed failure to further follow up with the overpayment could have been attributable to preoccupation with the recent surgery or medication Ms. Bauza was on when Ms. Bauza discovered the possible error with her check in June 2006. (Cutro Aff. Ex. B, Mills Dep 58-59).

66. Ms. Mills recommended Ms. Bauza's termination to Mr. Gillert and Ms. Commisso-Weinand (Cutro Aff. Ex. B, Mills Dep 54).

67. The ultimate termination decision was made by Ms. Commisso-Weinand and Marc Stephan, Chief Financial Officer. (Cutro Aff. Ex. B, Mills Dep 28, 54).

68. At the meeting to determine Ms. Bauza's discharge, there was no discussion of any other form of discipline other than termination. (Cutro Aff. Ex. B, Mills Dep 60-61).

69. Mediacom adopts a handbook with a progressive discipline policy. (Cutro Aff. Ex. B, Mills Dep 12).

70. At that meeting, and at no other time in the decision making process as to Ms. Bauza's discipline, was there discussion of similar fact patterns that had arisen with other employees and what discipline was applied in those situations. (Cutro Aff. Ex. B, Mills Dep 54; 79-81).

71. On November 28, 2006, Ms. Bauza was called into work and told by Ms. Mills that she was terminated because she failed to inform Mediacom of the overpayment of her benefits by Aetna. (Cutro Aff. Ex. B, Mills Dep 53-54).

72. Plaintiff asked Ms. Mills whether Aetna had made similar errors with respect to any other employee, to which she responded that it was "none of [her] business". (Riolo Aff. Ex. A; Complaint ¶ 25).

73. Gladys Falto worked in the same department with Ms. Bauza, with both reporting to Ms. Burgos. (Cutro Aff. Ex. C, Burgos Dep. 27, 36-38).

74. Ms. Falto was in a similar position of trust as Ms. Bauza. (Cutro Aff. Ex. B, Mills Dep. 78).

75. While Ms. Bauza was still in Mediacom's employ, Ms. Burgos believed that Ms. Falto was submitting time sheets to be paid for overtime hours she may not have actually worked. (Cutro Aff. Ex. C, Burgos Dep. 47-49).

76. Ms. Burgos reported this issue to Ms. Mills. (Cutro Aff. Ex. C, Burgos Dep. 47-49).

77. Ms. Mills admitted that employee theft of time is a serious issue. (Cutro Aff. Ex. B, Mills Dep. 77-78).

78. Mediacom took no disciplinary action against Ms. Falto, nor did it investigate. (Cutro Aff. Ex. C, Burgos Dep. 48-49).

79. Mr. Michulski raised two other issues of overpayments of STD benefits by Aetna to employees of Mediacom to Ms. Mills and neither her nor Mr. Gillert recommended disciplinary action against these employees. (Cutro Aff. Ex. B, Mills Dep. 71-74, 80; Ex. D, Michulski Dep. 16-17).

80. Defendants did not produce any documents, other than those produced by Aetna in response to plaintiff's subpoena, to the following request: "As a follow up to the request for production orally made on the record today as a result of the information testified today by Mr. Michulski and Ms. Mills, please produce the following information: Documents, investigative reports, notes, and memoranda created by the defendant or others on the defendant's behalf based on the over-payment(s) made by Aetna to any employees of defendant other than plaintiff, including the individuals identified by Mr. Michulski and Ms. Mills." (Letter is Ex. E to Cutro Aff.).

81. Aetna reviewed its history of overpayment of short term disability payments to Mediacom employees and found eleven (11) other incidents of overpayments to Mediacom

employees who kept the overpayments. (Records of overpayments of STD benefits by Aetna are attached as Ex. G to Cutro Aff.).

82. These overpayments were in amounts from $3219.66 to $39.94. (Cutro Aff., Ex. G).

83. One such overpayment of $3219.66 was paid to the employee for the period February 6, 2006 through March 19, 2006. (Cutro Aff., Ex. G).

84. On June 11, 2007, over fifteen months later, this money was not returned and Aetna sent out a notice for repayment. (Cutro Aff., Ex. G).

85. None of the employees the subject of the overpayments in Exhibit G were disciplined or discharged by defendant. (Cutro Aff. Ex. B, Mills Dep. 71-74, 80).

86. The employee discussed in paragraphs 81-83 was never disciplined by defendant. (Cutro Aff. Ex. B, Mills Dep. 71-74, 80).

87. According to Ms. Mills, no employee, except Ms. Bauza, was ever disciplined, let alone terminated, for depositing any overpayment of STD benefits. (Cutro Aff. Ex. B, Mills Dep. 71-74, 80).

Dated: Rye Brook, New York
May 30, 2008

BONNIST & CUTRO, LLP

By: _____
James J. Cutro (JC7174)
*Attorneys for Plaintiff*
800 Westchester Avenue, Suite S-332
Rye Brook, New York 10573
(914) 921-4820

TO:
Greg Riolo, Esq.
Jackson Lewis, LLP
One North Broadway, Suite 1502
White Plains, New York 10601