# EXHIBIT B

# In The Matter Of:

## *MIRIAM BAUZA v.*
## *MEDIACOM COMMUNICATIONS CORPORATION*

## MIRIAM BAUZA
*March 19, 2008*

# MERRILL LEGAL SOLUTIONS

*25 West 45th Street - Suite 900*

*New York, NY 10036*

PH: 212-557-7400 / FAX: 212-692-9171

BAUZA, MIRIAM - Vol. 1

Page 58

MIRIAM BAUZA

Terry, and Terry's the one who gave me the information.
Q. About how much the overpayment was?
A. Yes, and then where do I have to send it and everything.
Q. Did you ever speak with Angela again after that day in terms of you being switched back and forth between her and some other people?
A. I think I did. I asked for copies of all the conversations that I had made because I wanted to make sure that it shows what Julia answered me, being that she told me that all the phone calls are recorded. And in that paperwork that she sent me, Julius's conversation was not there.
Q. The Julius conversation where he said you owe nothing, on or about November 28th?
A. Exactly.
Q. Were there any other conversations that you recall having at Aetna that were not there?
A. Yeah, well, also the one that I called for the -- to actually finish my

Page 59

MIRIAM BAUZA

payments. To stop my payments. I didn't see that phone call either.
Q. To stop your payments.
A. To stop my payments.
Q. And that was about early August, correct?
A. Yes, exactly.
Q. What about the conversation that you had in July, was there a recording of that conversation?
A. This is something that I also asked her before. Why that phone call when I called that I felt there was something wrong in my check, why that phone call, they didn't record it.
    When I spoke to a few people that I spoke with from Aetna, they kept telling me that all the phone calls are recorded. But here I am, two phone calls were not recorded that to me were very important; the one that I called telling about the payments that I felt that it was wrong, and also the one that I spoke to Julius. And he told me that my balance was zero.

Page 60

MIRIAM BAUZA

Q. And what, if any, response did they provide?
A. Oh, that he didn't -- they told me Julius, he forgot to record it.
Q. And what, if anything, did they say about the earlier July conversation?
A. They told me that it's not on record. That's what they said.
Q. Any other conversations that you had with Angela?
A. We were just going back and forth about the checks I guess. Going back and forth, when I supposed to send the payment or when I was going to send it.
Q. So there were subsequent conversations about you providing the reimbursement for the overpayment?
A. Exactly, yes.
Q. Are there any other conversations that you had with Aetna, anybody else at Aetna, other than what you described?
A. I did spoke to, I don't know if it was Terry and a manager of taxes. But my taxes were wrong from them, too. My taxes were wrong

Page 61

MIRIAM BAUZA

and they have to -- I was fighting back and forth with them because I got them late and I needed to have the corrected form.
Q. This is taxes after the new year?
A. Yes.
Q. So this is sometime --
A. To reflect that payment.
Q. And this was sometime after your termination from Mediacom that you had these discussions with Aetna?
A. Yes, mm-hmm.
Q. And that was just about getting the right information from them for filing taxes this year?
A. Yes. Not this year, last year.
Q. For last year, I'm sorry.
A. Last year. Yes.
Q. The person -- I'm skipping over to Jennifer, because we'll get to that, on Exhibit C is Jennifer Clark. Do you see that?
A. Yes.
Q. And she was an employee of Mediacom?
A. Yes, that's correct.

Page 98

MIRIAM BAUZA

2  A.  It was done by Jen.
3  Q.  Any other duties that Gladys took
4  over after she started, other than what you've
5  discussed, up until June of 2006 that you're
6  aware of?
7  A.  Any other responsibilities. I
8  don't remember.
9  Q.  Who was Gladys reporting to?
10 A.  To me.
11 Q.  When you started, what was your
12 salary?
13 A.  42,5. Or 42 I think it was. 42.
14 Q.  Did it change in any way?
15 A.  Yes.
16 Q.  To what?
17 A.  To 42,5.
18 Q.  And when did it change, if you
19 know?
20 A.  It changes right before I was going
21 to disability.
22 Q.  You said that you were rediagnosed
23 with breast cancer in early 2006 while you were
24 at Mediacom, correct?
25 A.  Yes.

Page 99

MIRIAM BAUZA

2  Q.  Up until June of 2006, what
3  treatment, if any, did you have for the breast
4  cancer?
5  A.  That's when I had the two
6  lumpectomies and the mastectomy.
7  Q.  When were the two lumpectomies?
8  A.  One was in April 10, and the other
9  one was May 8th. And the mastectomy was done
10 July 7.
11 Q.  And the mastectomy occurred while
12 you were out on leave for the extended period,
13 correct?
14 A.  Yes. That's why I needed the --
15 right.
16 Q.  For the first lumpectomy on or
17 about April 10th, did you take a period of time
18 off from work?
19 A.  It was three days. I think it was
20 three days, yes.
21 Q.  And had you missed certain days
22 prior to that because of doctors' appointments?
23 A.  Yes.
24 Q.  Approximately how many days did you
25 miss?

Page 100

MIRIAM BAUZA

2  A.  The first one I think was
3  January 19th, that's when I had the mammogram.
4  And on February 20th I think it was, the biopsy.
5  I think it was the 20th.
6  Q.  For the January 19th and the
7  February 20th you didn't lose any pay because of
8  taking off those times, did you?
9  A.  No.
10 Q.  What about with respect to the
11 three days for the lumpectomy in April, did you
12 lose any time for that? Did you lose any pay?
13 A.  No, because I got disability
14 payments.
15 Q.  You got disability payments in
16 April?
17 A.  No, not in April. You're telling
18 me the mastectomy, no?
19 Q.  No, let's withdraw the last
20 question.
21    For the three days that you were
22 out in April for the first lumpectomy, did you
23 receive pay for those days that you were off?
24 A.  Yes.
25 Q.  Did you have accrued sick time?

Page 101

MIRIAM BAUZA

2  A.  I didn't accrue sick time, but when
3  I start working in Mediacom, I was working 12
4  hours a day. I started at 8:00 and I didn't
5  leave until 8:00 when the cleaning people was
6  leaving.
7  Q.  So for the April time frame you
8  didn't lose any pay for those three days?
9  A.  No.
10 Q.  How long were you out in May for
11 the second lumpectomy?
12 A.  I think it was either two, three
13 days. No more than that.
14 Q.  Again, did you have any sick days
15 that were available to you?
16 A.  No.
17 Q.  Did you lose any pay as a result of
18 the time you took off in May?
19 A.  I think I had some sick days
20 available at some point that I was able to get
21 pay, yes.
22 Q.  So up until you came back from the
23 second lumpectomy, you had not lost any pay, is
24 that correct?
25 A.  No.

### Page 154

```
 1              MIRIAM BAUZA
 2     Q.   So you were telling Judy that
 3   Regina was accusing you of --
 4     A.   Abusing company time.
 5     Q.   What did Judy say in response?
 6     A.   That if I had a problem with that,
 7   to talk to Brian. That's what she said to me.
 8     Q.   So those are the issues that you
 9   ended up speaking with Brian about.
10     A.   Yes. And she told me that also in
11   front of Sharon D'Elia.
12     Q.   Regina told you that?
13     A.   Yes, because they share the same
14   office.
15     Q.   So Judy then -- she said to speak
16   with Brian, and you did then go and speak with
17   him, correct?
18     A.   Correct.
19     Q.   After that point in time, were
20   there any further issues that you had with
21   Regina?
22     A.   Yes. She didn't change.
23     Q.   When you say she didn't change,
24   what is it that didn't change?
25     A.   Her attitude was the same.
```

### Page 155

```
 1              MIRIAM BAUZA
 2     Q.   And did Gladys feel that way as
 3   well?
 4     A.   As well.
 5     Q.   And when you say her attitude, was
 6   it the way that she spoke to you?
 7     A.   Yes.
 8     Q.   Other than the tone that she spoke
 9   to you in, any other problems or issues that you
10   continued to have with Regina?
11     A.   Yes. A lot of times if I do
12   something for her, it was not properly done, and
13   a lot of times she would say to me -- I said
14   could I stay late, and she said well, I don't
15   stay late because I have a life. So she meant
16   to me that I don't have a life. So I have to
17   stay late.
18     Q.   Anything else that she said to you
19   during that time that you had problems or
20   issues, other than her tone and that
21   conversation about her having a life?
22     A.   Many incidents that I'm not even
23   remembering right now.
24     Q.   Were there any other further issues
25   about you not being paid for any time that you
```

### Page 156

```
 1              MIRIAM BAUZA
 2   needed to take off after speaking with Brian?
 3     A.   No.
 4     Q.   Any conversations with Regina about
 5   taking time off after that conversation with
 6   Brian Walsh?
 7     A.   No.
 8     Q.   Any further conversations with
 9   anyone at Mediacom about your need to take off
10   after the conversation with Brian Walsh?
11     A.   Not that I remember right now.
12          (Defendant's Exhibit M for
13   identification, Bank Documents, document bearing
14   Bates production number Mediacom 0231.)
15     Q.   The first page is marked
16   Defendant's Exhibit M. Obviously these are
17   getting a little more difficult to read because
18   they're obviously from the bank. But do you see
19   this one is -- do you see the date on that? If
20   you look up here, can you see the date?
21     A.   July?
22     Q.   Does it look like July 11?
23     A.   Yes. I think so.
24     Q.   If you'll look at this, it says the
25   amount of the check. We don't have to look at
```

### Page 157

```
 1              MIRIAM BAUZA
 2   that number, we can look down at the bottom
 3   here. Do you see that?
 4     A.   Okay, mm-hmm.
 5     Q.   Do you recall if that was the
 6   amount of the checks that you were receiving?
 7     A.   Yes.
 8          MR. BONNIST: Objection. Is this
 9   paychecks?
10     Q.   No, this is from disability.
11     A.   From the disability.
12     Q.   As of July 11th is the period that
13   you were out, correct?
14     A.   That's right.
15     Q.   Did you endorse the -- you had to
16   endorse the disability checks that came,
17   correct?
18     A.   Yes, but I need to know where is
19   the dates that covers here. Where is the dates
20   that covers this particular check?
21     Q.   I'm not going to ask about the
22   dates right now because I've got other documents
23   that are better for that. I'm asking you the
24   checks that you received from your disability.
25   You had to sign those checks and deposit them,
```

Page 166

MIRIAM BAUZA
1
2  A.  No.
3  Q.  Your guess, as you understood it,
4  you were to get two-thirds of that.
5  A.  Okay.
6  Q.  So what was your understanding as
7  to what your gross should have been for
8  disability payments?
9  A.  You mean --
10      MR. BONNIST: Objection. Her
11 understanding today, her understanding then?
12      MR. RIOLO: No. She said she
13 understood that she was getting two-thirds.
14  Q.  So what my question is what was
15 your understanding as to the amount of
16 disability payments that you should be receiving
17 based on what you had said, the two-thirds
18 disability?
19  A.  Well, I knew it was going to be
20 less. And that's why my question was to the
21 insurance company, the people that sent me the
22 check, and that's why I called. Because I know
23 that the dates, the amount of days in the check,
24 to me it was wrong for the amount of money. And
25 that's why I called.

Page 167

MIRIAM BAUZA
1
2  Q.  That's why you called Aetna.
3  A.  That's why I called Aetna.
4  Q.  So it was clear to you from the
5  time of that second check that there was
6  something wrong with the payment.
7  A.  Exactly. So that's why I called.
8  Q.  And you had that conversation in
9  which they said no, it wasn't.
10 A.  When I called, I actually asked
11 them again for the second time, and they
12 reconfirmed to me that it was okay, I have no
13 doubt in my mind that they were right,
14 regardless.
15 Q.  So you thought they were right.
16 A.  I thought they were right.
17 Q.  Even though you had an
18 understanding that you were only supposed to
19 receive two-thirds.
20 A.  Yes. Because I -- yes. Yes.
21 Q.  And after you came back you didn't
22 discuss that with anybody at Mediacom as to this
23 what you thought was a mixup from Aetna.
24 A.  At this point I do made I think it
25 was two phone calls to Joe Mickulski, left a

Page 168

MIRIAM BAUZA
1
2  message for him to call me. And he never called
3  me back.
4  Q.  You didn't say what it was about.
5  A.  I didn't say what it was about.
6  But I left those two messages.
7  Q.  And how soon after you spoke with
8  Aetna did you leave those two messages?
9  A.  I don't quite remember, but it was
10 along the time that I was out.
11 Q.  You made those telephone calls from
12 home?
13 A.  Yes.
14 Q.  And the calls from Aetna, did you
15 make those calls from home as well?
16 A.  From home, too.
17 Q.  What's your home telephone number?
18 A.  My number is 845-561-1152. And if
19 I'm not mistaken, the phone calls that I made to
20 Joe Mickulski was directly to his extension.
21 Q.  Do you know what that is?
22 A.  I think the four last digits is
23 2721, if I'm right.
24      MR. BONNIST: Do you have a cell
25 phone that you would have called from?

Page 169

MIRIAM BAUZA
1
2  A.  That's the only number that I
3  called.
4  Q.  What was the phone service that you
5  use?
6  A.  I use Time Warner Cable.
7  Q.  And did you use that at the time?
8  A.  Yes. Mm-hmm.
9  Q.  And the number that you used for
10 Aetna, that was the one that you had received
11 on -- that you had on some of those documents.
12 A.  Exactly. Actually, from the check,
13 I picked it up from the check. From here. The
14 800 number I think it was.
15 Q.  Do you see it on any of the
16 documents that we marked?
17 A.  It's right here. 188. That's the
18 number I called.
19 Q.  So that number --
20 A.  That's the number I called.
21 Q.  You're looking on this specific
22 one, Defendant's Exhibit S. At least the 1-888
23 number.
24 A.  Exactly.
25 Q.  Now, you said that you had first

Page 186

1                MIRIAM BAUZA
2   her during that meeting?
3       A.   I don't remember if I said
4   anything.
5       Q.   Did she tell you the reason as to
6   why you were terminated?
7       A.   I think because of the
8   overpayment -- because of the overpayment and
9   that I didn't let anybody in Mediacom to know.
10  That's what she said to me.
11      Q.   Did she say anything else that you
12  recall?
13      A.   And I think I told her that that
14  was -- Aetna had said to me that it was their
15  mistake, their error. It was not my error.
16      Q.   Did she say anything in response to
17  you?
18      A.   No.
19      Q.   Did Joe say anything during that
20  meeting?
21      A.   No.
22      Q.   Is there anything else you can
23  recall either you saying during that meeting or
24  Judy saying during that meeting other than what
25  you've just testified to?

Page 187

1                MIRIAM BAUZA
2       A.   No.
3       Q.   Did you have any conversations with
4   Joe --
5       A.   After?
6       Q.   -- after that?
7       A.   Yes, I did.
8       Q.   Where was that?
9       A.   By my area.
10      Q.   What is it that you said to Joe and
11  Joe said to you?
12      A.   Joe said to me that, you know, he
13  felt he was sorry for what happened to me, I was
14  a great person and it was out of his hands. It
15  was not his decision.
16      Q.   Did he say whose decision it was?
17      A.   No, he didn't tell me.
18      Q.   Anything else that he said?
19      A.   No.
20      Q.   Is there anything that you said to
21  him during that conversation?
22      A.   I just told him that I just
23  couldn't believe it because here I am, cancer
24  patient, going through chemo, losing my job, I
25  just felt like -- it was like a nightmare.

Page 188

1                MIRIAM BAUZA
2       Q.   And you said that to him?
3       A.   Yes.
4       Q.   Anything else that you can recall
5   you saying to him during that conversation?
6       A.   I just told him that nobody knows
7   what I'm going through until that person --
8   until it happens really to you. Sometimes
9   people can sympathize for you but they never
10  know what that is until actually you go through
11  that yourself. And he said he could understand
12  where I was coming from and I feel bad.
13      Q.   Did you speak with anybody else
14  after that meeting with Judy and Joe other than
15  the conversation you just mentioned with Joe
16  before you left?
17      A.   I spoke to Regina. Regina asked to
18  speak with me before I was leaving. And she
19  told me if I need recommendations, she was
20  willing to give it to me. If I needed
21  references from her, she was willing to give it
22  to me.
23      Q.   Did she say anything else?
24      A.   No. She said that she feels bad.
25      Q.   Did you say anything to her?

Page 189

1                MIRIAM BAUZA
2       A.   I just told her that it was nice
3   working with her.
4       Q.   Did you ever learn as to whose
5   decision it was to terminate you?
6       A.   No. But I have to say something
7   that when I was terminated at that moment, I
8   remember Mark Stephan conversation once when I
9   just got in to work in the office. I think it
10  was four weeks or five weeks later. He was in
11  the cafeteria where is the corporate office.
12  And he was talking to someone saying that the
13  big boss is not comfortable to pay medical bills
14  for someone just coming aboard than for someone
15  that has been there five years with five years
16  of service.
17           At that point I got up because I
18  wanted to see who was the person that was
19  talking about that. And when I got up and went
20  around to the cafeteria, it was Mark Stephan. I
21  had met him -- that was one of the first people
22  that I met when I went for the interview, so
23  that's why I knew his name. The other person, I
24  didn't know who he was.
25      Q.   Did you ever learn who it was?

Page 190

```
 1            MIRIAM BAUZA
 2      A.   I didn't see from the face, but he
 3   was talking to somebody else.
 4      Q.   When did you overhear this
 5   conversation?
 6      A.   About five years later when I went
 7   into work. Into Mediacom.
 8      Q.   Five weeks after you just started?
 9      A.   Yes.
10      Q.   So this was prior to your
11   diagnosis.
12      A.   Prior to my diagnosis.
13      Q.   So that conversation, did you know
14   who it was referencing?
15      A.   No. Then Joe Mickulski, two times
16   before I was diagnosed, he made the same comment
17   to me. The same exact comment.
18      Q.   What comment did he make?
19      A.   About when a new person is just
20   aboard, the big boss is not comfortable paying
21   medical bills for somebody that just come aboard
22   than for somebody that has been there five years
23   of service.
24      Q.   How did that come up with Joe
25   during those two conversations with you?
```

Page 191

```
 1            MIRIAM BAUZA
 2      A.   It just come up -- I don't know why
 3   but it just come up, and about two times I
 4   overheard him saying the same thing to some
 5   other people. They were either on the phone --
 6   I couldn't tell if it was over the phone or the
 7   person was right next to him. Somebody from
 8   corporate. Because his office was in a corner.
 9   They have partition, they don't have offices.
10   So I was in a position where I always overheard
11   all his conversations. I would overheard
12   anybody talking over the cafeteria.
13           And when that happens to me that
14   they terminated me, I felt they terminated me
15   not for the reason why the checks. It was for
16   my illness, for my medical expenses.
17      Q.   And you feel that because of the
18   conversations that you overheard?
19      A.   Yes.
20      Q.   Is there any other reasons as to
21   why you feel it was over your cancer and your
22   medical bills other than recalling those
23   conversations you overheard with Joe and Mark?
24      A.   Because after I came back from my
25   disability, it was a big change the way
```

Page 192

```
 1            MIRIAM BAUZA
 2   everybody was treating me. Especially Judy
 3   Mills.
 4      Q.   Well, in what way differently did
 5   Judy treat you?
 6      A.   They were different. Even Italia
 7   was different. Everyone was different. Even
 8   Paul Miller was different. Everyone were
 9   different.
10      Q.   In what way?
11      A.   The way they were treating me.
12   They didn't ask me how I felt, how I was doing.
13   They didn't have that anymore.
14      Q.   Other than not asking you how you
15   felt, how else were you treated?
16      A.   Oh, another thing -- I have to go
17   back to that question that you asked me. When I
18   was in Judy Mills' room, when she spoke to me
19   about the checks she also -- I said Judy, you
20   don't know what I've been going through with my
21   chemo. In that stage I don't know how I even
22   recognized that I was overpaid. I don't even
23   know how I recognize that I have that
24   overpayment. My state of mind, it was so bad.
25   She said come on now, I don't want to hear it.
```

Page 193

```
 1            MIRIAM BAUZA
 2      Q.   During what meeting is this
 3   conversation?
 4      A.   This is the meeting that I had with
 5   her when Joe Mickulski was there and Regina was
 6   there. I don't want to hear it.
 7           I had diagnosis the second time in
 8   my life cancer. I had my second full
 9   mastectomy. I struggled to get up in the
10   morning and look in the mirror how I looked.
11   Losing my hair, dealing with all the side
12   effects, diarrhea, vomiting, constipation. Many
13   times when I was in the office, I had to run to
14   the bathroom, to the last one because I didn't
15   want anybody to know that I was so sick. But I
16   was there. I was a trooper, fulfilling my
17   complete job. And she don't want to hear it.
18      Q.   Anything else that you can recall
19   in terms of reasons -- conversations that you
20   had with people in terms of them expressing
21   either issues or problems with you taking time
22   or your treatments?
23      A.   Not that I recall right now.
24           (Defendant's Exhibit T for
25   identification, November 15th, 2006 Letter.)
```