# EXHIBIT C

ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

MIRIAM BAUZA,

                      Plaintiff,

      - against -     Case No. 07 CIV. 6542

MEDIACOM COMMUNICATIONS CORPORATION,

                      Defendant.

------------------------------------------------x

                    March 17, 2008

                    2:05 p.m.

Deposition of JUDY MILLS, a witness on behalf of the Defendant herein, taken pursuant to Notice, and held at the offices of Bonnist & Cutro, 800 Westchester Avenue, Suite S332, Rye Brook, New York, before April Pearl Schirm, a Court Reporter and Notary Public of the State of New York.

DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.609
800.DAL.8779  dalcoreporting.com

JUDY MILLS

2   A.   Correct.

3   Q.   Did you type this document up
4   yourself?

5   A.   Yes, I did.

6   Q.   After reviewing this document, any
7   other inconsistencies that you noticed?

8   A.   No.

9   Q.   And on the second paragraph of this
10  memorandum, which is Plaintiff's Number 8, it
11  begins:  On November 13th, it was learned, while
12  on a leave of absence, Ms. Bauza may have
13  collected the disability payments.  So the 13th is
14  the date that Ms. Burgos came to you with that
15  information?

16  A.   Yes.

17  Q.   It also mentions here that copies of
18  endorsed checks you received on the 14th.  Where
19  did you receive those checks from?

20  A.   They would have probably come from
21  Aetna, I believe.

22  Q.   How would Aetna provide those checks
23  to you?

24  A.   I'm not sure I understand your
25  question.



                              JUDY MILLS

2      Q.    Okay.  In the normal course, is it
3  that Aetna sends these checks back to you and
4  Mediacom has a file for those checks, or do you
5  request Aetna to send you these checks?
6      A.    We requested them.
7      Q.    Who did you request from Aetna to send
8  you those checks?
9      A.    I don't know if it was Steven Rubin or
10 somebody contacted Aetna directly, but it was
11 probably Steven Rubin.
12     Q.    So your testimony before about who you
13 spoke to at Aetna or anyone else still applies,
14 when you had that conversation with Mr. Rubin on
15 the 13th, after that you received some checks back
16 the next day from Aetna?
17     A.    Yes.
18     Q.    So you are assuming at some point
19 someone besides you made a request of Aetna for
20 this and you got that information?
21     A.    I probably asked Steven Rubin during
22 our meeting on the 13th to get me proof.  I didn't
23 want to believe this.
24     Q.    Right.
25     A.    Okay.



1       JUDY MILLS

2       Q.  Did you -- what did you believe of the
3   veracity of Ms. Bauza's statement, that she called
4   someone at Aetna and they told her that they
5   calculated it correctly?
6           MR. RIOLO:  Objection.  When?
7       Q.  When she first told you at the
8   November 15 meeting.
9       A.  At that time, I was believing her.  I
10  was hoping.  Nobody wanted -- everybody liked
11  Miriam.  We were hoping that we would be able to
12  get this cleared up.
13      Q.  When Ms. Bauza wasn't able to clarify
14  it, did you change your position regarding the
15  veracity of her statement that she called someone
16  at Aetna, and they told her that they calculated
17  the benefits correctly?
18      A.  I can't say that we -- I would say
19  that we questioned whether or not we had all of
20  the information from her.  I shouldn't say whether
21  we had all the information.  But we questioned
22  what she was telling us at that point.
23      Q.  After that meeting on November 15th, I
24  believe you testified that there was another
25  meeting with Ms. Commisso-Weinand and Mr. Gillert



51

JUDY MILLS

2  regarding Ms. Bauza's termination?

3      A.    Yes.

4      Q.    Between November 15th and that

5  meeting, the information you had received was that

6  Plaintiff's Exhibit Number 7, which is the

7  email --

8      A.    Correct.

9      Q.    -- concerning Mr. Rubin's report on

10 the situation?

11     A.    Yes.

12     Q.    And the input you got from Ms. Bauza

13 after the 15th meeting, November 15th meeting?

14     A.    Yes.

15     Q.    Anything else did you utilize at that

16 meeting to decide whether or not to terminate Ms.

17 Bauza?

18     A.    No.

19         MR. RIOLO:    Other than the

20 earlier stuff too?

21         MR. CUTRO:    Yes.

22     A.    No.

23     Q.    What happened at that meeting?  Do you

24 know the date of that meeting you had with

25 Mr. Gillert and Ms. Weinand?

```
1                    JUDY MILLS
2    provide you regarding her claim that she called
3    Aetna?
4         A.   When did she get back to me?
5         Q.   Yes.
6         A.   I don't recall.
7         Q.   Was it prior to the 21st or after the
8    21st of November?
9         A.   I don't know.
10        Q.   Was it prior to the meeting you had
11   with Ms. Weinand and Mr. Gillert?
12        A.   Yes.
13        Q.   What happened at that meeting where
14   you ultimately decided -- when a decision was made
15   to terminate Ms. Bauza? What happened then?
16        A.   We just talked about the situation.
17   We talked about the fact that Miriam was in a
18   position of trust. And that given the
19   circumstances, we believe that we needed to
20   terminate her employment. We could not continue
21   her employment.
22        Q.   How long did that meeting take?
23        A.   I don't know. I mean, I don't think
24   it was more than a half an hour or so.
25        Q.   When you say given the circumstances,
```



1                       JUDY MILLS
2     what were the circumstances?
3          A.   That she received the overpayment,
4     that she knew that it was incorrect and that she
5     never brought it to our attention.  Those were the
6     circumstances.
7          Q.   At that meeting, was it ever discussed
8     whether there were similar fact patterns that had
9     arisen with other employees and what discipline
10    was used in those types of situations?
11         A.   No.
12         Q.   Who had the ultimate authority to make
13    the decision to terminate Ms. Bauza at that
14    meeting?
15         A.   The ultimate authority would have been
16    Italia Commisso-Weinand and Mark Stefan.
17         Q.   Did you make a recommendation at that
18    meeting as to how to handle Ms. Bauza, or did you
19    present the facts or both?
20         A.   I made a recommendation, yes.
21         Q.   What was your recommendation?
22         A.   My recommendation was termination.
23         Q.   Now, was the fact that Ms. Bauza was
24    out on disability leave discussed at that meeting?
25         A.   No.



1                    JUDY MILLS

2         Q.   In making the recommendation to

3    terminate Ms. Bauza, did you consider that

4    treatment that Ms. Bauza was undergoing while she

5    was out on leave in regards to impacting her

6    mental capacity and her ability to -- general, you

7    know, physical well being?

8              MR. RIOLO:   Objection.

9              THE WITNESS:   Can I answer?

10        Q.   Yes.

11        A.   It was clear because she had already

12   said that she knew it was an overpayment, okay,

13   that she already knew that.   It wasn't something

14   that she claimed she did not know.   Okay.   I would

15   have to say that her -- I didn't have to consider

16   that because she had already said that she knew

17   that there was an overpayment.

18        Q.   Understood.

19        A.   Okay.

20        Q.   You know, the memo -- your

21   recollection is that she did acknowledge these

22   payments?

23        A.   Yes.

24        Q.   Because she did call Aetna to question

25   it, but in Ms. Bauza's ability to call Mediacom



1            JUDY MILLS

2   immediately and try to resolve this issue, did you

3   take into consideration the fact that she had just

4   undergone surgery and was under several

5   medications that may have impacted her ability to

6   respond properly to this situation to Mediacom?

7            MR. RIOLO: Objection.

8        A.   I didn't because she had said that she

9   was going to call Joe. So she had already came to

10  that conclusion that she was going to call him.

11  But she decided to wait until she returned. So I

12  never had to take that into consideration.

13       Q.   Okay.

14       A.   Okay.

15       Q.   Did you ever ask Mr. Rubin to have

16  Aetna get any phone logs from conversations that

17  it had with Ms. Bauza?

18       A.   I don't know if I specifically asked

19  him to do that.

20       Q.   Did you have any knowledge about

21  whether Aetna recorded phone calls that were made

22  to it?

23       A.   I have -- sorry. Finish your

24  question.

25       Q.   Did you ever have any knowledge about



JUDY MILLS

whether Aetna recorded phone calls by its customer to it regarding questions?

A. No. Specifically, no.

Q. Okay. In general?

A. In general, I had a hunch that they probably did, but I cannot speak for them.

Q. Did you ever ask Mr. Rubin to inquire of Aetna whether they made a recording?

A. No, I did not. I didn't ask specifically for something like that.

Q. Okay. That meeting that you had with Ms. Weinand and it was Mr. Gillert, right?

A. Uh-huh.

Q. And yourself, did you discuss the Bauza matter at all prior to the final termination meeting with her with anyone else?

A. I would guess that we probably did have some discussion.

Q. Who would we be?

A. Paul Gillert and Italia and I.

Q. But the final decision was made at that meeting?

A. Yes.

Q. Was there any discussion of any other



```
 1                    JUDY MILLS
 2    type of discipline short of termination to invoke
 3    in this situation?
 4         A.    I don't recall any other, any other
 5    discussion of any other disciplinary action.
 6         Q.    Did the company review anything else
 7    in Ms. Bauza's personnel file in regards to making
 8    the decision to terminate her?
 9         A.    No.
10         Q.    Performance had nothing to do with it?
11         A.    No.
12         Q.    At that meeting you had on the 15th
13    with Ms. Burgos, Mr. Michulski and Ms. Bauza, did
14    Ms. Bauza ever tell you during that meeting that
15    she never collected disability benefits before?
16         A.    She may have.  She may have.
17         Q.    And you did know at that meeting that
18    Ms. Bauza's responsibilities in her everyday job
19    were not in the area of disability benefits,
20    correct?
21         A.    Ms. Bauza has a background in
22    benefits.  She administered similar benefits in
23    the past.  And she knew about the 66 and two
24    thirds.
25         Q.    But that was not part of her job
```



```
 1                      JUDY MILLS
 2   happy with how Regina had dealt with a doctor's
 3   appointment. Maybe it was the chemo. And I told
 4   Miriam to go talk with Brian Walsh if she had a
 5   concern.
 6        Q.   Did Ms. Bauza talk to Mr. Walsh?
 7        A.   As far as I know she did, yes.
 8        Q.   When was that that she raised that
 9   issue to you?
10        A.   I honestly don't remember.
11        Q.   Prior to this issue being raised with
12   the Aetna overpayment, right?
13        A.   Oh, absolutely, it was prior to that.
14        Q.   After she returned from disability
15   leave?
16        A.   Yeah.
17        Q.   Did you ever investigate further
18   regarding the allegations that Ms. Burgos had made
19   that statement about Ms. Bauza abusing company
20   time by going to chemotherapy?
21             MR. RIOLO: Objection.
22        A.   I don't believe that that's how it was
23   presented to me. I believe that it was more, I
24   came into work for an hour and a half and I had to
25   leave for an appointment. And Regina questioned
```



1                    JUDY MILLS

2     the reason why she came into work.  I don't think

3     that it had -- there was a discussion that it was

4     because she was going to chemotherapy.  And that

5     is when I told Miriam to go talk with Brian Walsh,

6     who would have been Regina's supervisor.

7          Q.   Could Ms. Bauza have phrased it as I

8     asked it?

9          A.   I can't say how she would phrase it.

10    I mean, I'm not there.  I wasn't there, so I can't

11    say.

12         Q.   I mean, Ms. Bauza's -- one of the

13    allegations in this lawsuit is that Ms. Bauza

14    claims that she had told you that Ms. Burgos said

15    that Ms. Bauza was abusing company time by her

16    going to chemotherapy.  Could she have used those

17    words, that phrasing with you and you don't

18    recall?

19         A.   I don't believe that that is how it

20    was presented to me.

21         Q.   When you were at that meeting with Ms.

22    Bauza and others on November 15th, did Ms. Bauza

23    ask you whether this issue of an overpayment had

24    been raised before with other employees, in

25    regards to Aetna's payment of disability benefits?



```
 1                    JUDY MILLS
 2       Q.   Mr. Michulski testified earlier today,
 3  and he believed that when he was responsible for
 4  reviewing the payouts made by Aetna for disability
 5  payments to Mediacom employees that he had came
 6  across two other employees that were paid an
 7  overpayment in error by Aetna.
 8       A.   Okay.
 9       Q.   Are you aware of that?
10       A.   I'm aware of a couple of other
11  overpayments since Miriam, yes.
12       Q.   Were these after Miriam?
13       A.   After Miriam.
14       Q.   And these were by Aetna?
15       A.   Yes.
16       Q.   What were the facts surrounding those
17  cases?
18       A.   They were of minimal amounts.  They
19  were -- I don't have all of the facts.  I mean,
20  they were not people in positions that would cause
21  me to have to look into it or to react, I should
22  say, the way that we did or the way that we looked
23  at it with Miriam.  The amounts were certainly not
24  up to $4,000.
25       Q.   Correct me if I'm wrong, in Ms.
```



                         JUDY MILLS

1  Bauza's case, whether the amount was $4,000 or
2  $.40, according to your testimony, it was wasn't
3  the amount, it was her position and
4  responsibility?
5       A.   $.40 --
6            MR. RIOLO:  Objection.  Go ahead.
7       A.   $.40 would not have been noticeable at
8  all.  This was something that stood out, and it
9  was impossible for somebody not to notice it.
10      Q.   Okay.  Now, these two other incidents,
11 how much were the amounts?
12      A.   I don't know.
13      Q.   You don't know whether they were
14 minimal or not?
15      A.   I know that they were minimal.  I know
16 that they were nowhere near $4,000.
17      Q.   What were they near?
18      A.   I honestly don't know the number.
19      Q.   How did those incidents come to your
20 attention, the other two overpayments by Aetna?
21      A.   Probably because we were doing -- we
22 were reviewing things more closely at this point.
23 We wanted to know if we had a problem.
24      Q.   Mr. Michulski testified he noticed



1                    JUDY MILLS
2     these errors and brought them to someone's
3     attention.
4          A.   Okay.
5          Q.   No disciplinary action was taken
6     against those two employees that Aetna made
7     overpayments to; is that correct?
8          A.   I don't know of any disciplinary
9     action, no.
10         Q.   What time period did these other two
11    overpayments occur?
12         A.   I don't know.
13         Q.   After --
14         A.   I have no idea.
15         Q.   After Ms. Bauza was terminated, after
16    November '06?
17         A.   That is when I learned of them, yes.
18         Q.   Do you know if they were from
19    incidents prior to November '06?
20         A.   I don't recall.
21         Q.   When do you recall learning about
22    them; around November '06?
23         A.   Probably later than November '06.
24         Q.   After Ms. Bauza was terminated?
25         A.   Yeah.

1              JUDY MILLS

2         Q.   Did you advise Ms. Burgos to sit down?

3         A.   Sure.

4         Q.   Did you take any other action at HR

5    regarding that issue that Ms. Burgos brought to

6    your attention?

7         A.   There was no need at that point to

8    take any action.

9         Q.   Isn't it true that part of Ms. Burgos'

10   concern was Ms. Falto was putting in to get paid

11   for overtime for hours she may not have actually

12   worked?

13        A.   I don't know that to be a fact.  I

14   don't know.

15        Q.   If that was a fact -- let me step back

16   for a minute.

17             If an employee puts in to get paid for

18   time that they didn't work, whether it be overtime

19   or something else, as an HR person --

20        A.   I would be very concerned about that.

21        Q.   That is called theft of time, right?

22        A.   Yes.  I would be very concerned about

23   that.

24        Q.   If you were advised by an employee of

25   Mediacom that another employee may have been

