# EXHIBIT I - I

LEXSEE 2006 U.S. DIST. LEXIS 17542

**VINCENT LEE, Plaintiff, v. STATE OF CONNECTICUT, DEPARTMENT OF MOTOR VEHICLES, and DALE URSIN, Defendants.**

**Civil No.3:02CV02214(AWT)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*427 F. Supp. 2d 124; 2006 U.S. Dist. LEXIS 17542*

**March 30, 2006, Decided**

**COUNSEL:** [**1] For Vincent Lee, Plaintiff, Kimberly A. Graham, Hartford, CT.

For State of Connecticut, Dept. of Motor Vehicles, and Dale Ursin, Defendants, Margaret Q. Chapple, Attorney General's Office, Employment Rights, Hartford, CT.

**JUDGES:** Alvin W. Thompson, United States District Judge.

**OPINION BY:** Alvin W. Thompson

**OPINION**

[*126] *RULING ON MOTION FOR SUMMARY JUDGMENT*

The plaintiff, Vincent Lee ("Lee"), brings this action against the State of Connecticut Department of Motor Vehicles ("DMV") and Dale Ursin in his individual capacity. The First Claim for Relief set forth in the Third Amended Complaint (Doc. No. 19) ("Amended Complaint") alleges that the DMV intentionally discriminated against Lee in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* ("Title VII"). The Second Claim for Relief alleges that the DMV retaliated against Lee in violation of Title VII. The Third Claim for Relief alleges that Ursin, acting under the color of law, intentionally discriminated against Lee in violation of his constitutional right to equal protection provided by the *14th Amendment to the United States Constitution*. The Fourth Claim for Relief alleges [**2] that Ursin intentionally discriminated against Lee, a "class-of-one" plaintiff, without any rational basis for doing so in violation of his constitutional right to equal protection provided by the *14th Amendment to the United States Constitution*. The defendants have moved for summary judgment. For the reasons set forth below, the defendants' motion for summary judgment is being granted.

**I. *FACTS***

Lee is an African-American male, who was employed by the DMV as a Management Analyst from 1992 until his termination on January 10, 2000. Following an arbitration proceeding, Lee was reinstated in May 2001 and continued to work as a Management Analyst until he was laid off in January 2003. From 1992 to 1997, Lee worked under several different supervisors. In 1998, Steve Dodge ("Dodge") became Lee's immediate supervisor. At that time, Dodge was supervised by Charles Micelli, who was supervised by Ursin.

In November 1999, Lee expressed a concern to Ursin that he had not been invited to attend a Business Process Management meeting. Lee did not express to Ursin any belief that he had been excluded from the meeting because of his race.

On December 22, 1999, the DMV Human Resources [**3] Unit received a fax addressed to "Human Resources Director" from an individual named Sharon Gordon ("Gordon"). The fax consisted of four pages and had a cover sheet from "Rensselaer at Hartford." The fax stated:

> I'm sending this fax to the dept. of motor vehicles dept. hoping that I can get this problem resolved. I'm receiving threatening phone calls on my life and [*127] my family from Mr. Vincent Lee who works in the dept. of human resource development dept. yesterday I along with another co-worker received a e-mail from Mr. Lee from his workplace, which we found very strange being that we did not personally give Mr. Lee this information. I would like to see this matter taken care of.

Case 7:07-cv-06542-CS   Document 19-10   Filed 07/03/2008   Page 3 of 21

Page 2

427 F. Supp. 2d 124, *; 2006 U.S. Dist. LEXIS 17542, **

(Def. Loc. R. 56(a)(1) Statement, Ex. 2A.) Ursin received and reviewed this fax on December 22, 1999. On the afternoon of December 22, Ursin telephoned Gordon to inquire about information contained in the fax. Steve Shonta ("Shonta"), DMV's Principal Personnel Officer for Labor Relations, and Anne Fairbanks, Personnel Assistant, listened to the conversation between Ursin and Gordon on speakerphone. During the December 22, 1999 speakerphone conversation, Gordon told Ursin that Lee was threatening [**4] her and her family and that she wanted the threats to stop. Gordon also stated that she and Lee had previously been involved in a relationship and that he had contacted her multiple times throughout the day. Gordon stated that she attempted to stop the calls and e-mails when they became too "perverted." Finally, Gordon stated that two of her co-workers had also received threatening and harassing calls and e-mails from Lee. Following this telephone call, Ursin reported the substance of Gordon's fax and allegations to the DMV Commissioner, Jose Salinas ("Salinas"). Shonta and Detective Edward Daly ("Daly") were then assigned to investigate Gordon's allegations and report their findings.

As part of their investigation, Shonta and Daly audited certain DMV computer and telephone records and conducted several witness interviews. In late December 1999, Shonta and Daly reported their findings to Ursin, who later relayed them to Salinas.[1] Shonta and Daly reported that one of Gordon's co-workers, Elaine Kendall ("Kendall"), stated under oath that on December 20 or 21 of 1999 she answered the telephone at Rensselaer and a caller identified himself as "Tony" and stated that he wanted to speak [**5] to Gordon; Kendall transferred the call to Gordon. According to Kendall, the call was then re-transferred back to her telephone and the caller stated: "Tell that bitch I'm going to come down there and hurt her. There's nothing you or anyone else can do to stop this." (Def. Loc. R. 56(a)(1) Statement, Ex. 2C.) Additionally, Kendall stated that the same caller called back several times that morning and repeated the same threat. Shonta and Daly also obtained a sworn statement from Gordon, which appeared to corroborate Kendall's account of the threatening telephone call described above. In her statement, Gordon identified "Tony" as a name utilized by Lee and stated that she feared for her safety and her family's safety as a result of Lee's threats. Shonta and Daly also obtained a sworn statement from Jennifer Carone ("Carone"), another co-worker of Gordon's. Carone stated that she had received e-mails of a personal nature from VLee@power99 during State of Connecticut working hours. Shonta and Daly further reported that telephone records for Lee's state telephone number indicated that 14 separate telephone calls had been made from his state telephone number to Rensse-

laer between 9:51 a. [**6] m. and 11:04 a.m. on December 21, 1999. DMV computer usage records indicated that Lee maintained a personal internet e-mail account [*128] on his state computer under the e-mail name "Tony Sexx."

> 1   The plaintiff contends that the investigation failed to yield any credible evidence that Lee behaved in a threatening or harassing manner. However, the plaintiff does not deny that Shonta and Daly reported their findings to Ursin, who relayed them to Salinas.

In response to these findings and at Salinas' direction, the DMV issued a "Loudermill" notice to Lee informing him that the DMV was considering taking disciplinary action against him. This notice instructed Lee to appear with his representatives on January 5, 2000 to present material and information as to why the DMV's contemplated disciplinary action should not be taken. According to the notice, it was alleged that Lee 1) deliberately misused state telephones and computer in violation of established policy, 2) harassed and threatened members of the public in violation [**7] of Governor's Executive Order and DMV policy, and 3) misused state time to conduct personal business. The notice informed Lee that this conduct gave rise to the following disciplinary charges: 1) engaging in offensive and abusive conduct towards members of the public, 2) deliberately violating Agency policies, and 3) engaging in activities detrimental to the interests of the DMV and State of Connecticut. The notice effectively placed Lee on leave with pay pending the January 5, 2000 hearing (the "Loudermill hearing").

At the Loudermill hearing, Lee admitted making telephone calls and sending e-mails to Kendall, Gordon and Carone at Rensselaer on the days and at the times the threats were alleged to have been made. [2] At no time during the Loudermill hearing or any subsequent meeting with DMV representatives prior to his discharge did Lee deny making the physical threats. [3] In his CHRO affidavit, Lee admitted that on December 21, 1999 he "left word with the receptionist [at Rensselaer] to tell my ex-girlfriend (black/female) to stop calling and harassing me before I come down there." (Pl. Loc. R. 56(a)(1) Statement, Ex. P.) At the Loudermill hearing, Lee presented evidence that Gordon [**8] had harassed him in the past, but the DMV representatives informed him that such evidence did not substantially counter Shonta's and Daly's findings. The Loudermill hearing was continued until January 10, 2000 to allow Lee to collect and present additional evidence as to why the DMV should not take disciplinary action against him. When the Loudermill hearing reconvened on January 10, 2000 Lee failed to present any additional evidence.

Case 7:07-cv-06542-CS    Document 19-10    Filed 07/03/2008    Page 4 of 21

Page 3

427 F. Supp. 2d 124, *; 2006 U.S. Dist. LEXIS 17542, **

2   Lee denies making these admissions at the Loudermill hearing, but presents no evidence in support of his denial. Instead, he directs the court to his CHRO affidavit dated February 4, 2000. In P15 of the CHRO affidavit, Lee stated that when he was initially confronted with the allegations on January 3, 2000 he denied having threatened or harassed anyone. However, the CHRO affidavit does not support his denial of the defendants' statement that at the Loudermill hearing on January 5, 2000 he admitted making calls and sending e-mails on the day and times that the threats were alleged to have been made.

3   Lee denies that at the Loudermill hearing or subsequent meetings with DMV representatives he failed to deny making the physical threats. Again, he directs the court to his CHRO affidavit in which he states that he denied making the threats when he was initially confronted with the allegations on January 3, 2000. The CHRO affidavit does not support his claim that he denied the allegations at the Loudermill hearing and subsequent meetings.

[**9]  Based on all the information available to Ursin following the completion of the hearing on January 10, 2000, he believed that Lee had engaged in the conduct charged in the Loudermill notice. Based on his conclusion that Lee had, in fact, engaged in such conduct, Ursin recommended to Salinas that the DMV discharge Lee. Salinas adopted Ursin's recommendation and made the decision to discharge Lee. The [*129] discharge was effected by issuance of a letter of termination dated January 10, 2000.

On February 4, 2000, Lee filed a complaint with the CHRO and EEOC alleging that the DMV had illegally terminated him on the basis of his race and sex. After conducting a merit assessment determination, the CHRO concluded that there was no reasonable possibility that further investigation of the allegations in Lee's complaint would result in a finding of reasonable cause and dismissed the complaint.

However, pursuant to the provisions of his union's collective bargaining agreement, Lee also filed a grievance contesting his termination. The grievance was heard by an arbitrator on multiple days between June 23, 2000 and November 20, 2000. During the arbitration proceeding, the arbitrator heard testimony [**10] from a number of witnesses including Kendall and Gordon. By a written decision dated April 12, 2001, the arbitrator found, *inter alia*, that inconsistencies in the testimony of Kendall and Gordon undermined their credibility as to their allegations of harassment and threats by Lee. Additionally, while the arbitrator did not find that Lee's con-

duct constituted threats or harassment, he concluded that "[Lee] used the State's phone and computer for purposes of non-work related business in excess and therefore the conduct justified discipline." (Pl. Loc. R. 56(a)(1) Statement, Ex. M.) In light of these findings, the arbitrator determined that Lee's termination should be reduced to a 60-day suspension without pay or benefits and that Lee should thereafter be reinstated to his former position. Lee was reinstated in by DMV to his position of Management Analyst II in late April or May of 2001.

Following the arbitrator's decision, the CHRO granted Lee's request for reconsideration and assigned a CHRO Investigator to further investigate Lee's allegations. The CHRO Investigator conducted a fact-finding proceeding on February 26, 2002, and concluded that a determination of no reasonable [**11] cause was appropriate because the DMV reasonably concluded, based on the evidence available at the time it decided to terminate Lee, that he had engaged in threatening and harassing conduct.

In January 2003, the State of Connecticut identified the classification of Management Analyst for state-wide layoffs. The DMV was directed to lay off its Management Analysts, including Lee.

## II. *LEGAL STANDARD*

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. *Fed. R. Civ. P. 56(c)*. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994)*. *Rule 56(c)* "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex Corp., 477 U.S. at 322.* [**12]

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. *See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987)*; *Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)*. It is well-established that "credibility determinations, the weighing of the evidence, and the drawing of legitimate [*130] inferences from the facts are jury functions, not those of the judge." *Anderson, 477 U.S. at 255.* Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding

Case 7:07-cv-06542-CS    Document 19-10    Filed 07/03/2008    Page 5 of 21

Page 4

427 F. Supp. 2d 124, *; 2006 U.S. Dist. LEXIS 17542, **

them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224.*

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine *and* related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise [**13] properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248* (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Id.* As the Court observed in *Anderson*: "The materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* Thus, only those facts that *must* be decided in order to resolve a claim or defense that will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).*

When reviewing the evidence on a motion for summary judgment, the court must "assess [**14] the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)* (quoting *Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).* Because credibility is not an issue on summary judgment, the non-movant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the non-movant must be supported by the evidence. "Mere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997)* (quoting *Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).* Moreover, the "mere existence of a scintilla of evidence in support of the [non-movant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the non-movant. *Anderson, 477 U.S. at 252.*

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond [**15] the pleadings to determine if a genuine issue of material fact exists. *See Celotex Corp., 477 U.S. at 324.* "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," *Weinstock, 224 F.3d at 41,* if the movant demonstrates an absence of such issues, a limited burden of production shifts to the non movant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial. *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)* (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." *Weinstock, 224 F.3d at 41.* If the [*131] non-movant fails to meet this burden, summary judgment should be granted. The question then becomes: is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. *See Anderson, 477 U.S. at 248, 251.*

### III. DISCUSSION

#### A. Title VII Claims

##### 1.  [**16]  *Race Discrimination*

In order to survive a motion for summary judgment, a Title VII plaintiff alleging that he was discharged on the basis of his race must establish a *prima facie* case by demonstrating that (1) he is a member of a protected group; (2) he was performing his duties satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Fisher v. Vassar College, 114 F.3d 1332, 1344 (2d Cir. 1997).*

For purposes of the instant motion, the defendants concede that the plaintiff can establish the first three elements of a *prima facie* case; they dispute only whether Lee's discharge occurred under circumstances giving rise to an inference of discrimination. "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island Railroad, 230 F.3d 34, 40 (2d Cir. 2000).* "To be 'similarly [**17] situated' the individuals with whom [the plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)* (*citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).* "What constitutes 'all material respects' . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. . . Hence the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's

Case 7:07-cv-06542-CS    Document 19-10    Filed 07/03/2008    Page 6 of 21

Page 5

427 F. Supp. 2d 124, *; 2006 U.S. Dist. LEXIS 17542, **

cases, rather than showing that both cases are identical." *Graham, 230 F.3d at 40* (citations omitted).

In opposition to the defendants' motion for summary judgment, Lee contends that he received harsher disciplinary treatment than other, white DMV employees to whom he was similarly situated. However, Lee fails to present evidence that the DMV employees he identifies engaged in conduct that bears a "reasonably close resemblance" [**18] to the conduct for which he was discharged. In its termination letter to Lee, the DMV stated:

> It has been determined that you have deliberately misused State telephones and a computer in direct violation of established policy and have harassed and threatened members of the public in direct violation of the Governor's Executive Order and Department policies. The harassment noted above includes sexual harassment. You have also misused State time to conduct personal business.

(Pl. Loc. R. 56(a)(1) Statement, Ex. L.) None of the other DMV employees identified by Lee engaged in conduct that bears a "reasonably close resemblance" to the conduct described by the DMV in the termination letter. Lee directs the court specifically to the experiences of five DMV employees. First, Lee contends that DMV employee John Roberts ("Roberts"), an alleged similarly [*132] situated white male, received a relatively less severe sanction when he was charged with misuse of the state's computer system in June 2000. Roberts was alleged to have used the State Police Collect System to obtain the birth-dates of his father and girlfriend. Roberts acknowledged that his actions had been inappropriate and [**19] promised that he would not repeat this behavior. The DMV issued Roberts a formal letter of reprimand. Second, Lee contends that DMV employee Michael Boguslawski ("Boguslawski"), an alleged similarly situated white male, received a relatively less severe sanction when he was charged principally with misuse of state resources by utilizing a state vehicle for personal business. Boguslawski acknowledged and apologized for his conduct. The DMV entered into a performance agreement with Boguslawski - "a 'last chance' opportunity provided to [him] in lieu of termination" (Pl. Loc. R. 56(a)(1) Statement, Ex. N.) - whereby Boguslawski agreed not to engage in similar conduct in the future. Third, Lee contends that DMV employee Mark Niglio ("Niglio"), an alleged similarly situated white male, received a relatively less severe sanction when he was charged with misuse of agency letterhead in June 2000. The DMV issued Niglio a written warning in response to his conduct. Fourth, Lee contends that DMV employee Louis Florio ("Florio"), an alleged similarly situated Hispanic male, received a relatively less severe sanction when he was alleged to have misused a State telephone by using it to make 71 [**20] personal calls in February 1994. Florio had been found to have illegally used dealer plates in 1985. With respect to the allegation that he had misused a State telephone, Florio received a written warning. Fifth, Lee contends that DMV employee Carol Driscoll ("Driscoll"), an alleged similarly situated white female, received a relatively less severe sanction when a co-worker alleged that she held her fist in the co-worker's face in November 2000. The co-worker withdrew this allegation the day after it was made. Both parties exchanged apologies and no disciplinary action was taken against Driscoll.

It is undisputed that Lee and the DMV employees identified by him were subject to the same workplace standards. As to whether the conduct for which the DMV terminated Lee was of comparable seriousness to that of the other DMV employees discussed above, the court considers the facts and circumstances of Lee's and the other employees' conduct. Of the DMV employees identified by Lee, only Driscoll's conduct could be described as threatening or harassing. The other employees (i.e., Roberts, Boguslawski, Niglio and Florio) were charged with conduct that can generally be characterized as misuse [**21] of State resources. They were neither charged with nor found to have engaged in threatening or harassing behavior. *See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001)* (not similarly situated where plaintiff, like other employees, failed to produce new business, but, unlike other employees, submitted reports late, submitted poorly prepared reports and failed to provide leadership). Unlike these DMV employees, Lee was actually found by the DMV to have committed the violations charged. Moreover, none of the employees identified by Lee were alleged to have engaged in misuse of state resources *and* threatening and harassing conduct. Because the conduct of these DMV employees and Lee is not comparably serious, Lee is not similarly situated to them.

Nor is Lee similarly situated to Driscoll. First, the DMV did not make a finding as to whether Driscoll actually raised her fist to a co-worker. In this case, the DMV conducted an investigation and determined [*133] that Lee had, in fact, engaged in threatening and harassing behavior. Second, the only allegation against Driscoll was that she had raised her fist to a co-worker. Unlike Lee, Driscoll was [**22] not alleged to have also misused State computer equipment, telephone equipment and time. Third, the alleged threats made by Lee are more serious than Driscoll's alleged threatening behavior. It was reported to DMV officials that Lee threatened Gordon's life and her family. In contrast,

Case 7:07-cv-06542-CS     Document 19-10     Filed 07/03/2008     Page 7 of 21

Page 6

427 F. Supp. 2d 124, *; 2006 U.S. Dist. LEXIS 17542, **

Driscoll was alleged to have raised her fist toward a co-worker, who then simply walked away. Fourth, Kendall, one of the victims of Lee's threatening behavior, stated to DMV officials that she feared for her personal safety after being told by Lee to relay the threats to Gordon. (Pl. Loc. R. 56(a)(1) Statement, Ex. H.) The alleged victim of Driscoll's threatening behavior promptly withdrew the complaint and the parties exchanged apologies. Accordingly, there is no genuine issue of material fact as to whether Lee's conduct is comparably serious to Driscoll's, and the facts show that they are not similarly situated employees.

Having determined that Lee is not similarly situated to any of the DMV employees whom he has identified, the court need not address his argument that the DMV's legitimate, non-discriminatory reason for the discharge is mere pretext for discrimination. He has failed to show that [**23] he was treated differently than other similarly situated employees and thus cannot satisfy the fourth element of the *prima facie* case, i.e., that he was discharged under circumstances giving rise to an inference of discrimination.

## 2. Retaliatory Discharge

"To establish a *prima facie* case of retaliation, the plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001) (citing Gordon v. N. Y. City Bd. of Educ., 232 F.3d 111, 113 (2d Cir. 2000)).* "To prove that he engaged in protected activity, the plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII. However, the plaintiff must demonstrate a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)* (internal citations omitted).

Lee contends [**24] that he was discharged in retaliation for complaining to Ursin about his exclusion from a November 1999 meeting of a Business Project Management group. According to Lee, this complaint to Ursin constituted protected activity and satisfies the first element of his *prima facie* case. However, while the record supports Lee's claim that he complained to Ursin about not being invited to the meeting, there is no evidence that he informed Ursin of his belief that he was excluded because of his race. *See Manoharan, 842 F.2d 590, 594* (plaintiff did not prove "good faith" belief where initial complaint to employer failed to "point out discrimination against particular individuals" or discriminatory practices, as they were alleged). Lee implies,

without explicitly stating, that he complained to Ursin that he was not invited to the meeting because of this race. In support of this contention, Lee directs the court to the Third Amended Complaint, the Addendum to the CHRO Complaint and the Ursin Affidavit. The Third Amended Complaint states in relevant part:

> [*134]    In November, 1999, approximately sixty days prior to his termination, plaintiff complained to his supervisor, Dale [**25] Ursin that he, (plaintiff) was being treated differently and requested an explanation as to the reason for such disparate treatment.

(Pl. Loc. R. 56(a)(1) Statement, Ex. J.) There is no allegation that Lee expressed a belief that the basis for the alleged disparate treatment was his race, and in any event, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings." *Fed. R. Civ. P. 56(e).*

The Addendum to the CHRO Complaint states in relevant part:

> Back in November of 1999 I encountered a situation that *after much consideration I have come to believe presents a pattern of the cultural bias*. During a Process Improvement Event for the Employment Recruitment Process I was denied the opportunity to be present at a meeting to discuss the hot topic that was affecting the morale of other team members involved in improving the Recruitment Process of new employees. . . After discovering the meeting had taken place without me, I made my feelings known to the Process Improvement Sponsor, Dale Ursin (white/male). The Process Improvement Sponsor apologized for the over-sight and discussed my concerns [**26] with the Process Improvement Co-leader. The Process Improvement Co-leader later apologized for his over-sight and promised that it would not happen again.

(Pl. Loc. R. 56(a)(1) Statement, Ex. Q) (emphasis added) Again, Lee's account of his complaint to Ursin does not state that he expressed a belief that he was excluded due to his race. Moreover, his addendum to the CHRO suggests that it was only "after much consideration" that he

Case 7:07-cv-06542-CS   Document 19-10   Filed 07/03/2008   Page 8 of 21

Page 7

427 F. Supp. 2d 124, *; 2006 U.S. Dist. LEXIS 17542, **

came to believe that his exclusion was motivated by racial animus.

Finally, Lee cites PP10-13 of Ursin's affidavit in support of his contention that he complained to Ursin that he was excluded from the meeting because of his race. In P10 of the affidavit, Ursin states:

> ... Mr. Lee expressed concern because he said he was a "co-facilitator on the project and felt he should have been invited. At no time during this discussion did Mr. Lee state or imply, nor did I infer, that Mr. Lee's race had anything to do with his not being invited to the meeting.

(Pl. Loc. R. 56(a)(1) Statement, Ex. H.) Clearly, Ursin's affidavit does not support the conclusion that Lee communicated a belief that he had been excluded from the meeting because of [**27] his race.

Thus, there is no evidence that Lee informed Ursin of a belief that he was excluded from the meeting because of his race, nor any basis for inferring that, when he complained to Ursin, Lee believed he was excluded from the meeting because of his race. Consequently, he cannot establish that he held a good faith belief that his exclusion from the meeting violated the law. Thus, Lee fails to satisfy the first element of a *prima facie* case, which requires his participation in protected activity.

In addition, Lee fails to satisfy the second element of a *prima facie* case, because there is no evidence that could support a conclusion that Ursin understood, or could have reasonably understood, that Lee was engaging in protected activity. *See Galdieri-Ambrosini, v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)*("implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could have reasonably understood, that the [*135] plaintiff's opposition was directed at conduct prohibited by Title VII").

### B. *Equal Protection Claims*

"To state a cause of action under *§ 1983*, [the plaintiff] [**28] must allege (1) that the defendants deprived him of a right secured by the Constitution or the laws of the United States; and (2) that they did so under color of state law." *Giordano v. City of New York, 274 F.3d 740, 750 (2d Cir. 2001)* (quotations omitted).

Here, Lee pursues two equal protection theories: intentional discrimination based on race and selective enforcement.

### 1. *Race Discrimination*

Lee asserts that Ursin, acting under color of state law, intentionally treated him differently from other similarly situated white DMV employees. "An equal protection claim requires (*inter alia*) evidence from which a jury could find that the plaintiff was selectively treated as compared with others similarly situated." *Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 155 (2d Cir. 2006); see also Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998)*("An employee is denied [his] equal protection rights to be free from . . . discrimination when [he] is treated differently from other similarly situated employees . . ."). "In analyzing whether conduct was unlawfully discriminatory for purposes of *§ 1983*, [the [**29] Second Circuit] borrows the burden-shifting framework of Title VII claims." *Id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 n.1, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*.

For the reasons discussed in Part III.A.1. above, Lee has failed to create a genuine issue of material fact to whether he was similarly situated to other white employees but nevertheless treated differently.

### 2. *Class-of-One*

To prevail on a "class-of-one" equal protection claim, the plaintiff must demonstrate "(1) the person compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Giordano, 274 F.3d 740 at 750 at 750-51*. The Second Circuit has not yet resolved the issue of whether "the Supreme Court's decision in *Olech*. . . removed the requirement that malice or bad faith be shown in order to state a valid 'class of one' equal protection claim." *Harlen Associates v. Village of Mineola, 273 F.3d 494, 499-500 (2d Cir. 2003)*. [* *30] However, the court need not reach the question of malicious intent because, as discussed in Part III.A.1 above, Lee has failed to created a genuine issue of material fact with respect to whether he was treated differently than other similarly situated white employees.

### IV. *CONCLUSION*

For the reasons set forth above the Defendants' Motion for Summary Judgment (Doc. No. 55) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Dated this 30th day of March 2006 at Hartford, Connecticut.

Alvin W. Thompson

427 F. Supp. 2d 124, *; 2006 U.S. Dist. LEXIS 17542, **

United States District Judge

LEXSEE 2005 U.S. DIST. LEXIS 3604

**CYNTHIA LUCIBELLO, Plaintiff, v. YALE-NEW HAVEN HOSPITAL, Defendant.**

**CIVIL NO. 3:03cv0814 (RNC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2005 U.S. Dist. LEXIS 3604*

**March 10, 2005, Decided**

**DISPOSITION:**    Motion for summary judgment was granted.

**COUNSEL:**    [*1]   For Cynthia Lucibello, Plaintiff: John R. Williams, Katrena K. Engstrom, Williams & Pattis, New Haven, CT.

For Yale-New Haven Hosp, Defendant: Christopher A. Kelland, Margaret P. Mason, Tyler, Cooper & Alcorn, New Haven, CT; Elizabeth L. Leamon, Robert C. Hinton, Tyler, Cooper & Alcorn - NH, New Haven, CT.

**JUDGES:** Robert N. Chatigny, United States District Judge.

**OPINION BY:** Robert N. Chatigny

**OPINION**

*RULING AND ORDER*

Cynthia Lucibello brings this action against her employer, Yale-New Haven Hospital, pursuant to Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* ("Title VII"). The case arises from a verbal altercation that occurred at the Hospital during working hours between the plaintiff, who is white, and a co-worker, Brenda Baker-Chapman, who is AfricanAmerican . As a result of the incident, plaintiff was given a final written warning and three-day suspension while BakerChapman received only a written warning. Plaintiff claims that she received harsher discipline than Baker-Chapman because she is white. [1] The Hospital responds that its investigation of the incident led it to conclude that plaintiff was more culpable and, unlike Baker-Chapman, [*2] she had been disciplined before for similar conduct. The Hospital has moved for summary judgment. The admissible evidence in the record, even assuming it is arguably sufficient to permit a minimal inference of dispa-

rate treatment based on race, is plainly insufficient to permit a jury to logically infer that the Hospital's stated reasons for its disciplinary decision are a pretext for discrimination. Accordingly, the motion is granted. [2]

1   Plaintiff's statement of material facts in dispute states that the discipline she received "was unduly harsh in comparison with the discipline received by Brenda Baker-Chapman, an AfricanAmerican, and reflected disparate treatment on account of race by the defendant." The supporting citation is to a paragraph in plaintiff's affidavit where she states, "Although I know that I am considered a 'squeaky wheel' at the hospital, I believe that the disparity in treatment which I have experienced is racially based, and that management is afraid to take disciplinary action against African-American employees at the hospital." Pl.'s Aff. P26.

2   Plaintiff also seeks relief under *42 U.S.C. S 1981* and the Connecticut Fair Employment Practices Act, *Conn. Gen. Stat. § 46a-60, et seq.* These claims are governed by the same analysis as the claim under Title VII. *See Hudson v. IBM Corp., 620 F.2d 351, 354 (2d Cir. 1980) (section 1981* case); *Levy v. Comm'n on Human Rights & Opportunities, 236 Conn. 96, 103, 671 A.2d 349 (1996)*(CFEPA case). Accordingly, they are unavailing for substantially the same reasons stated in the text with regard to the Title VII claim.

**[*3]  I.** *FACTS*

The parties' Local *Rule 56* statements and accompanying exhibits, viewed most favorably to the plaintiff, show the following. Plaintiff has worked at the Hospital since 1989. Lucibello Aff. P4. In February 1998, she became a secretary in the facilities department, her current position. *Id.* P2. Beginning no later than 2001, she had difficulty with BakerChapman, who also works in

the facilities department. At some point in time, Baker-Chapman stopped speaking to the plaintiff and communicated with her by leaving post-it notes on office equipment. Baker-Chapman also displayed signs on her desk that plaintiff thought were meant to taunt her, for instance, a sign saying, "Forgive your enemies, nothing annoys them so much." *Id.* P7. Plaintiff complained to William Mahoney, a white male, who is the administrative director of the facilities department. *Id.* P9. Mahoney investigated but found nothing offensive in BakerChapman 's conduct. Def.'s Rule 56(a)(1) Statement ("DSOF")P7; Pl.'s Rule 56(a)(2) Statement ("PSOF") P7.

On May 20, 2002, plaintiff and Baker-Chapman had a loud argument in the facilities department. DSOF PP5-6; PSOF PP5-6. Plaintiff was offended [*4] by a note Baker-Chapman had placed on a computer terminal stating that people who turned off the computer should remember to turn it back on. Plaintiff had turned off the computer and forgotten to turn it back on just before the note was posted. Lucibello Dep. at 49.

Plaintiff complained to Mahoney about Baker-Chapman's note, calling it another instance of harassment. Mahoney disagreed with her characterization and took no action. DSOF P9; PSOF P9.

Plaintiff then circulated an e-mail to "The Team" (i.e. Baker-Chapman and others) regarding "Harassing Notes." The email stated:

> I am tired of Brenda Baker's "scolding" visual notes. This is indicative of the maturation and professional level of Brenda Baker in her level of communication and mutual respect in the office. A note "reminding" someone to turn the CCSS system back on is quite infantile. Yes, I turned it off to re-boot the system, but got side-tracked by dispatching and sinfully forgot to put it back on. However, I do not think a simple mistake warrants an open-view piece of childish harassment. What more can I say. Maybe the problem isn't Brenda Baker, especially when she is allowed to do this childish way of communicating.  [*5]

Mahoney Aff. Ex. 2B; *see also* DSOF P11; PSOF P11.

Twenty minutes later, plaintiff sent another e-mail to Baker-Chapman:

> I guess I have to communicate to teach you a little mutual respect, because Yale is not doing that for you. I consider your

messages in direct line of harassment. A copy is being forwarded to my attorney for his perusal. You have harassed unwarrantingly with your "visual" notes a little too often. Since seeing it was [not] dealt properly with Yale, as a whole, I am now considering it my duty to tell you to stop communicating in such a manner for all to see. The machine is not turned off so often to warrant this message or others you have given and I will be human without harassement [sic]. However, you cannot deal with issues in [a] respectful manner, even when it was not done with any intention.

Mahoney Aff. Ex. 2B.

Baker-Chapman responded by e-mail that the note she put on the computer terminal was not meant to be harassing "but simply to serve as a reminder to everyone." DSOF P11; PSOF P11. Plaintiff replied by e-mail:

> I am one of about two or three who handle this computer and I repeat for shortness sakes, I am tired [*6] of being harassed by communication. No further reply is needed As stated, I am forwarding this to my lawyer. I would not have to do that if she was stopped originally from this type of communication in the office. Is that in HR policy? She wants to communicate with me. That is ironic, she is so good at putting up her messages. End of subject, say what you want. It is finished for today and going to my lawyer.

Mahoney Aff. Ex. 2B.

Following this exchange of e-mails, Baker-Chapman left her work area to take a break. On her return, she went to plaintiff's desk and said, "Cynthia, if you have something to say to me, say it to my face, and stop e-mailing me." Mahoney Aff. Ex. C. Plaintiff stood up and told Baker-Chapman to stop displaying harassing notes.

This confrontation quickly escalated into a shouting match that created a "major workplace disturbance." DSOF PP5, 13; PSOF PP5, 13. Gretchen Zukunft, who is white, shepparded plaintiff and Baker-Chapman to a conference room, where the argument continued for some time. DSOF PP13-14; PSOF PP13-14. Plaintiff yelled that Baker-Chapman should stop harassing her with notes; criticized Baker-Chapman for being incapable of

doing her [*7] job; declared several times that she, the plaintiff, was going to sue Baker-Chapman and Yale; and stated that she had already spent $ 5,000 on a lawyer. DSOF P14; PSOF P14; *see also* Lucibello Dep. at 51-52. Baker-Chapman responded, "Fine, I'll sue your ass too" or "I'd spend any amount of money to get your ass." DSOF P15; PSOF P15; *see also* Lucibello Dep. at 51. The argument subsided only after a supervisor, Tom Roche, who is also white, intervened.

The next day, plaintiff sent an e-mail to her superior, Alvin Johnson, stating that she intended to sue him, Mahoney, Roche, Zukunft and others for "ALLOWING harassment." The e-mail stated, "Maybe 1 am the wrong race." Mahoney Aff. Ex. 2C.

At the time of the incident, the Hospital had a code of conduct for employees and a policy on workplace aggression. In the event of a suspected violation of the code or policy, the department head or supervisor was expected to conduct an investigation and determine the appropriate disciplinary action. In accordance with this procedure, Mahoney interviewed and collected statements from witnesses to the verbal altercation between plaintiff and Baker-Chapman. DSOF P18; PSOF P18. After his investigation [*8] was completed, he and Lina Perotti, the Hospital's Manager of Human Resources, who is also white, decided that both plaintiff and Baker-Chapman had engaged in improper conduct requiring formal disciplinary action. DSOF P22; PSOF P22.

The Hospital had five basic steps of progressive disciplinary action available to it: (1) counseling; (2) verbal warning; (3) written reprimand; (4) final written warning; and (5) discharge. Plaintiff was given a final written warning and three-day suspension. Baker-Chapman was given a formal written warning.

The warning notice given to plaintiff stated, "On 5/20/02 [you] provoked a disruption in response to a note on a CCSS Terminal. This behavior violates policy as attached." Mahoney Aff. Ex. 2E. A memorandum attached to the notice set forth the following details:

> By your behavior on May 20, 2002, with respect to your dispute with Brenda Baker Chapman, you are issued this final written warning with three (3) days' suspension as disciplinary action for violation of the Employee Code of Conduct as follows:
>
> *Policy # B:8 Basic Code of Employee Conduct*
>
> 3. Employees must refrain from engaging in abusive, provocative or profane language [*9]  or actions . . .

> Your repeated insults directed towards Brenda, both verbally and in writing, represent abusive and provocative language. You used terms such as childish, infantile, immature, unprofessional, and said you would "teach [her] a little mutual respect."
>
> 4. Employees should observe the principles of mutual respect in their working relationships with their supervisor and co-workers. You said, "The problem is the lead in the office who cannot establish mutual respect for anyone," [and] "The administration has not dealt with the issue of harassing notes"; also you recommended that [Baker-Chapman] get $ 5,000 and get a lawyer because you were going to sue her and "Yale."
>
> In addition, Cynthia, the above-referenced behaviors represent a serious violation of the Basic Code of Conduct, rule # 6 "Fighting, threatening physical harm, creating a disturbance, or other acts constituting gross disorderly conduct."
>
> By initiating this dispute, and then fueling the incident with numerous inflammatory e-mails, disruptive actions (banging items about on your desk) and loud, aggressive verbal exchanges, you created a situation which resulted in a significant disruption in [*10]  the office and lost work time of many individuals.
>
> Moreover, your conduct clearly represents a violation of G:2 policy on Workplace Aggression in that your remarks appear to have been intended to intimidate and threaten your co-worker. Specifically, "An act of aggression or violence is defined as any action or comment, [which] interpreted under the circumstances constitutes a threat and/or causes fear, intimidation or harm. This includes any verbal comment or physical action or threat of action, directed against [Hospital] employees. . . ."
>
> Given the Hospital's "zero tolerance" of workplace aggression, violation of this policy could result in the termination of your employment.
>
> Cynthia, I cannot stress the importance of an immediate change in your be-

havior. I urge you to consult with the Employee Assistance Program for counseling and/or referral. Failure to demonstrate significant immediate improvement in your interpersonal communications will result in the termination of your employment.

*Id.*; *see also* DSOF P24; PSOF P24.

The written warning given to Baker-Chapman stated that she had committed an offense or policy violation in that she had shown [*11] "Lack of Mutual Respect [for a co-worker]; contributed to a disruption in the workplace; [and directed] inappropriate language . . . at a co-worker." Ex. 5 to Pl.'s Opp; *see also* DSOF P23; PSOF P23.

Before the incident in question, plaintiff's supervisors had spoken with her on at least four occasions regarding her negative interaction with various co-workers. *See* DSOF PP27, 28, 32, 34; PSOF PP27, 28, 32, 34. In her 2001 annual performance appraisal, she had been admonished by Mahoney that "her temper and emotional outbursts were negatively affecting her job performance and the performance of the department, and that he could not continue to allow such behavior." DSOF P34; PSOF P34. Baker-Chapman had no prior disciplinary history. DSOF PP23, 35; PSOF PP23, 35.

## II. *DISCUSSION*

### A. *Standard for Summary Judgment*

Under *Rule 56(c) of the Federal Rules of Civil Procedure*, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits [presented by the parties] show that there is no genuine issue as to any material fact and that the moving [*12] party is entitled to a judgment as a matter of law." Because the purpose of summary judgment is to isolate and dispose of claims that lack evidentiary support, the nonmoving party may not rest on the allegations of its pleadings, but must point to evidence showing that the case involves a genuine issue of material fact requiring a trial. A fact is "material" for purposes of *Rule 56* if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. An issue as to a material fact is "genuine" if the evidence, viewed most favorably to the nonmoving party, would permit a reasonable jury to return a verdict for that party. *Id.*

### B. *Title VII*

Title VII makes it unlawful for an employer to discriminate against any individual with respect to terms, conditions, or privileges of employment because of the individual's race. *42 U.S.C. § 2000e-2(a)(1)*. The statute protects whites as well as nonwhites. *McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 280, 49 L. Ed. 2d 493, 96 S. Ct. 2574 (1976)*. A plaintiff can establish a prima facie case of discrimination by [*13] showing that he or she (1) belongs to a protected group; (2) was performing satisfactorily; (3) suffered an adverse employment action; and (4) the action occurred in circumstances supporting an inference that it was caused by discrimination. Evidence comprising a prima facie case raises a presumption that the defendant's action was motivated by discrimination. To rebut this presumption, the defendant must articulate a non-discriminatory reason for its action. The burden then shifts back to the plaintiff to show that the proffered reason is not the true or only reason for the defendant's action and that the action was motivated at least in part by discrimination. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*; *see also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*.

Sufficient evidence to permit a jury to find that the defendant's stated reason for its action is untrue, combined with evidence comprising a prima facie case, may permit an inference that the defendant is "dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)*. [*14] *see also Windham v. Time Warner, Inc., 275 F.3d 179, 188 (2d Cir. 2001)*; *Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)*. However, "conclusory allegations of discrimination are insufficient to satisfy the requirements of *Rule 56(e)*." *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)*.

### 1. *Prima Facie Case*

The Hospital contends that it is entitled to summary judgment because, even assuming plaintiff is able to satisfy the first three elements of a prima facie case, she has not satisfied the fourth one, that is, she has not shown that the adverse employment action at issue occurred in circumstances giving rise to an inference of discrimination. [3] Plaintiff contends that the circumstances support an inference of discrimination because she was similarly situated to Baker-Chapman. Showing that a similarly situated employee outside the protected group was treated more favorably is an effective way of establishing the fourth element of a prima facie case. *Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001)*. It is undisputed that Baker-Chapman was treated more favorably in [*15] that she received a less serious form

of discipline. Accordingly, the issue raised by the parties' dispute with regard to plaintiff's ability to establish a prima facie case is whether the record, viewed most favorably to the plaintiff, would permit a jury to find that she and Baker-Chapman were similarly situated. The Second Circuit has said that this issue ordinarily presents a question of fact for the jury. *Graham v. Long Island Rail Road*, 230 F.3d 34, 39-40 (2d Cir. 2000). Nevertheless, if the evidence would not support a finding that plaintiff and Baker-Chapman were similarly situated, summary judgment may be granted. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568 (2d Cir. 2000). [4]

> 3    In reverse discrimination cases, most courts of appeals require the plaintiff to show, as the first element of a prima facie case, background circumstances raising an inference that the defendant discriminates against whites. *Burbank v. Office of Atty. Gen.*, 240 F. Supp. 2d 167, 170 n.8 (D. Conn. 2003)(collecting cases), *aff'd*, 75 Fed. Appx. 857 (2d Cir. 2003). The Second Circuit has not addressed this matter directly. However, in a Title VII case brought by a white female complaining of race and gender discrimination with regard to severance pay, it held that the plaintiff had presented a prima facie case although no such background circumstances had been shown. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). The plaintiff made out a prima facie case, the Court stated, "by showing that she is within a protected group; that she is qualified for the position; that she was subject to an adverse employment action involving severance pay; and that a similarly situated employee not in the relevant protected group received better treatment." *Id.*; *see also Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312-13 (2d Cir. 1997)(non-Hispanic white male complaining of discrimination based on national origin satisfied standard elements of prima facie case without showing background circumstances). In view of *McGuinness*, I do not believe the Second Circuit would require plaintiff to show, as part of a prima facie case, background circumstances suggesting that defendant discriminates against whites. *See Pesok v. Hebrew Union College-Jewish Inst. of Religion*, 235 F. Supp. 2d 281, 286 (S.D.N.Y. 2002), *aff'd*, 86 Fed. Appx. 479 (2d Cir. 2004); *Tappe v. Alliance Capital Mgmt. L.P.*, 177 F. Supp. 2d 176, 181-83 (S.D.N.Y. 2001).

[*16]

> 4    Plaintiff's prima facie case stands or falls on her claim that Baker-Chapman was similarly situated because she offers no other evidence to support an inference of disparate treatment based

on race. In particular, she points to no evidence of the type other Circuits require to establish a prima facie case of reverse discrimination.

When a plaintiff tries to establish a prima facie case by pointing to more favorable treatment of other employees, "those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference [in] treatment may be due to discrimination." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001). In cases involving disparate treatment with regard to discipline, the plaintiff must show that the conduct of the other employee was of comparable seriousness. *Padilla v. Harris*, 285 F. Supp. 2d 263, 270 (D. Conn. 2003)(plaintiff's comparator not similarly situated for purpose of establishing prima facie case because conduct less serious); *see also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001) [*17]    (none of plaintiff's comparators also had been late with their reports or failed to provide leadership). If, as in this case, the employer uses a process of progressive discipline, the plaintiff may also have to show that the other employee was at a comparable stage in the process. *See Edwards v. Pa. Tpk. Comm'n*, 80 Fed. Appx. 261, 2003 WL 22508498, at *3 (3d Cir. 2003) (plaintiff's comparator charged with similar infractions but not similarly situated because at different stage of disciplinary scheme); *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003)(plaintiff's comparators not similarly situated because not subject to last chance agreement); *cf. Padilla*, 285 F. Supp. 2d at 270 (plaintiff's comparator not similarly situated because no similar disciplinary record of client neglect).

The Hospital contends that Baker-Chapman's situation was not sufficiently similar to plaintiff's to support an inference of discrimination because the behavior for which she was disciplined was objectively less serious and she had no prior disciplinary record. Plaintiff responds that Baker-Chapman's conduct was of comparable seriousness because [*18]    she started the argument by raising her voice and speaking in a derogatory tone, subsequently yelled in the conference room, and used profanity. Lucibello Aff. PP12, 19. In addition, she asserts that Baker-Chapman had no prior disciplinary record only because Mahoney chose to overlook her aggressive behavior toward the plaintiff. *Id.* P20. Crediting plaintiff's affidavit insofar as it alleges specific facts, viewing the statements of the third party witnesses in a manner most favorable to her, and ignoring all evidence that a jury would not have to believe, a jury could find with regard to the incident in question that Baker-Chapman confronted the plaintiff after taking a break, that the two then participated more or less equally in a shouting match, that each threatened to sue the other, and that Baker-Chapman was the only one to use profanity.

These findings could support an inference that Baker-Chapman's conduct was roughly comparable. Significantly, however, plaintiff points to no admissible evidence to support a jury finding that Baker-Chapman had a comparable history of disruptive behavior for which she should have been disciplined. She asserts that Baker-Chapman was guilty [*19] of using signs to harass her. Such conduct, objectively viewed, is clearly different from, and less disruptive than, the outbursts and negative interactions underlying the written warnings plaintiff previously received. In fact, plaintiff has no basis for her assertion that Baker-Chapman used the signs to harass her except her statement concerning her subjective perception of Baker-Chapman's intent. [5] In the absence of evidence permitting a finding that Baker-Chapman had a comparable history of disruptive conduct, the undisputed fact that at the pertinent time plaintiff and Baker-Chapman were at significantly different stages in the Hospital's process of progressive discipline precludes a finding that they were similarly situated. [6] The evidence is therefore insufficient to enable plaintiff to discharge her burden of establishing a prima facie case.

> 5    She also avers that long after the incident in question, Baker-Chapman threw a plexiglass file on her desk (plaintiff was not at her desk at the time), that it was reported to Mahoney by Zuknuft, and that he declined to discipline Baker-Chapman. Lucibello Aff. P25. Because this alleged instance of Mahoney's failure to discipline Baker-Chapman occurred long after he disciplined plaintiff for the incident in question, its probative value with regard to his state of mind when he disciplined plaintiff is weak. In any event, plaintiff's statement that Zuknuft reported the file-throwing incident to Mahoney is inadmissible hearsay and thus insufficient to create a genuine issue of fact. *Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).*

[*20]

> 6    In her affidavit, plaintiff asserts that other AfricanAmerican employees should have been disciplined at one time or another but were not. Such assertions are of no consequence. Generalizations about the allegedly tolerated misbehavior of others are insufficient to allow a jury to make a finding of improper motivation. *Powell v. Consolidated Edison Co. of N.Y., Inc., 2001 U.S. Dist. LEXIS 2706, No. 97 CIV. 2439(GEL), 2001 WL 262583, at *12 (S.D.N.Y. Mar. 13, 2001); see also Abbondanzo v. Health Mgmt. Sys., Inc., 2001 U.S. Dist. LEXIS 17567, No. 00 CIV. 4353 (LMM), 2001 WL 1297808, at *6 (S.D.N.Y. Oct. 25, 2001), aff'd, 36 Fed. Appx. 3 (2d Cir. 2002).*

### 2. Pretext

Though plaintiff's inability to prove the fourth element of a prima facie case is fatal to her claim, the Hospital has articulated nondiscriminatory reasons for its action, and plaintiff has had ample opportunity to investigate and challenge their validity. Accordingly, I assume without deciding that the evidence permits the minimal inference of discrimination required to establish a prima facie case and proceed to consider whether plaintiff can prove [*21] that the defendant's stated reasons for its action are a pretext for discrimination. *See Bluight v. Consol. Edison Co. of N.Y., 2002 U.S. Dist. LEXIS 1845, No. 00 CIV 3309 (GEL), 2002 WL 188349, at *4 (S.D.N.Y. Feb 6, 2002).*

The Hospital asserts that plaintiff was disciplined more severely than Baker-Chapman because Mahoney's investigation led him to view her as more culpable and, unlike Baker-Chapman, she had been admonished repeatedly for negative conduct toward coworkers. A jury could readily find that these are in fact the true reasons for the difference in discipline. Mahoney's warning notice to the plaintiff and accompanying memorandum explain in detail that her behavior violated the Hospital's code of conduct and policy against workplace aggression. The charges are substantiated by plaintiff's own e-mails, admissions in her affidavit concerning her own conduct, and seemingly credible statements of third party witnesses. In addition, Mahoney's affidavit states that he gave plaintiff a final written warning and three-day suspension "because [she] had prior instances of disruptive behavior and breaches of the Employee Code of Conduct." Mahoney Aff. P21. Plaintiff admits that she had been given [*22] "earlier written warnings," Lucibello Aff. P19, and a jury would be required to find that she received a strongly worded warning from Mahoney not long before the incident in question as part of her 2001 annual performance appraisal.

Because the Hospital's stated reasons for the challenged action are strongly supported by the evidence, the burden on plaintiff to prove that they are a pretext for discrimination is substantial. To enable a juror to discredit these reasons, plaintiff must show that they are "so ridden with error that [the Hospital] could not honestly have relied upon [them]." *Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir. 1980); see also Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994)*(to prove pretext plaintiff must demonstrate weaknesses, implausibilities, inconsistencies, or contradictions in employer's proffered legitimate reasons). She makes no such showing.

To establish pretext, plaintiff relies chiefly on the statements in her affidavit that Baker-Chapman started the argument by raising her voice and using a derogatory tone. Plaintiff's sworn statement raises a factual issue as

to how the argument began. But the issue at [*23] this stage of the analysis is not whether Baker-Chapman started the argument. The issue is whether evidence in the record would permit a jury to disbelieve the Hospital's explanation for its action.

Plaintiff offers no evidence to cast doubt on Mahoney's statement that his investigation caused him to view plaintiff as more culpable with regard to the incident as a whole. The statements in her affidavit concerning how the incident occurred do not controvert the statements in his affidavit concerning her violations of Hospital rules. Nor does she deny that she had a prior history of disruptive behavior in the workplace resulting in multiple written warnings. On this record, a reasonable juror would be bound to accept the Hospital's explanation as true. Sum-

mary judgment is therefore appropriate. *See Meiri, 759 F.2d at 998.*

## III. *CONCLUSION*

Accordingly, the motion for summary judgment is hereby granted. The Clerk may close the file.

So ordered.

Dated at Hartford, Connecticut this 10th day of March 2005.

Robert N. Chatigny

United States District Judge

LEXSEE 2001 US DIST LEXIS 21797

**PETER KHAN, Plaintiff, -against- COSTCO WHOLESALE INC., AND THOMAS FARANO, IN BOTH HIS INDIVIDUAL AND OFFICIAL CAPACITIES, Defendant.**

**99 CV 3944 (SJ)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 21797*

**December 13, 2001, Decided
December 14, 2001, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment GRANTED.

**COUNSEL:** Gregory R. Preston, Esq., PRESTON & WILKINS, New York, New York, for Plaintiff.

Edward Cerasia II, Esq., Paul Galligan, Esq., SEYFARTH SHAW, New York, New York, for Defendant.

**JUDGES:** Sterling Johnson, Jr., U.S.D.J.

**OPINION BY:** Sterling Johnson, Jr.

**OPINION**

MEMORANDUM AND ORDER

JOHNSON, District Judge:

**PROCEDURAL HISTORY**

By his complaint, filed with this Court on July, 14 1999, Plaintiff, Peter M. Khan, ("Plaintiff" or "Khan") brings this action against Defendants Costco Wholesale Inc. ("Costco") and Thomas Farano (collectively, "Defendants," individually, "Costco" and "Farano"), pursuant to *42 U.S.C § 1981*, claiming employment discrimination on the basis of race. Initially, Plaintiff also raised New York state law claims of false arrest, malicious prosecution, libel, slander, *prima facie* tort, and interference with prospective economic advantage. However, by letter to the court, dated April 30, 2001, Plaintiff discontinued the claims of defamation, intentional interference with prospective economic advantage, and *prima facie* tort. Presently before the court is Defendant's motion [*2] for summary judgment pursuant to *Federal Rule of Civil Procedure 56(b)*. For the reasons stated herein, Defendant's motion for summary judgment is GRANTED in its entirety.

**FACTUAL BACKGROUND**

**Kahn's Employment at Costco**

Plaintiff, Peter Khan, who is African-American, was employed by Costco Wholesale, Inc. in its Loss Prevention Department from June 1996 to June 20, 1998. Costco is a wholesale membership warehouse store providing low cost goods to individuals and businesses. Khan's first assignment with Costco was as a Loss Prevention Agent in the company's Westbury Long Island warehouse. In September 1996, Costco transferred Khan to its Brooklyn warehouse, where he worked as a Loss Prevention agent for roughly seven months. In March 1997, Mark Hanna, the Warehouse Manager of the Brooklyn warehouse at the time, promoted Khan to the position of Loss Prevention Supervisor. Hanna promoted Khan again in June 1997, this time to the position of Loss Prevention Manager. At the time of his departure in June 1998, Khan was the highest ranking employee in the Brooklyn warehouse's Loss Prevention Department.

As the Loss Prevention Manager, Khan reported directly to Mark Hanna. Khan's [*3] duties involved oversight of the Loss Prevention Department, which includes undercover loss prevention employees who seek to prevent shoplifting and employee theft. In addition, Khan was in charge of employees who work at the exit door and check customer receipts of purchases as they leave the store, as well as the escalator crew and parking lot crew, who perform similar security duties.

**Costco Procedure For Ringing in Transactions**

At Costco's Brooklyn store, members purchase goods through cashiers who operate any one of thirty registers at the warehouse. Costco members are issued membership cards which, according to Plaintiff, may be used either by the members themselves, or by others, as long as the holder of the card is present. (Pl. R. 56.1 Stmt. P 3.) If a membership card is used without the member's presence, the card is confiscated and the member is called to come to the store to pick it up.

When the warehouse was busy, Khan would perform cashier duties. In order to access the registers, all cashiers must input their own personal identification number ("PIN"). According to Khan, when he worked as a cashier, he used the following procedure when engaged in a credit [*4] card transaction: he checked the credit card against the membership card, which contains the member's picture on it; he scanned the membership card; he scanned the merchandise being purchased by the member; he asked the member to swipe the credit card; if and when the credit card was approved, he gave the member a receipt of the transaction for the member to sign; he then gave the member a signed receipt and put the other copy in a drawer. (Khan Dep. at 52-54.)

### The June 1998 Internal Investigation Into Credit Card Fraud

In early June 1998, Discover Card ("Discover") notified Costco that it was "charging back" to Costco a series of credit card charges made on May 22 and June 1, 1998, which Discover's credit card holders were disclaiming. Three Discover credit card holders denied purchasing the luxury items in question, which included jewelry, watches, and large screen televisions, worth almost fifteen thousand dollars. None of the three claims to have been in the Brooklyn warehouse on the days their credit cards were used.

Upon notification, Thomas Farano ("Farano"), Costco's Regional Loss Prevention Manager, began to investigate the charge back. Farano enlisted Troy Hedman [*5] ("Hedman"), a Loss Prevention Supervisor from Costco's Lawrence, New York warehouse, and commenced an internal investigation of the loss. For two days, Farano and Hedman examined evidence relating to the charge back incidents, before calling on Scott Schmidt ("Schmidt"), the Loss Prevention Manager from Costco's Lawrence warehouse, who had more experience in investigations of this nature.

Over the course of the next three days, the group reviewed transaction summary log reports, credit card receipts, the merchandise pick-up log, as well as interviewed witnesses and spoke with the credit card holders whose card numbers had been used without their knowledge. The transaction log reports showed which cashier had processed the transactions in question, as well as what items were purchased, the date and time of the purchases, the method of payment, the membership card number, and whether the credit card used in the transaction was swiped or hand keyed. The credit card receipts demonstrated that Khan had been the cashier for all of the purchases "charged back" by Discover, and that, in each instance, he had hand keyed in the credit card numbers into the cash register. The log reports [*6] showed a number of transactions voided by Khan using the same credit card and membership cards on May 11, May 22, and June 1.

Farano, Schmidt, and Hedman also found that the same membership card number had been used in all of the transactions in question. This card belonged to Gary Hecht ("Hecht"), an assistant principal employed by the New York City Department of Education. Farano questioned Hecht about the purchases, and discovered that Hecht's membership card had been confiscated by a cashier on March 9, 1998, because one of Hecht's assistants had attempted to use it. It is normal operating procedure for Costco to keep confiscated membership cards in the Loss Prevention office.

When questioned, Hecht denied making any of the purchases. Farano checked Hecht's shopping history on Costco's computer system and discovered that the high priced items bought with his membership card on May 22 and June 1 were not comparable to Hecht's usual purchases. Hecht also told Farano that, prior to May 22, he went to the Brooklyn warehouse to retrieve his membership card. Once there, Hecht was informed that the card could not be found, and he was issued a new one.

As part of the investigation, [*7] Farano and Schmidt interviewed a Costco employee named Dimitry Durand ("Durand"), who was a supervisor in the Majors Department of the Brooklyn warehouse. Durand told Farano and Schmidt that on May 22, 1998 he witnessed Khan help two gentlemen at the jewelry counter, ring their purchase at a register near the end of the line of registers, and then hand them the jewelry from the Merchandise Pick Up Cage ("MPU Cage"). Durand also told Farano and Schmidt that on June 1, 1998, he witnessed Khan helping one of the same men at the jewelry case.

Farano also interviewed Mannie Quinones ("Quinones"), an employee in Costco's Majors Department. Quinones told Farano that a few weeks prior to June 22, 1998, Khan asked him to bring two wide screen televisions and a computer up to the front of the warehouse, where Quinones then witnessed Khan ringing up those items at the register himself. During the course of their employment both Durand and Quinones have been suspected of employee theft and investigated by Khan.

Farano also interviewed Greg Grover ("Grover"), a Front End Supervisor at Costco, who told Farano that on or about May 22, 1998, Khan told him that he had sold a large order of Jewelry. [*8]  Grover also witnessed Khan going back and forth from the MPU cage to the jewelry case.

After reviewing the logs and interviewing various employees, both Farano and Schmidt suspected Khan's complicity in credit card fraud, and they decided to interview him. Prior to the interview, however, Farano called the New York City Police Department ("NYPD") and spoke to a detective in order to verify that, in the event that Khan refused to give a statement, Costco had collected enough evidence linking Khan to the credit card fraud for an arrest.

**The Interview of Peter Khan**

Farano and Schmidt interviewed Kahn in Hanna's office in the mid-morning of the fifth, and final, day of the investigation. Farano informed Kahn that he and Schmidt were investigating some transactions, worth a considerable amount of money, that were charged back to Costco by Discover. Farano informed Khan that his PIN had shown up on these transactions, and then asked Khan to explain the transactions. Khan responded that he did not know what Farano was talking about and that he was surprised he was being accused. When Farano and Schmidt showed Khan documentation concerning the transactions in question, Khan became [*9]  upset, stood up, and stated that he was going to the bathroom. Schmidt followed Khan, met him in the restroom area and urged him to return and talk with them. Instead, Kahn gave his duty keys to Hanna, and then walked out of the warehouse.

**The Conclusion of Khan's Employment with Costco**

Plaintiff and Defendants differ as to who concluded Khan's employment with Costco. According to Plaintiff, Costco terminated Khan's employment with the company or, in the alternative, Costco constructively discharged Khan. (Compl. P 15-16.) Defendants, however, claim that Khan's actions on June 20 and thereafter evinced a desire to resign. (Def. Mem. of Law in Supp. of Mot. for Summ. J. ("Def. Mot.") at 8.) When Khan left the interview with Farano and Schmidt on June 20, 1998, he did not state that he was resigning. Khan did not return to the warehouse at any point in the next nine days. According to Plaintiff, the police contacted Khan and informed him that he would be arrested and that he should not return to Costco. (Pl. R. 56.1 Stmt at 5.) On June 23, 1998, the NYPD requested that Khan come to the precinct to be questioned. Khan complied with the NYPD's request and went to see the police [*10]  that day. Upon his arrival, after the police questioned him and showed him copies

of credit card receipts, they arrested Khan for grand larceny. He was detained for sixteen hours and then released. Six days later, on June 29, 1998, Khan received a letter from Hanna informing him that he was not to enter the Brooklyn warehouse without the specific permission of Costco management. The letter also contained a check for unused vacation and holidays.

**Khan's Claims of False Arrest and Malicious Prosecution**

After Khan left the warehouse on June 20, 1998, Schmidt called the police at the behest of Farano, and asked them to come to the warehouse. When the police arrived, Farano, Schmidt, and Hanna described what had transpired. The uniformed police officer made a report, and that same day the NYPD requested that Farano, Schmidt, and Hanna go to the 72nd precinct, with their investigation file on Khan, to see Detectives Ford and Amato. The two detectives interviewed the three men for between and hour and a half and two hours regarding both the information obtained in Costco's investigation, and Costco's procedures for such events.

Three days later, on June 23 1998, the Police requested [*11]  that Khan come into the 72nd precinct, where they arrested him after questioning him and showing him copies of certain credit card statements linked to the charge back items in question. Despite the arrest, the District Attorney ("DA") declined to prosecute the case. Upon learning that the prosecutor was not going to prosecute Khan, Farano contacted the DA to question why he would not continue the case. When the DA told Farano that he and his supervisor had discussed the issue and rendered their decision, Farano asked to speak with the supervisor. The DA and his supervisor remained resolute in their decision not to prosecute, however, and Farano then met with Detective Amato and Lieutenant Hotling, this time to discuss why the DA was refusing to move forward with the case. Lieutenant Hotling suggested that Farano call the Brooklyn DA to seek further information on the DA's position regarding Khan, and told Farano that he would do the same.

Lieutenant Hotling made contact with an attorney within the Brooklyn DA's office, and soon thereafter Assistant District Attorney Patricia McNeill ("ADA McNeill") contacted Farano. She requested that Farano meet with her to review the case, and [*12]  Farano, accompanied by Schmidt, did so in late June or early July 1998. Over the next couple of months, ADA McNeill reviewed information provided by Farano, other Costco employees, and those persons whose credit card had been used, and eventually decided to pursue charges against Khan. On December 3, 1998, Detective Amato swore out a criminal complaint against Khan for two counts of grand larceny and one count of petit larceny.

Pursuant to Amato's criminal complaint, Khan was then arrested for a second time. ADA McNeill presented the State's case against Khan to the grand jury, but the grand jury declined to indict him, and the case was dismissed.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The court need only determine if there is a genuine issue to be tried rather than resolve disputed issues of fact. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. [*13]

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)*. Once the moving party has made a showing that there are no genuine issues of material fact to be tried, the burden shifts to the non-moving party to raise triable issues of fact. *Anderson, 477 U.S. at 250*. However, mere conclusory allegations will not suffice. *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)*. The non-moving party must present "significant probative supporting evidence" that there is a factual dispute. *Anderson, 477 U.S. at 249*. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-moving party. *477 U.S. at 248*. Furthermore, in conducting its analysis, the court must draw all inferences and view all evidence in the light most favorable to the non-moving party. *477 U.S. at 254-255*. In employment discrimination lawsuits courts are cautious to grant summary judgment where an employer's intent and state of mind are a central issue to be determined [*14] by the finder of fact. See *Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991)*; *Meiri, 759 F.2d at 998*; *Ayton v. Lenox Hill Hospital, et al., 1997 U.S. Dist. LEXIS 122*, No. 93 Civ. 6601, 1997 WL 10000, at *1 (S.D.N.Y. 1997).

### II. Plaintiff's Federal Claim:  *42 U.S.C. § 1981*

Plaintiff alleges that Defendants terminated his employment with Costco on account of his race, in violation of *42 U.S.C. § 1981* ("*Section 1981*"). *Section 1981* provides a remedy for racial discrimination in the employment context. It states, in pertinent part:

> (a) All persons within the jurisdiction of the United States shall have the same right to make and enforce contracts, . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, . . .

> (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.

Courts have recognized that a [*15] victim of discrimination is seldom able to prove his claim by direct evidence, and is usually forced to rely on circumstantial evidence; an employer who discriminates is unlikely to leave a "smoking gun" exposing discriminatory intent. *Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)*. If there is no direct evidence of discrimination, courts evaluate *Section 1981* cases under the three part burden shifting analysis set out by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. Under the McDonnell Douglas analysis, the plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. *411 U.S. at 802*. Establishing a *prima facie* case creates a rebuttable presumption of discrimination. *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)* (quoting *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981))*.

Once a Plaintiff succeeds in presenting a *prima facie* case of discrimination, [*16] the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. *McDonnell Douglas, 411 U.S. at 802*. That burden only requires that the defendant rebut the presumption of discrimination established by the *prima facie* case. *Burdine, 450 U.S. at 254*. The employer need not prove by a preponderance of the evidence that its actions were motivated by the proffered non-discriminatory reason. Id. Rather, the "employer's burden is one of production of evidence rather than one of persuasion." Id. Should Defendant carry this burden, the presumption established by Plaintiff's *prima facie* case is rebutted, and the burden shifts back to Plaintiff to establish that there is a material issue of fact as to whether the employer's proffered reason was mere pretext for discrimination. *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000)*. The ultimate burden of persuading the trier of fact remains at all times with Plaintiff. *Hicks, 509 U.S. at 507*.

The Second Circuit has held that in order to establish a *prima facie* case [*17] of discriminatory discharge in violation of *42 U.S.C. § 1981*, a plaintiff must show (1) that he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class. See *McLee v. Chrysler Corporation, 109 F.3d 130, 134 (2d Cir. 1997)*; See e.g., *Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995)*; *Chambers v. TRM Copy Center Corp., 43 F.3d 29, 37 (2d Cir. 1994)*. Courts have permitted the final element of the *prima facie* case to be satisfied by proof that the plaintiff was replaced by a non-minority worker. *Jackson v. Ebasco Services Inc., 634 F. Supp. 1565 (S.D.N.Y.1986)*. If the plaintiff was not replaced, the final element may be satisfied by proof that non-minority workers with comparable backgrounds were retained while the plaintiff was terminated. Id.

In the present case, Defendant does not contest that Plaintiff, who is African-American, is a member of a protected class, or that, prior to [*18] the alleged conduct underlying this case, he was performing his duties satisfactorily. Rather, Defendant asserts that Plaintiff is unable to satisfy the third and fourth elements of his *prima facie* discrimination discharge claim. This Court agrees that Plaintiff has not made out a *prima facie* claim under *Section 1981*.

With respect to the third prong of the *prima facie* case, whether Plaintiff was discharged from his position at Costco, there exists a dispute as to material facts. As such, this Court will not rule, as a matter of law, that Plaintiff has failed to establish this element of the *prima facie* case. Plaintiff claims that Costco's actions amounted to his effective termination, or that, in the alternative, Plaintiff was constructively discharged due to the inhospitable work environment at Costco. Defendants argue that Khan's actions -- walking out of the June 20, 1998 meeting and not returning -- are tantamount to a resignation. Whether Khan resigned or was fired requires a determination of contested facts. Such an inquiry is better left to a jury.

This Court does find, however, that Plaintiff cannot make out the fourth element of the *prima facie* case. [*19] Plaintiff seeks to satisfy the fourth element by establishing that non-minority workers with comparable backgrounds were treated differently in similar circumstances. The Second Circuit has held that, "where a plaintiff seeks to make out her *prima facie* case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir.*

*2001)*. Similar circumstances need not be identical, but "there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's Corp., 270 F.3d 94, 2001 U.S. App. LEXIS 22456* at *8 (2d Cir. 2001). What is key is that they be similar in significant aspects. Id. Whether two people are similarly situated is usually a question of fact for the jury. Id.; See also *Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)*. Nonetheless, Plaintiff must offer sufficient evidence from which a jury could reach the conclusion that there was indeed disparate treatment of a [*20] similarly situated employee. Id.

Here, Plaintiff cites three examples of Costco employees who were accused of theft, yet neither terminated immediately nor arrested and prosecuted: (1) David Kaplan, a Caucasian pharmacy manager accused of employee theft, was not terminated until after he admitted his theft, and was never arrested or prosecuted for his acts; (2) Andy Ungerleider, a Caucasian who worked in the pharmacy department, was accused of employee theft, but was not terminated until after he admitted his theft, and was never arrested or prosecuted for his acts; and (3) Samari Sverrison, a Caucasian bakery manager, was accused of theft and was subsequently demoted, but neither arrested nor prosecuted for this indiscretion.

Plaintiff offers these three cases to illustrate that he was treated differently because he is African-American. This Court acknowledges that upon first glance, these situations are analogous to the case at hand, but a more probing look at the facts before the Court reveals so many distinctions between Plaintiff's situation and that of those he cites, that Defendants' treatment of those employees bears no logical relevance to Plaintiff's claim. The only [*21] common traits shared by those persons cited and Defendant himself is that they were all employees at Costco and, at some point, each was accused of theft. Plaintiff offers no evidence that illustrates a similarity "in significant respects" between those he cites to and himself. For example, none of those cited by Plaintiff worked as a Loss Prevention Manager, or for that matter, in any other capacity in the Loss Prevention Department. Plaintiff offers no evidence of comparable work history, such as how long they had been employed by Costco, and how their performance had been rated over the years; there is no evidence that Thomas Farano, who purportedly terminated Plaintiff, also supervised these employees; there is no evidence that any of these employees were allegedly engaged in credit card fraud, or that, regardless of the form of their theft, their acts were of the magnitude of which Defendant was alleged to have committed, which amounted to roughly fifteen thousand dollars in loss for Costco. Because of these disparities, this Court concludes that Plaintiff's proffer of evidence that Defendant treated Kahn differently does