# EXHIBIT I -2

not satisfy the minimal requirement of a *prima facie* [*22] case of disparate treatment under the McDonnell Douglas framework.

Moreover, even assuming, *arguendo,* that this court were to find that Plaintiff had established a *prima facie* case of discrimination, Defendants have articulated a legitimate, non-discriminatory reason for its actions. Defendants believed that Khan committed credit card fraud.

The employer need not prove by a preponderance of the evidence that its actions were motivated by the proffered non-discriminatory reason. *Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997).* Here, Defendants contend that if Khan was indeed terminated by Defendants, it was because Defendants believed that he defrauded the company. Regardless of whether Defendants were correct in their assessment of the situation, their belief that Khan was engaged in credit card fraud was, at the very least, a legitimate, defensible position. The Second Circuit has made it clear that an "employee may be discharged 'on the basis of subjective business judgments, for any reason that is not discriminatory.'" *Fierro v. Saks Fifth Avenue, 13 F. Supp. 2d 481, 489 (S.D.N.Y. 1998)* (quoting *Thornley v. Penton Publishing, 104 F.3d 26, 29 (2nd Cir. 1997)* [*23] (citation omitted)). It is true that a jury might well feel sympathy for Khan because the grand jury found that there was not enough evidence to indict him, but Costco's business decisions are not held to the same standard as those of the District Attorney. *Section 1981* imposes liability on an employer for discrimination, not for meting out harsh punishments for suspected theft.

Upon the presentation of a legitimate, non-discriminatory reason for Defendants' actions, the burden shifts back to Plaintiff to establish that there is a material issue of fact as to whether Defendants' proffered reason is mere pretext for discrimination. An employer's proffered reason for termination "cannot be proved to be 'a pretext for *discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Fierro, 13 F. Supp. 2d at 489* (quoting *Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1225 (U.S.D.C. 1998)* (citation omitted) (emphasis in the original)). In this case, Plaintiff has shown neither.

Plaintiff attempts to demonstrate pretext by arguing that he was treated differently than similarly [*24] situated non-minority employees. As this Court addressed above, the distinctions between those cited by Plaintiff and Plaintiff himself are too numerous and too material for the individuals to be considered "similarly situated" with Plaintiff in any meaningful way.

Plaintiff also argues that Defendants' belief that Khan was complicit in credit card fraud is without credence. This Court does not agree. Even accepting Plaintiff's assertion that Farano and Schmidt had concluded that Khan was guilty of fraud before they interviewed him (Pl. R. 56.1 Stmt. at 4), the record illustrates that, whether ultimately correct or not, it was within Costco's business judgment to initiate an investigation and take action against Khan. All eleven of the charged-back transactions involved Discover credit cards that were hand keyed in by Khan; all of the transactions in question were rung into the register using Gary Hecht's Costco membership card which had been confiscated months before and never returned to him; confiscated membership cards are normally kept by the Loss Prevention Department, which Khan managed; on May 11, May 22, and June 1, Khan voided numerous transactions while on the register, [*25] leading Costco to believe that he was testing credit card limits; none of the Discover credit card users was in the Brooklyn warehouse on the days their credit cards were used; an employee interviewed by Farano and Schmidt stated that he observed Khan with the same gentleman on May 22 and June 1, helping him at the jewelry counter, ringing his transactions at the register, and retrieving the merchandise from the MPU cage; an employee interviewed by Farano and Schmidt stated that he retrieved two widescreen televisions and a computer for a gentleman whom Khan was supposedly helping, and he observed Khan ringing up those sales at the register himself. When viewed cumulatively, this evidence could lead a reasonable person to suspect Khan of theft, and in this case, serves as a legitimate non-discriminatory reason for Defendants' actions.

In addition to failing to show pretext, Plaintiff has failed to make even a threshold showing that discrimination was the real reason for his termination. In sum, the evidence supporting Plaintiff's wrongful discharge claim under *Section 1981* is too tenuous for this Court to find in his favor. Accordingly, because Plaintiff has failed to set forth any [*26] genuine issue of fact with respect to whether his discharge occurred in violation of *Section 1981,* Plaintiff's claim against Defendants is hereby dismissed.

### III. State Law Claims

#### A. Pendent Jurisdiction

In addition to Plaintiff's federal claims, Plaintiff alleges violations of New York law, including claims of False Arrest and Malicious Prosecution. Where state law claims are joined with another claim over which federal courts have subject matter jurisdiction and the state law claims arise out of a common nucleus of operative fact, the district court has jurisdiction to hear the state law claims. *Robison v. Via, 821 F.2d 913, 925 (2d Cir. 1987)* (citing *United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-28, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)).* In the case at bar, the facts underlying both

Plaintiff's federal claims and his state claims arise out of a common nucleus, and as such, this Court will exercise its pendent jurisdiction over Plaintiff's state law claims.

## B. False Arrest

Plaintiff also brings a claim of False Arrest against Defendant. Plaintiff was arrested twice on the basis of the same underlying facts, [*27] once in June of 1998 and then again later. For the purposes of this claim, this Court will analyze each arrest separately.

### Plaintiff's Arrest on June 23, 1998

As to the first arrest, which occurred on June 23, 1998, Defendants argue that Plaintiff's claim of False Arrest is time-barred. This Court agrees. False arrest claims are governed by a one-year statute of limitations, which begins to run as soon as Plaintiff is released from custody. *N.Y.C.P.L.R. 215(3)*. Kahn was arrested on June 23, 1998, and he spent sixteen hours in jail. He then filed his complaint on July 14, 1999, over one year from the date he was released from custody. Therefore, Plaintiff's false arrest claim concerning his first arrest in June of 1998 is untimely, and is dismissed as time-barred.

### Plaintiff's Second Arrest

To establish a claim of False Arrest, Khan must show that (1) Defendants intended to confine him; (2) he was conscious of confinement; (3) he did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Fernandez v. DeLeno, 71 F. Supp. 2d 224, 229 (S.D.N.Y. 1999)*. This Court finds that Plaintiff is unable to make out a *prima facie* [*28] case against Defendants.

The Second Circuit has held that, "there can be no false arrest if the arresting officer had "probable cause." *Singer v. Fulton Co. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995)*, cert. denied, *517 U.S. 1189, 134 L. Ed. 2d 779, 116 S. Ct. 1676 (1996)*. If probable cause existed at the time of the arrest, the arrest is "privileged," and the individual arrested has no statutory claim. *Decker v. Campus, 981 F. Supp. 851, 856 (S.D.N.Y. 1997)*. Probable cause exists where the arresting "officer has knowledge, or reasonably trustworthy information, of facts and circumstances that would warrant a person of reasonable caution to believe that the individual who is arrested has committed or is committing a crime." *Kinzer v. Harris, 146 F. Supp. 2d 194, 199 (N.D.N.Y. 2001)* (citation omitted). Here, the police relied on the statements of Farano and other Costco employees, as well as the dossier of evidence Farano and the Costco investigation team collected over the course of their five-day investigation. As such, probable cause for Khan's arrest existed,

and this Court grants Defendants request for summary judgment with respect to Plaintiff's False Arrest claim.

### [*29] C. Malicious Prosecution

Plaintiff also brings a claim of Malicious Prosecution against Defendants. To establish a Malicious Prosecution claim, Plaintiff must show that: (1) Defendants started a criminal proceeding against him; (2) the proceeding terminated in his favor; (3) there was no probable cause for the proceeding; and (4) the proceeding was instituted with malice. *Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2nd Cir. 1996)*.

It is undisputed that the criminal proceedings terminated in favor of Plaintiff. In order to prevail on his claim, however, Plaintiff must prove all four elements. This he cannot do. Plaintiff claims that in the first instance, "Defendant initiated the action against Khan by contacting the police and providing the police with their file, and requesting that Khan be arrested and charged." (Pls' Mem. Opp. Summ. J. at 17.) Plaintiff further alleges that, "on the second arrest, Farano did more than just provide information to the police and the District Attorney." (Id.) In each instance, however, the police, and subsequently the District Attorney's office, made independent assessments of the facts, and came to their own conclusion [*30] about Khan's involvement in the alleged credit card fraud.

Plaintiff can only point to two acts by Defendants as evidence that Defendants did more than merely provide information to law enforcement agencies: (1) After learning that the DA was not going to prosecute Khan, Farano called Detective Amato. Upon receiving an invitation to discuss the matter further, Farano met with Amato, in order to, "get [Amato's] feeling why he felt this attorney would not prosecute the case" (Farano Dep at 131); and (2) During the meeting between Amato and Farano, when the Detective intimated that the DA might be avoiding the case because it was cumbersome, Farano asked, "What do we do?," prompting a suggestion by the Detective that both he and Farano call the District Attorney to inquire about the case. (Id.) All other activity concerning the arrest and prosecution of Khan was initiated by either the police department or the DA's office. Thereafter, Detective Amato made contact with the DA's office, and pursuant to Amato's conversation with the DA's office, Farano received a telephone call from ADA McNeill asking him to come in for a meeting. Farano, along with Schmidt, met with McNeill and an investigator [*31] soon thereafter and spent about two and a half hours reviewing the documents in the case. (Id. at 138.) After the meeting, McNeill telephoned Farano to say that, "she reviewed everything with the investigator and she agreed with her supervisor, and they were going to prosecute the case." (Id. at 138.) The fact that both the

2001 U.S. Dist. LEXIS 21797, *

police and the DA's office took an independent look at Khan's file and reached the same conclusion is sufficient for this Court to conclude that the prosecution was commenced by the District Attorney's office.

Moreover, Plaintiff's claim would fail even if Defendants had commenced the prosecution against Khan. There can be no claim of malicious prosecution where there is no malice, and as illustrated above, there is simply no evidence of malicious intent in the record. Furthermore, on the record before this Court, no reasonable trier of fact could conclude that Plaintiff was arrested and indicted without probable cause. While the evidence against Plaintiff was entirely circumstantial, there was indeed circumstantial evidence against him; evidence that was sufficient for the police to arrest him and for the District Attorney's office to believe that he would be [*32] indicted. As was noted recently in Theresa Baer v. Sprint Long Distance, dismissal of an indictment prior to trial, a fact on which plaintiff relies heavily, does not necessarily indicate a lack of probable cause at the time of indictment. *60 F. Supp. 2d 209, 213 (S.D.N.Y. 2001)*.

For the foregoing reasons, this Court grants Defendants' request for summary judgment with respect to Plaintiff's claim of malicious prosecution.

**CONCLUSION**

For the reasons stated herein, Defendants' motion for summary judgment is GRANTED in its entirety.

**SO ORDERED.**

Dated: December 13, 2001

Brooklyn, New York

Sterling Johnson, Jr.

U.S.D.J.

JUDGMENT - FILED DEC 19 2001

A Memorandum and Order of Honorable Sterling Johnson Jr., United States District Judge having been filed on December 14, 2001, granting the defendants' motion for summary judgment in its entirety; it is

ORDERED and ADJUDGED that plaintiff take nothing of the defendants; that the defendants' motion for summary judgment is granted in its entirety.

Dated: Brooklyn, New York

December 18, 2001

LEXSEE 1997 US DIST LEXIS 12406

**BABS L. LEDIJU, Plaintiff. -against- NEW YORK CITY DEPARTMENT OF SA-
NITATION, Defendant.**

**95 Civ. 9942 (PKL)(AJP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*173 F.R.D. 105; 1997 U.S. Dist. LEXIS 12406*

**March 26, 1997, Decided
March 27, 1997, Filed**

**SUBSEQUENT HISTORY:**    [**1]    *173 F.R.D.
105 at 107*

**DISPOSITION:**    Recommended that this plaintiff's
complaint dismissed with prejudice.

**COUNSEL:** BABS L. LEDIJU, plaintiff, Pro se,
Brooklyn, NY.

For THE CITY OF NEW YORK, DEPARTMENT OF
SANITATION, defendant: Randy Ilene Monkarsh, Paul
A. Crotty, Corporation Counsel of the City of NY, New
York, NY.

**JUDGES:** ANDREW J. PECK, United States Magistrate
Judge. Honorable Peter K. Leisure, United States District
Judge.

**OPINION BY:** ANDREW J. PECK

**OPINION**

[*107] *REPORT AND RECOMMENDATION*

**ANDREW J. PECK, United States Magistrate
Judge:**

**To the Honorable Peter K. Leisure, United States
District Judge:**

Plaintiff pro se Babs L. Lediju has failed to obey
court orders and failed to prosecute this action. He con-
ducted no discovery. When defendant moved for sum-
mary judgment on July 15, 1996, plaintiff Lediju sought
and received five extensions giving him five months to
respond to the motion. Despite a "no further extension"
ruling at the time of the fourth and fifth extensions, Le-
diju sought a sixth extension, which the Court denied. It

is now eight months since defendant moved for summary
judgment, and plaintiff Lediju has not responded to the
motion. His case should be dismissed for failure to pros-
ecute and failure to [**2] obey court scheduling orders.
But even if the Court were to reach the merits of defen-
dant's summary judgment motion, defendant is entitled to
summary judgment. Lediju has not presented any evi-
dence that defendant's failure to hire him was the result
of discrimination, nor has he rebutted defendant's evi-
dence that it hired a more qualified candidate for legiti-
mate, non-discriminatory reasons. On default or on the
merits, plaintiff's complaint should be dismissed with
prejudice.

*PROCEDURAL BACKGROUND*

*The Complaint*

On October 19, 1995, plaintiff Babs L. Lediju
brought his complaint against the New York City De-
partment of Sanitation alleging discrimination due to his:
race and color (African-American), national origin (Ni-
gerian), age (born April 1, 1939) and disability ("job
related injury"). (Dkt. No. 2, [1] Cplt. P 7, p. 4.) The com-
plaint alleges that plaintiff Lediju applied for several
positions with the [*108] Department of Sanitation, but
that defendant discriminated against him by hiring less
qualified candidates. (Cplt. P 8, p. 5.) The complaint
asserts claims under Title VII, the Age Discrimination in
Employment Act, and the Americans With Disabilities
Act. (Cplt., p. [**3] 2.)

> 1    References to "Dkt. No." are to the docket
> entry on the Court's PACER/CHASER electronic
> docket sheet.

*Plaintiff Lediju Conducted No Discovery*

On March 8, 1996, an initial pretrial conference was
held and the Court entered a *Rule 16* Initial Pretrial Con-

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 6 of 25

Page 2

173 F.R.D. 105, *; 1997 U.S. Dist. LEXIS 12406, **

ference Order, setting a discovery cutoff date of June 7, 1996. (Dkt. No. 8.)

At the May 17, 1996 status conference, plaintiff Lediju stated that he had not yet initiated any discovery against defendant, because he was too busy with his other litigations. [2] The Court warned the parties that it was unlikely to extend the June 7, 1996 discovery cutoff date. (*See* Dkt. No. 12, 5/23/96 memo endorsed order, summarizing 5/17/96 conference; *see also* Dkt. Nos. 9, 15.)

> 2  A CHASER check reveals that Mr. Lediju has three cases besides this one pending in this Court alone. *Lediju v. Human Resources Administration*, 93 Civ. 4699 (LBS), *Lediju v. City of New York Office of Management & Budget*, 95 Civ. 9030 (JFK), and *Lediju v. Federation of Employment & Guidance Service*, 96 Civ. 4282 (RPP).

[**4]  On May 31, 1996, Mr. Lediju sought an extension of the discovery deadline, explaining that he still had not served any discovery requests on defendant "due to an unexpected short illness from May 20, 1996 through May 29, 1996." By memo endorsed order, the Court denied the request. (Dkt. No. 15.)

At the June 21, 1996 status conference, the Court denied Mr. Lediju's request for "reconsideration" as to an extension of the discovery cutoff date. (Dkt. No. 22: 6/21/96 Tr. at 13-15.)

Plaintiff Lediju filed objections with Judge Leisure to the denial of his applications to extend the discovery cutoff date. By Order dated August 20, 1996, Judge Leisure denied plaintiff's objections. (Dkt. No. 26.)

### *Plaintiff Lediju Has Failed to Respond to the Defendant's Summary Judgment Motion*

At the June 21, 1996 status conference, defendant confirmed that it would be moving for summary judgment and a schedule for the motion was set: defendant's moving papers on July 15, 1996, Mr. Lediju's opposition on August 9, and defendant's reply on August 30. (Dkt. No. 22: 6/21/96 Tr. at 12.)

Defendant timely served and filed its summary judgment motion on July 15, 1996. (*See* Dkt. Nos. 19-20.) [**5]  Although plaintiff Lediju's response to the motion was due by August 9, 1996, on August 6, 1996 he requested an extension until August 27, 1996, because he allegedly did not receive defendant's papers on time. The Court granted Lediju's request. (Dkt. No. 23.)

On August 24, 1996 plaintiff Lediju requested a second extension, to September 15, 1996, admitting that he had "miscalculated" the time he would need to re-

search and write his opposition papers. The Court again granted Lediju's extension request. (Dkt. No. 25.)

On September 18, 1996, plaintiff Lediju requested a third extension, to October 10, 1996, due to his inability to finish his research, partly because of his involvement in other litigation. The Court again granted the extension. (Dkt. No. 26.)

On October 10, 1996, plaintiff Lediju requested a fourth extension, to October 31, 1996, allegedly due to leaks in his apartment which caused damage to some of his papers. The Court granted the extension, but explicitly stated that "No further extensions will be granted to plaintiff." (Dkt. No. 29.)

On October 31, 1996, despite the "no further extensions" order, plaintiff Lediju requested a fifth extension, until November 15, [**6] 1996, this time because he allegedly had lost his eye glasses and could not see without them. The Court reluctantly granted the additional extension, until November 15, 1996, conditioned upon plaintiff Lediju submitting an affidavit as to his loss of his glasses, his inability to read or write without them and that he had no other useable glasses, and an affidavit from his eye doctor as to his eyesight and inability to read or write without glasses. The Court warned plaintiff Lediju that "the Court really does mean it when it says there will be no further extensions for Mr. Lediju on this motion." The [*109] Court further warned Mr. Lediju that if his opposition papers were not received on November 15, "the Court will consider Mr. Lediju as having defaulted in response to the [summary judgment] motion." (Dkt. No. 30.)

On November 15, 1996, plaintiff Lediju nevertheless requested a sixth extension, of one month. He did not submit the affidavits that he had been ordered to submit. He advised the Court that he could not file his papers due to lack of sleep, headaches, lack of concentration and other problems relating to his litigations in other courts. The Court finally ran out of patience [**7] with Mr. Lediju and denied the request, ruling:

> Mr. Lediju's request for a further extension is denied. His last extension request was reluctantly granted by the Court with the notice that no further extensions will be granted. *Mr. Lediju essentially has failed to meet any deadline in this case, and each time has a different tale of woe. Enough is enough.* If the Court does not receive his opposition papers forthwith, the Court will grant defendant's motion on default and for violation of court orders, after November 25, 1996. In addition, if Mr. Lediju does submit opposition papers,

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 7 of 25

Page 3

173 F.R.D. 105, *; 1997 U.S. Dist. LEXIS 12406, **

the Court intends to sanction him (monetarily) pursuant to *Rule 37, Fed. R. Civ. P.*

(Dkt. No. 31, emphasis added.)

The Court has not heard from Mr. Lediju since that Order. Mr. Lediju was granted five extensions for a total of five months to respond to defendant's summary judgment motion papers. It has now been three and one-half months since the Court denied his request for a one-month extension, and yet Mr. Lediju still has not responded to defendant's motion. In other words, eight months have passed since defendant filed its summary judgment motion on July 15, 1996, but plaintiff [**8] Lediju still has not responded to the motion. The time has come (some might say that the time has long since passed) for the Court to dismiss Mr. Lediju's complaint with prejudice.

## UNDISPUTED FACTS FOR THE SUMMARY JUDGMENT MOTION

Based on defendant's Rule 3(g) statement (and plaintiff's failure to oppose it), the following facts are undisputed:

Plaintiff Lediju alleges in this action that he was discriminated against based on age, race, national origin and disability when he applied for and was denied several positions with defendant. (City 3(g) PP 3-4, 11-14; Cplt. P 7, p. 4.) Lediju's complaint with the New York State Division of Human Rights ("NYSDHR"), however, alleged discrimination solely in connection with his June 1992 application for a Budget Analyst position, and did not raise discrimination claims based on national origin or disability. (City 3(g) PP 2, 4-6.)

The NYSDHR, after investigation, found "no probable cause" to believe defendant engaged in discrimination. (City 3(g) P 8 & Ex. C.) The NYSDHR stated:

> After investigation, and following review of related information and evidence with named parties, the Division of Human Rights has determined that, [**9] insofar as respondent THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT OF SANITATION is concerned, there is NO PROBABLE CAUSE to believe that the said respondent has engaged in or is engaging in the unlawful discriminatory practice complained of. This determination is based on the following:

> The investigation revealed that there were three vacancies in the Analyst series in 1992, that the position of Assistant Analyst was filled by a referral from the department's Personnel Redeployment Center, that the Associate Staff Analyst position was filled by a Black applicant, that the Complainant was interviewed for the position of Budget Analyst; however, it was filled by an applicant who had more relevant work experience and was promoted from within the agency. There is insufficient evidence that the Complainant was denied a position because of his age and race and color.

(City 3(g) Ex. C.)

Although Mr. Lediju was interviewed for the Budget Analyst vacancy, he was not hired because he lacked experience in budgetary planning. (City 3(g) PP 13, 16; Affidavit [*110] of Louis DiMartino, then Assistant Director of defendant's Bureau of Motor Equipment Materials Management Division [**10] (the "Bureau"), dated 7/15/96, P 2.) Defendant hired a white female, Stacey Pheffer, for the Budget Analyst position. (City 3(g) P 17; DiMartino Aff. P 3.) Ms. Pheffer had previously worked at the Department of Sanitation and had received "superior" and "outstanding" evaluations. She also had prior experience with and knowledge of the Bureau's operations, and knowledge of the Bureau's fleet inventory system. In fact, she was "uniquely qualified for the position" because she had designed the Bureau's fleet inventory system. (City 3(g) PP 17-19; DiMartino Aff. PP 3-4.)

Mr. DiMartino, who interviewed plaintiff and made the hiring decision, swore that he was not aware of plaintiff's age and did not consider "plaintiff's, or any candidate's, race, color, or national origin in [his] hiring decisions." (DiMartino Aff. P 5.)

In his deposition, plaintiff Lediju could point to no evidence of discrimination, except that discrimination is

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 8 of 25

Page 4

173 F.R.D. 105, *; 1997 U.S. Dist. LEXIS 12406, **

"self-evident" at the Department of Sanitation. (*See* City 3(g) P 15; City 3(g) Ex. B: Lediju Dep. at 202.)

## ANALYSIS

### I. MR. LEDIJU'S COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PROSECUTE AND AS A SANCTION FOR FAILURE TO OBEY COURT SCHEDULING [**11] ORDERS

In the seventeen months since Lediju filed his complaint in this action, he has taken no steps to advance the litigation, except to ask for repeated extensions. He asked for and received five extensions for a total of five months to respond to defendant's summary judgment motion. When he could no longer obtain extensions, he defaulted on the motion. His conduct justifies dismissal of his complaint with prejudice for failure to prosecute and for failure to obey scheduling orders pursuant to *Fed. R. Civ. P. 16(f)* and *37(b)(2)*.

#### A. Failure to Prosecute

In the Second Circuit, ordinarily "the fact that there has been no response to defendant's summary judgment motion does not . . . mean that the motion is to be granted automatically. Such a motion may properly be granted only if the facts as to which there is no genuine dispute 'show that the moving party is entitled to a judgment as a matter of law.'" *Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996)*.

Nevertheless, a summary judgment motion may be granted by default if the facts justify a dismissal for failure to prosecute. *E.g., Lukensow v. Harley Cars of New York, 124 F.R.D. 64 (S.D.N.Y. 1989)* (Leisure, [**12] J.) (granting summary judgment by default to defendant where plaintiffs neither responded to the motion nor offered excuse for their failure to do so); *see also, e.g., Martin v. Manufacturers Hanover Trust, 1996 U.S. Dist. LEXIS 15568, 94* Civ. 6183, 1996 WL 603937 (S.D.N.Y. Oct. 22, 1996) (denying plaintiff's motion to amend the judgment dismissing his complaint for failure to prosecute, where plaintiff had requested and received multiple extensions to file opposition papers to defendant's summary judgment motion, and finally, never did); *Stoute v. Rockefeller Foundation, 1995 U.S. Dist. LEXIS 17875, 93* Civ. 2628, 1995 WL 708690 (S.D.N.Y. Nov. 30, 1995) (dismissing plaintiff's complaint for failure to prosecute where plaintiff failed to submit opposition papers to defendant's summary judgment motion, as well as failing to conduct discovery); *TWI International, Inc. v. Vanguard Oil & Service Co., 1994 U.S. Dist. LEXIS 5805, 84* Civ. 1665, 1994 WL 174036 (S.D.N.Y. May 4, 1994) (granting defendant's summary judgment motion by default where defendant failed to file opposition papers).

The Supreme Court has recognized the district court's inherent power to dismiss an action *sua sponte* for failure to prosecute. *E.g., Stoenescu v. Jablonsky, 162 F.R.D. 268,* [**13] *270 (S.D.N.Y. 1995); Lukensow v. Harley Cars of New York, 124 F.R.D. at 66* & n.3). "A dismissal for lack of prosecution pursuant to *Fed. R. Civ. P. 41(b)* is a matter committed to the sound discretion of the trial Court." *Lukensow v. Harley Cars of New York, 124 F.R.D. at 66; see also, e.g., Link v. Wabash Railroad Co., 370 U.S. 626, 630-33, 82 S. Ct.* [*111] *1386, 1388-90, 8 L. Ed. 2d 734 (1962); Harding v. Federal Reserve Bank of New York, 707 F.2d 46, 50 (2d Cir. 1983); West v. City of New York, 130 F.R.D. 522, 524 (S.D.N.Y. 1990)*.

The Second Circuit has instructed that the Court must consider the following factors in determining whether to dismiss an action for failure to prosecute pursuant to *Fed. R. Civ. P. 41(b)*: "(1) the duration of plaintiff's failures; (2) whether plaintiffs have received notice that further delays would result in dismissal; (3) whether defendants are likely to be prejudiced by further delay; (4) a balancing of the need to alleviate court calendar congestion and a party's right to due process; and (5) the efficacy of lesser sanctions." *Lukensow v. Harley Cars of New York, 124 F.R.D. at 66; accord, e.g., Lucas v. Miles, 84 F.3d 532, 535* [**14] *(2d Cir. 1996); Alvarez v. Simmons Market Research Bureau, Inc., 839 F.2d 930, 932 (2d Cir. 1988); Harding v. Federal Reserve Bank of New York, 707 F.2d at 50; Martin v. Manufacturers Hanover Trust, 1996 U.S. Dist. LEXIS 15568, 1996 WL 603937* at *4; *Stonescu v. Jablonsky, 162 F.R.D. at 270-71; Stoute v. Rockefeller Foundation, 1995 U.S. Dist. LEXIS 17875, 1995 WL 708690* at *2. All of those factors favor dismissal here.

First, as to the duration of plaintiff's failures, in the seventeen months since he brought his complaint, Lediju has conducted no discovery, and has failed to respond to defendant's summary judgment motion; he has done nothing to litigate his case other than ask for, and receive, extensions. After denying his last extension request, the Court has not heard from Lediju. The net effect of Lediju's combined actions is an absolute failure to prosecute for the duration of this action, seventeen months. In situations such as this, dismissal is appropriate. *See, e.g., Martin v. Manufacturers Hanover Trust, 1996 U.S. Dist. LEXIS 15568, 1996 WL 603937* at *5 (plaintiff's conduct "consisted of 'repeated requests for continuous [and] persistent late filing of court ordered papers, which 'may warrant dismissal after merely a matter of months.'"); [**15] *Stonescu v. Jablonsky, 162 F.R.D. at 270* (holding that the record as a whole warranted dismissal, after 21 months of failing to prosecute); *Stoute v. Rockefeller Foundation, 1995 U.S. Dist. LEXIS 17875, 1995 WL 708690* at *2 (plaintiff failed to

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 9 of 25

Page 5

173 F.R.D. 105, *; 1997 U.S. Dist. LEXIS 12406, **

take any discovery); *Lukensow v. Harley Cars of New York, 124 F.R.D. at 65* (action dormant for around two years); *see also, e.g., Chira v. Lockheed Aircraft Corp., 634 F.2d 664, 666-67 (2d Cir. 1980)* (Kaufman, C.J.) (six months of inactivity); *West v. City of New York, 130 F.R.D. at 525* (nineteen months of inactivity); *Yacub v. Coughlin, 105 F.R.D. 152, 153 (S.D.N.Y. 1985)* (twenty-one months of inactivity).

Second, Lediju was certainly on notice of the consequences of his failure to respond to defendant's summary judgment motion. The Court's October 31, 1996 and November 15, 1996 Orders warned Lediju in no uncertain terms that if his summary judgment opposition papers were not submitted, defendant's motion would be granted on default. (Dkt. Nos. 30, 31; *see* discussion at pp. 5-6, above.)

Third, prejudice to the defendant may be presumed from the length of the delay. *E.g., Lukensow v. Harley Cars of New York, 124 F.R.D. at 67. See also,* [**16] *e.g., Lyell Theatre Corp. v. Loews Corp., 682 F.2d 37, 43 (2d Cir. 1982); Stoute v. Rockefeller Foundation, 1995 U.S. Dist. LEXIS 17875, 1995 WL 708690* at *3; *Stonescu v. Jablonsky, 162 F.R.D. at 271*.

Fourth, the Court must weigh plaintiff's right to due process with the Court's need to alleviate the congestion in its calendar. Lediju has been afforded every opportunity to litigate his claim; he has chosen not to. "Delays have dangerous ends and unless district judges use the clear power to impose the ultimate sanction when appropriate, exhortations of diligence are impotent." *Chira v. Lockheed Aircraft Corp., 634 F.2d at 668*; *see also, e.g., Martin v. Manufacturers Hanover Trust, 1996 U.S. Dist. LEXIS 15568, 1996 WL 603937* at *6 ("If parties could ignore Court Orders with the liberty in which [plaintiff] has acted, the civil justice system would suffer, and judges would have no reason to invest their energy in case management. In effect, parties and the Court would be at the mercy of the least diligent, the most irresponsible, or any obstreperous litigator. There would be no premium placed on adherence to a schedule or a Court Order, and no incentive to manage the litigation to reduce its cost and bring justice [*112] as expeditiously [**17] as possible to each of the parties."); *Lukensow v. Harley Cars of New York, 124 F.R.D. at 67*.

Fifth, lesser sanctions will not suffice in lieu of dismissal. Since plaintiff Lediju is proceeding in forma pauperis, monetary sanctions would have no effect. *See, e.g., Martin v. Manufacturers Hanover Trust, 1996 U.S. Dist. LEXIS 15568, 1996 WL 603937* at *7. "The Court cannot permit this litigant, or any litigant, to abuse its scarce resources while many others, desirous and deserving of relief, must patiently await their turn." *Yacub v. Coughlin, 105 F.R.D. at 153*. Lediju has failed to re-

spond to defendant's summary judgment motion. Since he is impecunious, no lesser sanction will suffice.

Accordingly, defendant's summary judgment motion should be granted on default and plaintiff Lediju's action dismissed with prejudice for failure to prosecute.

**B. *Failure to Obey Court Orders***

In addition to dismissal for Lediju's failure to prosecute, dismissal also would be appropriate for Lediju's failure to obey Court Orders.

*Rule 16(f) of the Federal Rules of Civil Procedure* states that "if a party . . . fails to obey a scheduling or pretrial order, . . . the judge, upon motion or the judge's own initiative, [**18] may make such orders with regard thereto as are just, and among others, any of the orders provided in *Rule 36(b)(2)(B), (C), (D)*." The *Rule 37* sanctions incorporated into *Rule 16* include "rendering a judgment by default against the disobedient party."

The Supreme Court has set forth policy reasons for even the strictest of sanctions. "'Sanctions must be applied diligently both "to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent"'" *Dukes v. New York City Police Comm'r Ward, 129 F.R.D. 478, 481 (S.D.N.Y. 1990)* (Leisure, J.) (quoting *Roadway Express, Inc. v. Piper, 447 U.S. 752, 763-64, 100 S. Ct. 2455, 2463, 65 L. Ed. 2d 488 (1980)), accord, e.g., Miltope Corp. v. Hartford Cas. Ins. Co., 163 F.R.D. 191, 192, 194 (S.D.N.Y. 1995)* (Peck, M.J.); *see also, e.g., New York Bay Co. v. State Bank of Patiala, 1995 U.S. Dist. LEXIS 13959, 93 Civ. 6075, 1995 WL 567357* at *4 (S.D.N.Y. Sept. 22, 1995) (Peck, M.J.).

The most severe sanctions require the highest degree of fault. The "'degree of fault which must be shown increases in proportion to the severity of the sanction'" *New York Bay* [**19] *Co. v. State Bank of Patiala, 1995 U.S. Dist. LEXIS 13959, 1995 WL 567357* at *5 (quoting 2 M. Silberberg *Civil Practice in the Southern District of New York* § 26.09 at 26-27). Dismissal is appropriate where (1) the party has demonstrated willfulness, bad faith or fault, (2) less drastic sanctions will not work, and (3) the party has been warned of the risk of dismissal for failure to comply with court orders. *See, e.g., Bobal v. Rensselaer Polytechnic Institute, 916 F.2d 759 (2d Cir. 1990), cert. denied, 499 U.S. 943, 111 S. Ct. 1404, 113 L. Ed. 2d 459 (1991); Banjo v. United States, 1996 U.S. Dist. LEXIS 10743, 95 Civ. 0633, 1996 WL 426364* at *4 (S.D.N.Y. July 30, 1996) (courts look to standards for dismissal for failure to prosecute in dismissing under *Rule 37*); *New York Bay Co. v. State Bank of Patiala, 1995 U.S. Dist. LEXIS 13959, 1995 WL 567357* at *5.

173 F.R.D. 105, *; 1997 U.S. Dist. LEXIS 12406, **

Courts have not hesitated to dismiss actions pursuant to *Rule 37(b)(2)* in appropriate situations. *See, e.g., National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 640, 96 S. Ct. 2778, 2779, 49 L. Ed. 2d 747 (1976)* (dismissal for party's refusal for seventeen months to answer crucial interrogatories); *Minotti v. Lensink, 895 F.2d 100, 102-03 (2d Cir. 1990)* (dismissal [**20] for failure to obey discovery orders on four occasions, delaying case for two years); *Chira v. Lockheed Aircraft Corp., 634 F.2d 664, 666 (2d Cir. 1980)* (doing "absolutely nothing at all" to comply with court orders to pursue discovery); *Johnson v. M. Melnick & Co., 1996 U.S. Dist. LEXIS 6154, 91 Civ. 7961, 1996 WL 23994* (S.D.N.Y. May 8, 1996) (dismissal pursuant to *Rule 16(f)* and *Rule 41* for repeatedly deficient proposed pretrial order in violation of court orders), *aff'd mem., 104 F.3d 355 (2d Cir. 1996)*; *Martin v. Metropolitan Museum of Art, 158 F.R.D. 289, 292-93 (S.D.N.Y. 1994)* (dismissal pursuant to *Rule 37* and *Rule 41* for blatant failure to produce documents so that the "case stands still at a preliminary stage"); [*113] *Muina v. H.P.D., 1994 U.S. Dist. LEXIS 2840, 91 Civ. 4154, 1994 WL 88606 at *2* (S.D.N.Y. March 14, 1994) (dismissal for failure to obey court orders and failure to appear at deposition).

In the instant case, plaintiff Lediju was ordered to submit his summary judgment opposition papers four months ago, and he was warned that failure to do so would result in dismissal for failure to obey court orders. He nevertheless has totally failed to submit his opposition papers.

It is clear that had Lediju for [**21] the past four months wilfully failed after Court Order (and after being warned of the consequences) to make himself available for a deposition or to answer interrogatories, dismissal would be appropriate. Allowing the present action to continue merely because Lediju's wilful failure to comply is with a scheduling order to submit opposition papers, and not refusal to comply with a discovery order, seems illogical.

The Court finds that plaintiff's refusal to submit papers in opposition to defendant's summary judgment motion after seeking and receiving repeated and lengthy extensions, warrants dismissal pursuant to *Rules 16(f)* and *37(b)(2) of the Federal Rules of Civil Procedure.*

## II. DEFENDANT NEW YORK CITY DEPARTMENT OF SANITATION IS ENTITLED TO SUMMARY JUDGMENT ON THE MERITS [3]

> 3     For discussion of the summary judgment standards applicable to employment discrimination actions, *see, e.g., Hernandez v. New York City Law Dep't Corp. Counsel, 1997 U.S. Dist. LEXIS 620, 94 Civ. 9042, 1997 WL 27047 at*

*6-7 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.); Burger v. Litton Indus., Inc., 1996 U.S. Dist. LEXIS 5560, 91 Civ. 0918, 1996 WL 421449 at *7 (S.D.N.Y. April 25, 1996) (Peck, M.J.), aff'd, 1996 WL 609421 (S.D.N.Y. Oct. 22, 1996).*

[**22] The Court should not need to reach the merits of defendant's summary judgment motion because Lediju's action should be dismissed for failure to prosecute and failure to obey a scheduling order. Nevertheless, in an excess of caution, the remainder of this Report and Recommendation will address the merits of defendant's summary judgment motion.

The only claim appropriately raised before the Court is plaintiff's claim that he was not hired by defendant for the Budget Analyst position in June-August 1992. (*See* City Br. at 7-15 & authorities cited therein.) That is the only charge he timely raised before the NYSDHR. Filing of a charge with the EEOC and/or NYSDHR is a jurisdictional prerequisite to a private civil action under Title VII and the ADEA. *See, e.g., Hernandez v. New York City Law Dep't, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047* at *8 (and cases cited therein).

Defendant is entitled to summary judgment on plaintiff's retaliation claim. (*See* City Br. at 16-17.) To establish a *prima facie* case of retaliation, plaintiff must prove that: "(1) [he] was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the [**23] employer took adverse action against plaintiff based on [his] activity; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)*; *accord, e.g., Kotcher v. Rosa & Sullivan Appliance Center, Inc., 957 F.2d 59, 64 (2d Cir. 1992)*; *Burrell v. City Univ. of New York, 894 F. Supp. 750, 759-60 (S.D.N.Y. 1995).* Plaintiff's only "protected activity" -- the filing of his NYSDHR complaint in March 1993 and this lawsuit in November 1995 -- both occurred *after* defendant's decision not to hire him as Budget Analyst in August 1992. The retaliation claim, therefore, is frivolous.

Where a plaintiff alleges a failure to hire in violation of Title VII, the three-step burden-shifting test of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973)*, supplies the appropriate analytical framework.

In an employment discrimination case, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." *Texas Dep't of Community Affairs v.* [**24] *Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093,* [*114] *67 L. Ed. 2d 207 (1981)*; *see also, e.g., O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308,*

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 11 of 25

Page 7

173 F.R.D. 105, *; 1997 U.S. Dist. LEXIS 12406, **

134 L. Ed. 2d 433, 116 S. Ct. 1307, 1309 (1996); *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47, 125 L. Ed. 2d 407 (1993)*; *McDonnell Douglas v. Green, 411 U.S. at 802, 93 S. Ct. at 1824*; *Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)*; *Hernandez v. New York City Law Dep't, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047 at \*12*; *Burger v. Litton, 1996 U.S. Dist. LEXIS 5560, 1996 WL 421449 at \*8*. Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *St. Mary's v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2747* (quoting *Texas v,. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094*); *Hernandez v. New York City Law Dep't, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047 at \*12*; *Burger v. Litton, 1996 U.S. Dist. LEXIS 5560, 1996 WL 421449 at \*8*.

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. *E.g., O'Connor v. Consolidated Coin, 116 S. Ct. at [\*\*25] 1309*; *St. Mary's v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747*; *Texas v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94*; *McDonnell Douglas v. Green, 411 U.S. at 802, 93 S. Ct. at 1824*; *Chambers v. TRM, 43 F.3d at 38*; *Hernandez v. New York City Law Dep't, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047 at \*12*; *Burger v. Litton, 1996 U.S. Dist. LEXIS 5560, 1996 WL 421449 at \*8*. The burden on the defendant at this phase is one of production rather than persuasion. *E.g., St. Mary's v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747*; *Texas v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096*; *Hernandez v. New York City Law Dep't, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047 at \*12*; *Burger v. Litton, 1996 U.S. Dist. LEXIS 5560, 1996 WL 421449 at \*8*. If the defendant carries this burden of production, the plaintiff must show that the defendant's articulated reason for its decision is a pretext for discrimination. *E.g., St. Mary's v. Hicks, 509 U.S. at 511, 113 S. Ct. at 2749, 2751-53*; *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)*; *Chambers v. TRM, 43 F.3d at 38*; *Hernandez v. New York City Law Dep't, 1997 U.S. Dist. LEXIS 620, 1997 WL 27047 at \*12*; *Burger v. Litton, 1996 U.S. Dist. LEXIS 5560, 1996 WL 421449 at \*8*.

Plaintiff's speculation and generalities (*e.g.*, discrimination [\*\*26] is self-evident) (City 3(g) P 15), is insufficient even to state a prima facie case under *McDonnell* Dougla s's first prong. *See, e.g., Burrell v. Bentsen, 1993 U.S. Dist. LEXIS 18005, 91* Civ. 2654, 1993 WL 535076 at \*10 (S.D.N.Y. Dec. 21, 1993) ("plaintiff cannot satisfy his burden of proof by offers of speculative beliefs and gut feelings"), *aff'd mem., 50 F.3d 3 (2d Cir. 1995)*; *Ulrich v. Exxon Co. USA, 824 F. Supp. 677, 685-86 (S.D. Tex. 1993)* ("A subjective belief of discrimination, however genuine, cannot alone be the basis for judicial relief. . . . [Plaintiff's] proffered summary judgment evidence consists exclusively of conclusory and speculative allegations of race discrimination which are unsupported by specific facts. In the court's view, this evidence is insufficient to support a prima facie case of employment discrimination or to raise a genuine issue of material fact."); *Lim v. Citizens Savings & Loan Assoc., 430 F. Supp. 802, 814 (N.D. Cal. 1976)* (plaintiff's conclusory affidavit that she "believed she was discriminatorily treated" insufficient to establish prima facie case or defendant has rebutted her story with such overwhelming evidence of legitimate reasons that summary [\*\*27] judgment is appropriate). But even assuming plaintiff satisfied the first prong (which he did not), the Department of Sanitation presented evidence that it had a legitimate, non-discriminatory reason for not hiring Mr. Lediju, *i.e.*, it hired a more qualified applicant. (City 3(g) PP 16-19; DiMartino Aff. PP 3-5.) This satisfies defendant's burden under the second *McDonnell Douglas* prong. Plaintiff Lediju completely failed to present any evidence that the Department of Sanitation's articulated reason was a pretext for discrimination. Defendant therefore is entitled to summary judgment. *See, e.g., Smith v. American Express Co., 853 F.2d 151, 154-55 (2d Cir. 1988)* (conclusory and unsupported allegations insufficient to show employer's justifications to be a pretext for discrimination); *Meiri v. Dacon, 759 F.2d 989, 997-98 (2d Cir.)* ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." Summary judgment for defendants upheld where plaintiff offered no [\*115] evidence of pretext), *cert. denied, 474 U.S. 829, 106 S. Ct. 91, [\*\*28] 88 L. Ed. 2d 74 (1985)*.

## CONCLUSION

For the reasons set forth above, I recommend that the Court dismiss plaintiff Lediju's complaint for failure to prosecute and failure to obey Court scheduling orders. In addition, if the Court were to reach the merits, on the undisputed facts set forth in defendant's 3(g) statement, defendant is entitled to summary judgment because plaintiff Lediju has not presented any evidence that defendant's failure to hire him as Budget Analyst was based in any way on discrimination. Defendant's evidence that it hired a more qualified candidate for legitimate, non-discriminatory reasons is unrebutted. On default or on the merits, plaintiff's complaint should be dismissed with prejudice.

## *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

173 F.R.D. 105, *; 1997 U.S. Dist. LEXIS 12406, **

Pursuant to *28 U.S.C. § 636(b)(1)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also Fed. R. Civ. P. 6*. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Peter K. Leisure, 500 Pearl Street, [**29] Room 1910, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Leisure. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994)*; *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993)*; *Frank v. Johnson, 968 F.2d 298, 300* (2d Cir.), *cert. denied, 506 U.S. 1038, 113 S. Ct. 825, 121 L. Ed. 2d 696 (1992)*; *Small v. Secretary of Health & Human Services, 892 F.2d 15, 16 (2d Cir. 1989)*; *Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988)*; *McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983)*; *28 U.S.C. § 636(b)(1)*; *Fed. R. Civ. P. 72, 6(a), 6(e)*.

DATED: New York, New York

March 26, 1997

Respectfully submitted,

**Andrew J. Peck**

United States Magistrate [**30] Judge

LEXSEE 2004 U.S. APP. LEXIS 11534

**GAYLE CARPENTER, Plaintiff-Appellant, -v- CITY OF TORRINGTON, MAR-QUAM JOHNSON, BOARD OF PUBLIC SAFETY OF THE CITY OF TOR-RINGTON, MARY JANE GRYNIUK, THOMAS GRITT, JOHN FIELDS and JAYE GIAMPAOLO, Defendants-Appellees.**

**03-9194**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*100 Fed. Appx. 858; 2004 U.S. App. LEXIS 11534*

**June 10, 2004, Decided**

**NOTICE:**    [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:**    Appeal from the United States District Court for the District of Connecticut (Underhill, J.).

**DISPOSITION:**    Affirmed.

**COUNSEL:** Appearing for Plaintiff-Appellant: JOHN R. WILLIAMS, New Haven, CT.

Counsel for Defendant-Appellee City of Torrington: MICHELLE HOLMES, Sack, Spector & Karsten, LLP, West Hartford, CT.

Counsel for Defendant-Appellee, Marquam Johnson: ALEXANDRIA L. VOCCIO, Howd & Ludorf, Hartford, CT.

**JUDGES:** Present: ROGER J. MINER, ROSEMARY S. POOLER, Circuit Judges. RICHARD W. GOLDBERG, * Judge.

> *    The Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

**OPINION**

[*859] **SUMMARY ORDER**

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DE-CREED** that the District Court's order be AFFIRMED.

On September 15, 2003, the district court granted defendants' motion for summary judgment, issuing a ruling from the bench. The court dismissed Carpenter's sexually hostile work environment claims, finding that Carpenter failed to establish [**2] that (1) the sexually offensive conduct by defendant Marquam Johnson, chief of the fire department for the City of Torrington and Carpenter's direct supervisor, was committed against Carpenter on account of her gender and (2) that his purportedly [*860] abusive conduct was severe and pervasive. The court dismissed Carpenter's due process and the "class-of-one" claims, finding that there was no deprivation of a property or liberty interest because Carpenter did not suffer any loss of pay, benefits, or other material workplace consequences as a result of Johnson's activities. The court also dismissed Carpenter's class-of-one claim upon finding that she failed to submit evidence of malice. Finally, the court dismissed Carpenter's state court claims upon declining to exercise supplemental jurisdiction.

Reviewing the case *de novo, see Hayut v. State University of New York, 352 F.3d 733, 743 (2d Cir. 2003),* we find that the district court correctly dismissed all of Carpenter's claims. The court found that the acts allegedly committed by Johnson were not on account of Carpenter's gender, as required by *Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998),* [**3] because Johnson was equally, if not more, sexually offensive to male employees of the fire department. Moreover, the complained of incidents were not severe or pervasive because they primarily consisted of inappropriate comments that occurred only a handful of times over a four-year period. The district

100 Fed. Appx. 858, *; 2004 U.S. App. LEXIS 11534, **

court dismissed Carpenter's class-of-one Equal Protection claim upon finding that she failed to establish that Johnson committed such acts with malice. We, instead, find that these claims should have been dismissed because Carpenter failed to establish that she was intentionally singled out for different treatment. *See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 145 L. Ed. 2d 1060, 120 S. Ct. 1073 (2000)* (per curiam). As Carpenter concedes, Johnson's inappropriate treatment of her was similar to his treatment of other employees. Finally, Carpenter's *Title VII* retaliation claim was also correctly dismissed. No defendant ever disciplined Carpenter, re-

duced her pay, placed her on suspension, or removed any of her duties in response to her filing a complaint about Johnson's conduct towards her. Although she claims she was forced to share an office with a hostile co-worker and was [**4] given a "silent treatment," these claims do not amount to a "materially adverse change' in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)*.

We therefore AFFIRM.

FOCUS - 5 of 13 DOCUMENTS

**ZARIN KHAN, Plaintiff, - against - FEDERAL RESERVE BANK OF NEW YORK, Defendant.**

**02 Civ. 8893 (JCF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 1543; 10 Wage & Hour Cas. 2d (BNA) 585*

**February 2, 2005, Decided
February 2, 2005, Filed**

**DISPOSITION:**    [*1]    Defendant's motion for summary judgment granted and plaintiff's cross-motion for summary judgment denied.

**COUNSEL:** For Zarin Khan, Plaintiff: Bernard Weinreb, Suffern, NY.

For Federal Reserve Bank of N.Y., Defendant: David Gross, Federal Reserve Bank of NY, New York, NY.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION**

*MEMORANDUM OPINION AND ORDER*

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Zarin Khan, a programmer analyst, has sued the Federal Reserve Bank of New York (the "Bank") for violation of her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.;* the Family and Medical Leave Act (the "FMLA"), *29 U.S.C. § 2601 et seq.; 42 U.S.C. §§ 1981* and *1983*; the New York State Human Rights Law (the "NYSHRL"), *N.Y. Exec. Law § 290 et seq.;* and the New York City Human Rights Law (the "Administrative Code"), *§§N.Y.C. Admin. Code 8-107(1), 8-107(2),* and *8-107(3).* She also claims to have been subjected to the intentional infliction of emotional distress. The parties consented to referral of the case to me to decide [*2] dispositive motions and conduct trial pursuant to *28 U.S.C. § 636(c).* Each has now moved for summary judgment pursuant to *Rule 56*

*of the Federal Rules of Civil Procedure.* For the reasons discussed below, the defendant's motion is granted.

*Background*

The plaintiff [1] was born in India (Deposition of Zarin Khan dated June 9, 2003 ("Khan Dep."), at 8), and she is a Muslim. (Affidavit of Zarin Khan, dated May 22, 2004 ("Khan Aff."), P3). The defendant is one of the twelve Federal Reserve Banks. (Defendant's Local Civil Rule 56.1 Statement of Material Facts on Motion for Summary Judgment ("Def. 56.1 Statement"), P2). Its jurisdiction covers the Second Federal Reserve District, an area that consists of the State of New York, part of southwestern Connecticut, and twelve northern New Jersey counties. (Def. 56.1 Statement, P2). Ms. Khan began working at the Bank as a Programmer Analyst in the Electronic Payments Systems Department on January 12, 1998. (Affidavit of Margaret Mullins dated March 31, 2004 ("Mullins Aff."), Exh. 6 of Defendant's Exhibits ("Def. Exh."), P5).

> 1    The plaintiff's current name is Zarin Alizade. Her maiden name is Zarin Khan, which she used when she commenced this lawsuit. (Khan Aff., P1).

[*3]  In June 1998, the plaintiff enrolled in a flexible work arrangement offered by her employer. (Def. Exh. 3). Pursuant to the plan, Ms. Khan could work for nine days over a two week period, with extended hours each day, instead of working ten days with regular hours. (Def. Exh. 3 at 1-2).

Sometime around 1998-1999, one of plaintiff's supervisors, John Lines, was talking with two other employees about the testing of nuclear bombs in Pakistan and India. (Khan Dep. at 18, 27-28). When the plaintiff joined the conversation, Mr. Lines allegedly told her, "If

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 16 of 25

Page 2

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

you don't like it, you can leave the country." (Khan Dep. at 26-28). [2]

> 2    In her affidavit, Ms. Khan stated that Mr. Lines told her to "go back to [her] country." (Khan. Aff., P23).

On April 1, 1999, the plaintiff received her first job evaluation from Mary Mulvey, another supervisor. (Khan Dep. at 20-21; Def. Exh. 5). Ms. Khan did not receive any grade of "below standard." (Def. Exh. 5).

On December 9, 1999, the plaintiff asked Mr. Lines, who was Ms. Mulvey's [*4] superior, to change her schedule for Ramadan so that she could observe the Muslim holy month. (Khan Dep. at 18, 42-43; Khan Aff., P7). Ramadan had started that day. (Ramadan Schedule for 1999-2000, attached as Exh. A to Khan Aff.). Ms. Khan proposed to work from 8:00 a.m. to 4:00 p.m. without a lunch break, instead of from 9:00 a.m. to 5:45 p.m. with a lunch period of one hour. (Khan Aff., P6-7). Ms. Khan explained to Mr. Lines that, as she would be fasting during each day of Ramadan, she wished to end work earlier because an observant Muslim is required to cease fasting as soon as the sun sets. (Khan Aff., PP7-8). Mr. Lines told the plaintiff that he would inform Ms. Mulvey about her request. (Khan Dep. at 43). However, Ms. Mulvey told the plaintiff that to allow her to work through the day without taking a lunch break would disrupt the work of her co-employees, and Paulette Lundy, another bank employee, told her that official bank policy barred employees from working through lunch. (Khan Dep. at 62). The plaintiff then proposed to work from 7:00 a.m. to 3:45 p.m., taking a lunch break of one hour. Ms. Mulvey accepted this arrangement, but the plaintiff immediately withdrew her proposal [*5] when she realized that it was not workable for her. (Khan. Dep. at 56-57, 62; Khan Aff., P16). [3] Ms. Khan met several times with Ms. Mulvey and Mr. Lines "to come up with the best way possible" for the plaintiff to change her schedule. (Khan Dep. at 46).

> 3    Because the trip from the plaintiff's home to her office takes approximately one hour and forty-five minutes door to door, the plaintiff would have to leave her house by 5:15 a.m. to be at work on time. In December 1999, according to the Muslim religious calendar, the morning prayer had to start at approximately 5:30-5:45 a.m. (Khan. Aff., P16 & Exh. A). Therefore, the plaintiff's proposal was not compatible with the Islamic prayer schedule.

On December 14, 1999, the plaintiff did not go to work due to illness and she did not return until January 10, 2000. (Khan Aff., P22; Def. Exh. 6). During this period, she was treated by a physician and a psychiatrist for anxiety and depression. (Khan Aff., P22; Pl. Memo. at 12). When Ms. Khan did return to the bank on [*6] January 10, she believed that she was physically attacked by someone there. (Khan Aff., P24). However, she is not certain if she was really attacked, or if she imagined it because of her state of anxiety and stress. (Khan Aff., P24). She suffered an anxiety attack and left work that day and did not return to work until March 23, 2000. (Khan Aff., PP24-25; Khan Dep. at 89-90).

On March 27, 2000, Ms. Khan had a meeting with Ms. Mulvey and Chuck Badagliacca from the Electronic Payments Group. (Khan Dep. at 15-16, 108). During the meeting, the plaintiff expressed her reluctance to work with Miriam Rubin because Ms. Rubin had allegedly posted a cartoon in her cubicle depicting Muslims in a derogatory light. (Khan Dep. at 77-78, 109-10). Ms. Mulvey and Mr. Badagliacca told the plaintiff that she had to "work with Miriam." (Khan Dep. at 110). Later that day, the plaintiff wrote an e-mail to Marge Mullins, an employee in the Department of Human Resources, complaining that she could not work "with persons who are totally anti-Muslim, extremely violent, and abusive and physically threatening." (Khan Dep. at 112; Def. Exh. 11). She asked Human Resources to "investigate the hostility by Mary [*7] [Mulvey] and Miriam [Rubin] against all Muslims and [myself] in particular." (Khan Dep. at 111-12; Def. Exh. 11).

On March 28, 2000, the plaintiff was given two written warnings at a meeting with Om Bagaria, the Senior Vice President of the Electronics Payments Department, and Ms. Mulvey. (Khan Dep. at 33, 74, 118). One warning was for "unscheduled absences" (Khan Dep. at 120; Def. Exh. 12) and the other for "unprofessional behavior and insubordination" because she "refused to work with another individual on the staff." (Def. Exh. 13).

After receiving these warnings, the plaintiff felt that she was excluded from some projects and assigned fewer new ones. (Khan Dep. at 135-36; Khan. Aff., P31). On May 29, 2000, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). (Khan Dep. at 168).

On September 28, 2000, the plaintiff was reclassified from a Programmer Analyst to a Systems Programmer "B" as a result of the Bank's Progression Program Guidelines. (Mullins Aff., P5). She kept the same salary and benefits. (Mullins Aff., P5).

In March 2001, the plaintiff received a performance evaluation in which she was rated below standard. [*8] (Khan Dep. at 144; Def. Exh. 14; Khan. Aff., P33). She believed that the review constituted unfair treatment and retaliation by her employer. (Khan Dep. at 144-46; Khan. Aff., P33). Around the same time, she was told she was

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 17 of 25

Page 3

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

no longer eligible to work a flexible schedule because of her "excessive absences." (Khan Dep. at 137, 140; Khan Aff., P31).

On November 8, 2001, the plaintiff again was reclassified, this time from Systems Programmer "B" to Business Support Analyst (Mullins Aff., P5), and was transferred to another group. (Khan Dep. at 146). Again, she kept the same salary and benefits. (Khan Dep. at 147-48).

Ms. Khan did not go to work on November 19, 2001, but she was present on November 20 and 21, immediately before Thanksgiving. After the holiday, she did not return to work because her child was ill. (Mullins Aff., P6; Khan Dep. at 156). In December, she requested to be allowed to work from home, but that request was denied. (Khan Dep. at 157-58).

On December 4, 2001, the plaintiff was informed by phone that if she did not show up for work on December 6, she would be terminated. (Khan Dep. at 159-60). Ms. Khan did not go to work on December 6, and she was terminated from [*9] employment on December 7, 2001. (Mullins Aff., P5).

On September 30, 2002, the EEOC issued a right-to-sue letter, indicating that it was unable to conclude that the information obtained in its investigation established any violation of law. (Def. Exh. 17). On November 26, 2002, Ms. Khan filed this lawsuit, alleging violation of her rights under federal, state, and local laws.

*Discussion*

The defendant moves for summary judgment on the grounds that: (1) the plaintiff has not established a prima facie case of discrimination based on religion or national origin; (2) the plaintiff has not made out a prima facie case of retaliation; (3) the plaintiff's claims under *42 U.S.C. § 1981 & § 1983* fail as a matter of law; (4) the Bank did not violate the FMLA; (5) the plaintiff's claims under New York state and local laws fail for lack of jurisdiction; and (6) the plaintiff has not made out a claim of intentional infliction of emotional distress. (Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def. Memo.") at 11-25).

The plaintiff asserts four arguments in her cross-motion for summary judgment. She contends that: (1) she has satisfied [*10] her burden of proving a prima facie case of religious discrimination, while the defendant has failed to show that it provided her with a reasonable accommodation for her religious observance; (2) she was subjected to a hostile work environment on the basis of her religion and national origin; (3) she was demoted in retaliation for engaging in protected activity;

and (4) the defendant is subject to New York State and City laws. (Plaintiff's Memorandum of Law in Support of her Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pl. Memo.") at 11-22).

*A. Summary Judgment Principles*

Pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); accord Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002); Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co., 189 F.3d 208, 214 (2d Cir. 1999).* [*11] The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Where the moving party meets that burden, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial," *Fed. R. Civ. P. 56(e),* by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322.*

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995).* But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson, 477 U.S. at 249* (citation omitted), and grant summary judgment where the nonmovant's evidence is conclusory, speculative, [*12] or not significantly probative. *Id. at 249-50.* "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997)* (internal quotations and citations omitted); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995)* (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits support-

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 18 of 25

Page 4

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

ing the motion are not credible"). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968))*.

Courts [*13] are particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. *See Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994)*; *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)*. Because direct evidence of an employer's discriminatory intent will rarely be found, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo, 22 F.3d at 1224*. However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment. *See Meiri, 759 F.2d at 998*.

### B. *Title VII - Religious Accommodation*

Title VII provides that "it shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." [*14] *42 U.S.C. § 2000e-2(a)(1)*. It further defines religion as including "all aspects of religious observance and practice, as well as belief." *42 U.S.C. § 2000e(j)*. Claims of religious discrimination under Title VII can be framed under at least three theories. First, a plaintiff may advance a claim based on disparate treatment, that is, she may assert that her employer treated her less favorably than other similarly situated employees because of her religious beliefs or practices. *See Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004)*; *Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)*. Second, a plaintiff may claim that she has been subjected to a hostile work environment by, for example, being exposed to pervasive religious slurs or insults. *See Feingold v. State of New York, 366 F.3d 138, 149-50 (2d Cir. 2004)*. Third, a plaintiff can argue that an employment requirement, although evenhandedly implemented by the employer, conflicts with her religious practices. Enforcement of such a requirement against the plaintiff constitutes a violation of Title VII unless [*15] the employer demonstrates that it is unable to accommodate the employee's religious practices without undue hardship. *See 42 U.S.C. § 2000e(j)*; *Cosme v. Henderson, 287 F.3d 152, 157-58 (2d Cir. 2002)*.

In this case, Ms. Kahn argues, in part, that the Bank failed to accommodate her religious beliefs. To make out a prima facie case of religious discrimination under this theory, she must, according to the formulation developed by the Second Circuit, prove that: (1) she held a bona fide religious belief that conflicts with an employment requirement; (2) she informed the employer of this belief; and (3) she was "disciplined for failure to comply with the conflicting employment requirement." *Knight v. Connecticut Department of Public Health, 275 F.3d 156, 167 (2d Cir. 2001)* (citing *Philbrook v. Ansonia Board of Education, 757 F.2d 476, 481 (2d Cir. 1985), aff'd and remanded on other grounds, 479 U.S. 60, 93 L. Ed. 2d 305, 107 S. Ct. 367 (1986))*. If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not reasonably accommodate the employee's religious practices and beliefs [*16] without incurring undue hardship. *Knight, 275 F.3d at 167*.

The Bank contends that Ms. Khan cannot establish a prima facie case, primarily because she cannot satisfy the third element. [4] This element in effect encompasses two distinct principles: the plaintiff must be the subject of discipline, and the discipline must be the consequence of the plaintiff's exercise of her religious beliefs.

> 4 The defendant does superficially address the first and second elements in a footnote in its Memorandum of Law. (Def. Memo. at 12 n.8). The Bank questions whether the plaintiff holds a bona fide religious belief because she did not request any accommodation in the prior year (Khan Dep. at 63), and because she was not sure whether she had ever requested an accommodation at her previous jobs. (Khan Dep. at 64). The plaintiff explained that she did not need to request an accommodation in previous years either because she lived close to work or because she was otherwise exempt from observing Ramadan. (Khan Dep. at 63-64). A plaintiff's failure to take leave on holy days during past years does not necessarily mean that her beliefs are not sincerely held when she now requests an accommodation. *See Philbrook, 757 F.2d at 482*. Therefore, the defendant has not established that the first element of a prima face case cannot be satisfied. The Bank also questions whether the plaintiff can meet the second element because she did not inform her employer of her needs until the first day of Ramadan. The defendant cites two cases to support the argument that Ms. Khan provided notice too late. However, in each of those cases, the plaintiff informed her employer of her religious requirements only after violating an employment policy. In *Johnson v. Angelica Uniform Group, 762 F.2d 671, 673 (8th Cir. 1985)*, the plaintiff

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 19 of 25

Page 5

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

did not inform her employer of her religious affiliation and corresponding need for accommodation until after she had missed twelve days of work. Similarly, the plaintiff in *Hussein v. Pierre Hotel, 2001 U.S. Dist. LEXIS 4859, No. 99 Civ. 2715, 2001 WL 406258, at *3-4 (S.D.N.Y. April 20, 2001)*, did not notify his employer of the fact that his religion required her to wear a beard until after he appeared at work unshaven in violation of the employer's policy. In contrast, the plaintiff here provided the Bank with notice of her need for an accommodation prior to any absences and, in any event, she attributed her absences to illness rather than to religious observance.

[*17]    Although in the specific contexts of the *Knight* and *Philbrook* cases the Second Circuit referred to "discipline," the standard necessarily reaches a broader range of action by the employer. To be sure, a plaintiff must show that she has suffered a cognizable injury. *See Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)*. But that injury may occur whenever, in the language of Title VII, the employer's action affects the employee's "compensation, terms, conditions, or privileges of employment." *42 U.S.C. § 2000e-2(a)(1)*. It is not limited to what is conventionally understood to be "discipline." Thus, courts generally characterize the requirement as one of demonstrating that the plaintiff has suffered an "adverse employment action." *See, e.g., Peterson, 358 F.3d at 606; Reyes v. N.Y. State Office of Children & Family Servs., 2003 U.S. Dist. LEXIS 12644, No. 00 Civ. 7693, 2003 WL 21709407, at *7 (S.D.N.Y. July 22, 2003), aff'd, 109 Fed. Appx. 466 (2d Cir. 2004); Durant v. NYNEX, 101 F. Supp. 2d 227, 233 (S.D.N.Y. 2000)*. Accordingly, actions not normally considered [*18] "discipline," such as a failure to hire, may give rise to liability when an employment requirement conflicts with an applicant's religious practices. *See, e.g., Gordon v. MCI Telecommunications Corp., 791 F. Supp. 431, 434-35 (S.D.N.Y. 1992)*.

Furthermore, an employee faced with an employer's refusal to accommodate is not required to violate employment rules and suffer the consequences before she is able to bring suit. *See Rodriguez v. City of Chicago, 1996 U.S. Dist. LEXIS 533, No. 95 C 5371, 1996 WL 22964, at *3 (N.D. Ill. Jan. 12, 1996)* ("It is nonsensical to suggest that an employee who, when forced by his employer to choose between his job and his faith, elects to avoid potential financial and/or professional damage by acceding to his employer's relgiously objectionable demands has not been the victim of religious discrimination[.]"). Rather, the threat of an adverse action is sufficient to meet this element of the prima facie case, provided that the plaintiff can prove that the employer is in fact intransigent and that the threatened action is causally related to

the conflict between the employer's policy and the plaintiff's religion. *See Opuku-Boateng v. State of California, 95 F.3d 1461, 1467 n.9 (9th Cir. 1996)* [*19] (employer "threatened" discriminatory treatment); *Reznick v. Aramark Corp., 1999 U.S. Dist. LEXIS 6618, No. 97-CV-1897, 1999 WL 287724, at *10 (E.D.N.Y. May 5, 1999)* (employee must show that she "faced discipline"); *Rodriguez, 1996 U.S. Dist. LEXIS 533, 1996 WL 22964, at *3* ("threat" of discharge sufficient); *but see Chaplin v. DuPont Advance Fiber Systems, 293 F. Supp. 2d 622, 627 (E.D. Va. 2003)* (insufficient for plaintiffs to speculate that they "could" be reprimanded or discharged).

Even under this broader articulation of the standard, however, Ms. Khan has not presented evidence from which the finder-of-fact could conclude that she had met the third prong of the prima facie case. First, she argues that the Bank's failure to accommodate her caused her to suffer mental and emotional illness, which in turn resulted in her being absent from work and forfeiting compensation as well as losing less tangible benefits such as prospects for advancement. (Pl. Memo. at 12-13). But Ms. Khan has produced no evidence apart from her own speculation that would support a causal connection between the employer's policies and her illness. Even if she had, the fact that there was ultimately some loss [*20] of employment benefits to the plaintiff does not in itself mean that she suffered an adverse employment action. Where the action of the employer could not reasonably be expected to result in the employee's loss of benefits, no Title VII liability attaches. That is the case here: an employer could not reasonably be expected to anticipate that the failure to accommodate religious needs would so affect an employee's mental health that she would lose time from work.

Next, Ms. Khan argues that she was, in fact, disciplined in the more conventional sense. (Pl. Memo. at 14-16). First, on March 28, 2000, she received two written warnings that informed her that she was "not eligible for salary increases [and] promotions" during a probationary period of three months for the first warning and an indefinite period for the second warning. [5] (Def. Exhs. 12, 13). Second, when the plaintiff was transferred to a new position in 2001, her responsibilities encompassed doing "inventory of computers" and "backups" (Khan Dep. at 146-47), but no longer entailed programming. (Khan Dep. at 148). Thus, taking the plaintiff's representations as true, a juror could conclude that Ms. Khan had materially diminished [*21] responsibilities and that, therefore, she was subject to adverse action.

> 5    The record here is somewhat inconsistent, showing both that the probationary period was open-ended and that it was for a period of six months, with the provision that if the plaintiff

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 20 of 25

Page 6

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

behaved inappropriately in the future, the "area management [would] recommend her release from the bank." (Def. Exh. 12).

However, the plaintiff does not provide any evidence to support her claim that she was penalized because of her request for accommodation or because she did not work during Ramadan. The Bank, on the other hand, has submitted both direct and circumstantial evidence that the plaintiff was not disciplined because of her religious beliefs. The plaintiff received the first written warning because of "unscheduled absences" taken from November 30, 1999 to December 12, 1999 and from March 10, 2000 to March 22, 2000. (Def. Exh. 12). Clearly, the unscheduled leaves for which Ms. Khan was disciplined were not taken during Ramadan. In addition, [*22] the record shows that the plaintiff received a second warning because she did not "accept [some] assignments from her management," she "refused to work with another individual on the staff," and she "used threatening language." (Def. Exh. 13). Therefore, she was disciplined for her "inappropriate behavior and insubordination" (Def. Exh. 13), and the two warnings were unrelated to her request for an accommodation during Ramadan. Moreover, with regard to the plaintiff's alleged demotion, the record shows that it occurred more than a year after her request for a religious accommodation. (Mullins Aff., P5; Khan Dep. at 146). Thus, a reasonable jury could not conclude that the plaintiff was disciplined *because* she requested an accommodation for Ramadan more than a year earlier.

As discussed above, an instance of actual discipline is not necessary to establish an adverse employment action: the threat of a sanction is enough. However, Ms. Khan has not argued that she was constructively discharged, that is, that she ceased reporting for work because of an irreconcilable conflict between her religion and the requirements of the job. *See EEOC v. Delta Airlines, Inc., 2002 U.S. Dist. LEXIS 17259, No. 97 CV 5646, 2002 WL 1447582, at *4-5 (E.D.N.Y. June 26, 2002)* [*23] (plaintiff claims failure to accommodate "forced" her to resign; claim rejected on facts); *Johnson v. Kmart Corp., 942 F. Supp. 1070, 1072-73 (W.D. Va. 1996)* (same). Moreover, now that she is no longer employed by the Bank, there is no present threat of an adverse employment action.

In short, because Ms. Khan has not presented evidence that she has suffered or will suffer negative employment consequences because of her religion, she cannot satisfy the third element of the prima facie case, and her claim of religious discrimination based on a failure to accommodate must be rejected. Accordingly, there is no need to address whether any proposed accommodation would have imposed an undue burden on the Bank.

## C. *Title VII - Hostile Environment*

The plaintiff also argues that there is a triable issue of fact as to whether she was subjected to a hostile work environment on the basis of her religion and national origin. (Pl. Memo. at 16-17). The defendant contends that the alleged incidents of discrimination do not rise to the level of a hostile environment and that there is no proof that they were motivated by discriminatory animus. (Def. [*24] Memo. at 13-17; Defendant's Reply Memorandum in Further Support of Defendant's Motion for Summary Judgment ("Def. Reply") at 6-8).

In order to survive summary judgment on a claim of a hostile work environment, a plaintiff must produce evidence that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)* (quoting *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986))*. Isolated instances of harassment ordinarily do not rise to this level. *See, e.g., Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 62 (2d Cir. 1992)*. "Casual comments, or accidental, or sporadic conversation" are not sufficient to establish a hostile atmosphere. *Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)* (citation omitted). "Plaintiffs must prove more than a few isolated incidents of racial enmity". *Id.* "'Mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions [*25] of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Harris, 510 U.S. at 21* (quoting *Meritor Savings Bank, 477 U.S. at 67*). Rather, the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were "sufficiently continuous and concerted" to have altered the conditions of her working environment. *Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)* (quoting *Carrero v. New York City Housing Authority, 890 F.2d 569, 577 (2d Cir. 1989))*. In evaluating whether a hostile work environment exists, courts must look at "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23*.

In this case, the record does not contain sufficient [*26] evidence of harassment based on national origin or religion to create a triable question with respect to Ms. Khan's hostile work environment claim.

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 21 of 25

Page 7

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

### 1. *Purported Anti-Muslim and Anti-Indian Conduct*

The plaintiff alleges that Ms. Rubin's "racist cartoon," Mr. Lines' comments, and the failure to accommodate her scheduling request for Ramadan are clear evidence of a work environment hostile to her religion and national origin. (Pl. Memo. at 17-21).

The plaintiff remembers only vaguely the context in which Mr. Lines stated that "if [the plaintiff] does not like it, [she] can leave the country." (Khan Dep. at 26-28). She believes that the statement was made in reference to testing of nuclear bombs in Pakistan and India but cannot remember exactly what prompted it. (Khan Dep. at 26-28, 30). Indeed, Ms. Khan could not tell from his tone of voice whether Mr. Lines was serious or joking. (Khan Dep. at 32). Thus, the meaning of Mr. Lines' comment is unclear, and this is not a case where a supervisor used an unambiguous racial slur to refer to the plaintiff. *See Richardson v. New York State Department of Correctional Service, 180 F.3d 426, 439 (2d Cir. 1999)* ("Perhaps [*27] no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (quoting *Rodgers v. Western-Southern Life Insurance Co., 12 F.3d 668, 675 (7th Cir. 1993)).* Accordingly, Mr. Lines' comment was not severe enough to create an objectively hostile or abusive work environment. *See Harris, 510 U.S. at 20-21.*

Next, the plaintiff alleges that the cartoon hung in Ms. Rubin's cubicle depicted Muslims in a derogatory light. (Pl. Memo. at 17-18; Khan Dep. at 77-78). However, Ms. Khan does not remember anything specifically offensive about the cartoon, except that it made "fun of [Muslims'] clothing" and beards. (Khan Dep. at 80-81). Even taking the plaintiff's assertions as true, this is certainly not severe enough to withstand summary judgment. *See id.* at 21.

The plaintiff testified that apart from Mr. Lines' comments and the cartoon, there were no other comments she perceived to be anti-Muslim or anti-Indian. (Khan Dep. at 125). Indeed, the plaintiff recalled no other occasion [*28] on which Mr. Lines brought up her national origin. (Khan Dep. at 32). Thus, the incidents offered by the plaintiff as proof are not enough to demonstrate an objectively hostile work environment, either separately or in combination. *See id.*

Finally, Ms. Mulvey and Mr. Lines met several times with the plaintiff to find a compromise with respect to Ms. Khan's request for a schedule modification for Ramadan. (Khan Dep. at 45-46). Therefore, even though no accommodation was ultimately agreed upon, the conduct of these supervisors was hardly severe enough to create a hostile or abusive environment.

### 2. *Workplace Friction*

The plaintiff also asserts that other incidents contributed to a hostile work environment. (Pl. Memo. at 16-17). Specifically, she alleges that she was subjected to a hostile environment (1) by being "yelled at" and "by being given the silent treatment," (2) "by being given undeserved written warnings for excessive absences . . . and for insubordination," (3) by being criticized for leaving her desk to go to the lavatory, (4) by being required to e-mail notice of her arrival, (5) by no longer being permitted to work from home or on a flexible schedule, (6) by being [*29] kept out of meetings, and (7) by being transferred to a "secretarial type position." (Pl. Memo. at 16-17).

First, Ms. Khan has failed to provide any evidence in support of some of these claims. Her allegations of being shouted at, being criticized for leaving her desk, and being excluded from meetings are entirely conclusory, and thus are not sufficient to defeat a motion for summary judgment. *See Bickerstaff v. Vassar College, 196 F.3d 435, 451-452 (2d Cir. 1999).*

Second, to sustain a Title VII hostile environment claim, "[the plaintiff] . . . must produce evidence that she was discriminated against *because* of her race [or religion, or national origin]. *Richardson, 180 F.3d at 440* (citation omitted) (emphasis added). Here, there is no evidence that any of the events described above was motivated by discriminatory animus. To the contrary, there is evidence that the written warnings the plaintiff received were issued for legitimate reasons. As previously discussed, the written warnings indicate that the plaintiff was being disciplined because of unscheduled absences and insubordination. (Def. Exhs. 12 & 13). The plaintiff has not submitted [*30] any evidence that could lead a jury to conclude that these reasons are pretextual. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).*

Moreover, the defendant argues that the reason why Ms. Mulvey asked the plaintiff to acknowledge her arrival by e-mail if she were to work from 7:45 a.m. to 3:45 p.m. is because the Bank had to know when employees began work when their schedules fall outside of normal working hours. (Def. Memo. at 14). The plaintiff has presented no evidence that this reason is pretextual. In addition, Ms. Khan was told by Mr. Badagliacca that the discontinuation of her flex-time was due to excessive absences. (Khan. Dep. at 137-40). The plaintiff has produced no evidence to contradict that rationale. And, although the plaintiff complains that she was not permitted to work from home, she also testified that she had

Case 7:07-cv-06542-CS     Document 19-11     Filed 07/03/2008     Page 22 of 25

Page 8

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

worked from home only sporadically in the past. (Khan Dep. at 81). Finally, assuming that the plaintiff's transfer to a secretarial position was a demotion, there is no evidence that it was motivated by discriminatory animus.

In addition, Ms. Khan asserts that her "employer treated [her] differently . . . than it did other [*31] employees with respect to time and attendance issues." (Pl. Memo. at 5). However, she has not shown that any of the other employees she identifies [6] were similarly situated. *See Schumway v. United Parcel Services Inc., 118 F.3d 60, 64 (2d Cir. 1997)* (inference of discrimination possible only if plaintiff shows that she was "similarly situated in all material respects" to the individuals with whom she seeks to compare herself). Therefore, the plaintiff has not provided any circumstantial evidence that would permit a jury to draw an inference of discrimination.

> 6    The plaintiff alleges that Julio Mendosa, Henry Wong, and Ms. Rubin were treated more favorably than she was. (Pl. Memo. at 5; Khan Dep. at 73, 116-17).

Since there is no evidence that the employer tolerated a work environment hostile to the plaintiff's national origin or religion, the defendant's motion for summary judgment is granted on this issue and the plaintiff's motion is denied.

### D. *Title VII- Retaliation*

Title VII prohibits [*32] employers from discharging workers in retaliation for their opposing discriminatory employment practices. *Section 704(a)* provides in relevant part that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

*42 U.S.C. 2000e-3(a).*

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she was engaged in an activity protected under the discrimination laws; (2) the employer was aware of this fact and subjected her to an adverse employment action; and (3) there is a causal connection between the protected activity and the ad-

verse employment action. *See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996); Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991).* The term "protected activity" refers to actions taken to protest or oppose statutorily prohibited [*33] discrimination. *42 U.S.C. § 2000e-3; see also Wimmer v. Suffolk County Police Department, 176 F.3d 125, 134-35 (2d Cir. 1999)* (discussing scope of statute's "protected activity" provision).

Ms. Khan contends that she was retaliated against when she was demoted to a "clerk/secretarial type of position" in 2001. [7] (Pl. Memo. at 21). She also asserts that she was mistreated by her employer, given an unfair evaluation, and threatened with termination in retaliation for her complaining about religious discrimination. (Compl. P64). Her claim is somewhat cryptic since she does not identify which specific complaints she is referring to. She may be alluding to the fact that on March 27, 2000, she complained to Ms. Mullins about colleagues who were "Anti-Muslims" (Def. Exh. 11), to her complaint to the internal EEO office on April 17, 2000 (Khan Dep. at 126-28), or to her charge of discrimination filed with the EEOC on or about June 1, 2000. (Compl. P11). All of these complaints about discrimination could be considered protected activities within the meaning of Title VII. The law is clear that opposition to a Title VII violation need not rise to [*34] the level of a formal complaint in order to receive statutory protection. The notion of "opposition" includes activities such as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of coworkers who have filed formal charges." *Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).*

> 7    Ms. Khan was transferred from a position of Programmer Analyst to a job as Business Support Analyst. She first learned of her transfer in March 2001, but was not actually transferred until November 2001, when she came back to work after several months off. (Def. Reply at 4 n.7; Mullins Aff., P5).

Nevertheless, the plaintiff has not made out a prima facie case of retaliation because she has failed to demonstrate a causal connection between the protected activities in which she engaged and the employer's adverse actions. A plaintiff may establish a causal connection through either direct [*35] or indirect evidence. An inference of retaliation could be established with circumstantial evidence, for example, by showing that the protected activity was closely followed by discriminatory treatment or by showing that employees who engaged in similar conduct were treated differently. *See DeCintio v.*

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 23 of 25

Page 9

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

*Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir. 1980).*

Here, each of the defendant's alleged adverse employment actions took place more than nine months after the plaintiff en gaged in "protected activity." [8] Such a long delay between the protected conduct and the adverse action negates any inference of a causal connection. *See Zenni v. Hard Rock Cafe International, Inc., 903 F. Supp. 644, 656 (S.D.N.Y. 1995)* (plaintiff failed to establish prima facie case of discrimination when "full year passed between the filing of the charge and [the] allegation of retaliatory conduct"); *Fitch v. R.J. Reynolds Tobacco Co., 675 F. Supp. 133, 138 (S.D.N.Y. 1987)* (that plaintiff received lowest performance evaluation seven months after he filed EEOC charge [*36] "is insufficient to make out a prima facie case of retaliatory discrimination").

> 8    As discussed above, the plaintiff complained to Ms. Mullins on March 27, 2000, e-mailed the internal EEO office on April 17, 2000, and filed her complaint with the EEOC on or about June 1, 2000. She received her negative evaluation and learned about her transfer to a new position in March 2001.

In addition, there is no evidence in the record showing that other employees who engaged in conduct similar to the plaintiff's were treated differently. Thus, no connection has been established between the protected activity and the alleged adverse employment actions, and the defendant's motion for summary judgment on this claim must be granted.

### E. *Section 1981*

Next, the plaintiff alleges that the conduct of her employer created a discriminatory work environment in violation of *42 U.S.C. § 1981.* (Compl. P60). That statute provides that "all persons within the jurisdiction of the United States" shall enjoy the [*37] same rights and benefits of law as are "enjoyed by white citizens." *42 U.S.C. 1981(a).* To sustain a claim under *§ 1981*, a plaintiff must show (1) that she was subjected to intentional discrimination [9] and (2) that this discrimination interfered with a contractual relationship. *Krulik v. Board of Education, 781 F.2d 15, 23 (1986)* (citation omitted). Because, as discussed above, the record is barren of any evidence of intentional discrimination on the basis of the plaintiff's national origin or religion, the defendant's motion for summary judgment with regard to plaintiff's *§ 1981* claim is granted. [10]

> 9    Claims under *§ 1981* are analyzed under the same framework as claims brought pursuant to

Title VII. *See McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).*

10    The defendant also argues that Ms. Khan's *section 1981* claim fails because, as an at-will employee, she had no contractual relationship with the Bank. (Def. Memo. at 22). However, *section 1981* protects at-will employees as well as those with formal employment agreements. *Lauture v. International Business Machines Corp., 216 F.3d 258, 260 (2d Cir. 2000).*

### [*38]    F. *Section 1983*

The plaintiff contends that the defendant deprived her of "equal protection of the laws" and "due process" under the *Fourteenth Amendment* by discriminating against her based on her religion, national origin, and race, and that, as a result of this constitutional violation, she is entitled to the remedies available under *42 U.S.C. § 1983.* (Compl. PP87-90). *Section 1983* provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Accordingly, to state a claim for relief under *§ 1983*, a plaintiff must allege that (1) some person has deprived her of a federal right; and (2) that person acted "under color of state . . . law." *Scott v. Federal Reserve Bank, 704 F. Supp. 441, 446 (S.D.N.Y. 1989)* [*39] (quoting *Gomez v. Toledo, 446 U.S. 635, 640, 64 L. Ed. 2d 572, 100 S. Ct. 1920 (1980)).*

The Federal Reserve Bank of New York is an instrumentality of the United States because it derives its powers from and is chartered pursuant to the *Federal Reserve Act. Scott, 704 F. Supp. at 446-47.* Thus, the Bank "derives its authority to act from federal law, not state law." *Id. at 447.* Accordingly, the defendant's motion for summary judgment with regard to the plaintiff's *§ 1983* claim is granted.

### G. *State and City Laws*

The plaintiff also contends that the defendant discriminated against her in violation of the NYSHRL and the Administrative Code. (Comp. at 1, 8-12). The defen-

Case 7:07-cv-06542-CS    Document 19-11    Filed 07/03/2008    Page 24 of 25

Page 10

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

dant argues that New York State and New York City cannot "regulate a federal instrumentality, such as the New York Fed . . . because there has been no clear and unambiguous authorization by Congress for state or local regulation of the employment practices of Federal Reserve Banks." (Def. Memo. at 24-25).

Currently, there is a split in authority concerning whether state and local laws are preempted by the Federal Reserve Act and other banking provisions containing similar language. *Compare Ana Leon T. v. Federal Reserve Bank of Chicago, 823 F.2d 928, 931 (6th Cir. 1987)* [*40] (rights under Michigan law preempted by federal law), *and Osei-Bonsu v. Federal Home Loan Bank, 726 F. Supp. 95, 98 (S.D.N.Y. 1989)* (state human rights agency's jurisdiction over claim of racial discrimination against bank preempted by *Federal Home Loan Bank Act*), *with Katsiavelos v. Federal Reserve Bank, 1995 U.S. Dist. LEXIS 2603, No. 93 C 7724, 1995 WL 103308, at *4 (N.D. Ill. March 3, 1995)* (bank subject to provisions of Illinois Human Rights Act), *and Moodie v. Federal Reserve Bank, 835 F. Supp. 751, 752-53 (S.D.N.Y. 1993)* (New York State Human Rights Law not preempted by Federal Reserve Act).

That issue need not be decided here because the "consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims." *Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000)* (citations omitted). Since the plaintiff has failed to make out a prima facie case under Title VII, the defendant's motion for summary judgment on the corresponding State and City Human Rights Law claims must be granted.

## H. *Infliction of Emotional Distress*

The plaintiff also alleges that [*41] the defendant, by permitting her to be exposed to harassment and other offensive conduct, caused her to suffer severe emotional distress. (Comp. at 12-13).

"Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999)* (quoting *Murphy v. American Home Products Corp., 58 N.Y.2d 293, 303, 448 N.E.2d 86, 461 N.Y.S.2d 232, 236 (1983)).* The facts alleged by the plaintiff concerning the defendant's adverse employment actions fall far short of this standard since they fail even to constitute a hostile work environment. Therefore, the defendant's motion for summary judgment on the claim of intentional infliction of emotional distress is granted.

## I. *Family and Medical Leave Act*

Finally, the plaintiff alleges that she had a serious health condition that kept her out of work for less than a twelve week period and that the warnings she received because of her absences were therefore in violation [*42] of the FMLA, *29 U.S.C. § 2615(a)(2).* (Compl. at 13-14).

The FMLA provides in pertinent part that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *29 U.S.C. § 2612(a)(1)(D).* Pursuant to *29 U.S.C. § 2615(a)(1),* an employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Therefore, an employer is prohibited from discriminating or taking an adverse action against an employee because the employee has taken FMLA leave. *29 C.F.R. § 825.220(c); accord Hodgens v. General Dynamics Corp., 144 F.3d 151, 159-60 (1st Cir. 1998).* However, an employee must expressly request FMLA leave. FMLA defines "eligible employee" as "an employee who has been employed (i) for at least 12 months by the employer *with respect to whom leave is requested* under section 2612 of this title. . . ." *29 U.S.C. § 2611(2)(A)(i)* (emphasis added); [*43] *see also Sampson v. Citibank, 53 F. Supp. 2d 13, 19 (D.C. Cir. 1999)* (plaintiff's FMLA claim failed because employee never expressly requested FMLA leave and FMLA not automatically triggered when an employee takes days off for illness).

Here, the record shows that the plaintiff received warnings because of absences not covered by the FMLA. According to the written warnings received by the plaintiff, she was penalized for unscheduled absences between November 30, 1999 and December 2, 1999, and between March 10, 2000 and March 22, 2000, which were not "related to the FMLA." (Time & Labor Activity Entitlement Summary, attached to Mullins Aff.). The defendant's time and labor records likewise show that these absences were not part of the plaintiff's FMLA leave. (Time & Labor Activity/Entitlement Summary, attached to Mullins Aff.). The plaintiff has not brought forth any evidence to show that the absences for which she was issued a warning were indeed FMLA leave. Therefore, the defendant's summary judgment motion must be granted with regard to this claim.

## Conclusion

For the reasons discussed above, the defendant's motion for summary judgment is granted and the [*44] plaintiff's cross-motion for summary judgment is denied. The Clerk of the Court shall enter judgment in favor of the defendant dismissing the complaint.

2005 U.S. Dist. LEXIS 1543, *; 10 Wage & Hour Cas. 2d (BNA) 585

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

February 2, 2005